# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

---

Larry Davis,

                                        Plaintiff,

         v.                                              9:24-CV-384
                                                         (AJB/MJK)

Lisa Westmiller.,

                                        Defendant.

---

Larry Davis, Plaintiff *pro se*
Olivia R. Cox, Asst. Attorney General, for Defendants

Mitchell J. Katz, U.S. Magistrate Judge

To the Honorable Anthony J. Brindisi, U.S. District Judge:

## REPORT-RECOMMENDATION

United States District Court Judge Anthony J. Brindisi referred Westmiller's summary judgment motion to the Court for report and recommendation.[1] In this *pro se* civil rights action, Davis alleges that Westmiller violated his Eighth Amendment right when she evaluated him, exercised her professional judgment, and determined that Davis should not be transferred to the Residential Crisis Treatment Program.

---

[1] The District Court has the authority to refer dispositive motions to this Court under 28 U.S.C. § 636(b) and N.D.N.Y. Local Rule 72.3(c).

1

For the reasons below, the Court recommends granting Westmiller's summary judgment motion in its entirety.

## I.    BACKGROUND

### A. Westmiller's version of events.

Around noon on January 27, 2023, Davis told an Auburn Special Housing Unit (SHU) officer to call Lisa Westmiller because he felt suicidal. (Davis Depo., Dkt. 27-2, pg. 56, at lns. 2-7). The SHU officer immediately notified Westmiller. (*Id.*, pg. 58, at lns. 3-8). Within minutes, Westmiller arrived at Davis's cell and began interviewing Davis to determine whether he should be moved to the Residential Crisis Treatment Program ("RCTP").[2] (*Id.*, pg. 56, at lns. 6-7).

During the evaluation, Westmiller noted that Davis had good insight, good understanding of current circumstances, good judgment, organized, rational, and logical thought, and no thoughts or intent to

---

[2] RCTP allows OMH staff "to evaluate and treat incarcerated patients in need of short-term crisis mental care." (Westmiller SOMF., Dkt. 27-3, pg. 2, at ¶6)." Only the OMH Unit Chief, the psychiatrist, or the Unit Chief's designee can order that an incarcerated individual be admitted to RCTP." (Westmiller Decl., Dkt. 28-1, pg. 4, at ¶14.). It is unclear from Westmiller's submission whether an incarcerated individual *must* be placed within RCTP once they allege suicidal ideation in front of a person authorized to transfer an incarcerated person. *See Id.* Westmiller does not attach the policy. But Davis testifies that individuals must qualify for RCTP. (Davis Depo., Dkt. 27-2, pg. 45, at lns. 2-11).

harm others. (Westmiller Exh. A., Dkt. 28-2, at pg. 2). Westmiller also noted that Davis did not report being suicidal, having a plan to commit suicide, or an intent to commit suicide. (*Id.*). To end the evaluation, Westmiller determined that Davis did not need to be transferred to RCTP. (*Id.*). After making that determination, Westmiller left. (Westmiller SOMF, Dkt. 27-3, pg. 4, at ¶25).

About an hour and a half after the first evaluation, a SHU officer notified Westmiller that Davis again reported feeling suicidal and that he self-harmed. (Davis Depo., Dkt. 27-2, pg. 69, at lns. 5-11); *see also* (Westmiller Exh. B., Dkt. 28-2, at pg. 2). After being notified, Westmiller returned to Davis's cell and admitted him to RCTP. (Davis Depo., Dkt. 27-2, pg. 69-70, at lns. 24-3).

**B. Davis's version of events.**

Westmiller's and Davis's version of events are substantially the same. The only relevant difference is that Davis claims that he told Westmiller that he was suffering from suicidal and homicidal ideation. (*Id.*, pg. 59, at lns. 19-25). In response, Westmiller denied Davis access to RCTP, told the SHU officer that Davis was not suicidal because he wanted to be extracted, and laughed at him. (*Id.* at pgs. 60-61).

## C. Procedural history.

Davis began this action by filing a Complaint and moving for leave to proceeding *in forma pauperis*. (Dkts. 1, 2). U.S. District Court Judge Mae A. D'Agostino, on her own, reviewed the Complaint, determined that Davis's 42 U.S.C. §1983, Eighth Amendment deliberate-indifference-to-medical-needs claim against Westmiller survived, and dismissed all other claims. (Dkt. 4). Soon after, Westmiller answered the Complaint. (Dkt. 16). After discovery was completed, Westmiller moved for summary judgment on Davis's remaining claim. (Dkts. 27, 28). Davis requested—and this Court granted—three, separate extensions to respond to Westmiller's motion. (Dkts. 31, 33, 35). Davis never responded.

## II.    STANDARD OF REVIEW

### Summary Judgment

"Summary Judgment is appropriate only if the movant shows that there is no genuine issue as to any material fact." *Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014) (cleaned up). When deciding if there is a genuine issue of material fact, courts "must view the evidence in the light most favorable to the" non-moving party. *Id.* at 656 (cleaned up).

Likewise, courts must "resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment." *Kessler v. Westchester County Dep't of Social Services,* 461 F.3d 199, 206 (2d Cir. 2006). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

"The moving party bears the initial burden of showing that there is no genuine dispute as to a material fact." *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec.,* 475 U.S. at 586. "The nonmoving party may not rely on mere conclusory allegations nor speculation but instead must offer some hard evidence showing that its version of the events is not wholly fanciful." *D'Amico v. City of New York,* 132 F.3d 145,149 (2d Cir. 1998) (cleaned up).

"If the defendant in a run-of-the-mill civil case moves for summary judgment," judges "must ask" themselves "not whether" they "think the

evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). "A court cannot credit a plaintiff's merely speculative or conclusory assertions." *DiStiso v. Cook,* 691 F.3d 226, 230 (2d Cir. 2012).

## III.  DISCUSSION

The District Court should grant Westmiller summary judgment. *First*, the Court recommends the District Court adopt Westmiller's statement of material facts because Davis knew he needed to respond, knew the consequences of failing to respond, and he failed to respond. *Second*, the Court recommends the District Court find that no reasonable juror could conclude that Westmiller was deliberately indifferent to Davis's mental health issues.

### A. The District Court should adopt Westmiller's version of events because Davis did not respond to Westmiller's summary judgment motion.

As an initial matter, the Court, on its own, recommends accepting Westmiller's statement of material facts ("SOMF") as true because Davis failed to comply with Local Rules 7.1(a) and 56.1.

"While courts are required to give due deference to a plaintiff's *pro se* status, that status 'does not relieve plaintiff[s] of [their] duty to meet the requirements necessary to defeat a motion for summary judgment.'" *Jackson v. Moore*, No. 9:21-CV-1001 (GTS/ATB), 2023 WL 4710869, at *2 (N.D.N.Y. Apr. 14, 2023) (quoting *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003)), *report and recommendation adopted*, 2023 WL 4711091 (N.D.N.Y. July 24, 2023). "Where a party has failed to respond to the movant's statement of material facts as required by Local Rule 7.1(a)(3), the facts in the movant's statement will be accepted as true (1) to the extent they are supported by evidence in the record, and (2) the non-movant, if proceeding *pro se*, has been specifically advised of the possible consequences of failing to respond to the motion." *Id.* (citing *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996)).

When a party moves for summary judgment against a *pro se* litigant, either the movant or the district court must provide the *pro se* litigant with notice of the consequences of failing to respond to the motion. *See Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620 (2d Cir. 1999). And when such notice is provided and a *pro se* plaintiff fails to respond to a summary judgment motion, the court may accept the defendant's factual assertions as true to the extent they are supported by the evidence in the record. *See Jackson,* 2023 WL 4710869 at *2; *see also Price v. Oropallo,* 9:13-CV-563 (GTS/TWD), 2014 WL 4146276, at *5 (N.D.N.Y. Aug. 2014) ("An unopposed summary judgment motion may properly be granted 'only if the facts as to which there is no genuine dispute show that the moving party is entitled to judgment as a matter of law.'") (quoting, *Champion,* 76 F.3d at 486).

The Court, on its own, recommends the District Court adopt Westmiller's SOMF as true. Included with Westmiller's motion are her notes, which were created contemporaneous to the incident. *See, e.g.,* (Westmiller Exh. A, Dkt. 28-2); Westmiller Exh. B, Dkt. 28-3). These documents contain her mental notes and impression from the incident, and they supports her SOMF. *See* (Westmiller Exh. A, Dkt. 28-2). In

addition to this, Westmiller served Davis with a notice of the

consequences for failing to respond to a summary judgment motion.

(Notice of Motion, Dkt. 27, at pg. 3). That document reads: "if you do not

submit a proper response to the defendant's statement of material facts,

the Court may deem you to have admitted the defendants' factual

statements." (*Id.*). Aware of the consequence, Davis *chose* not to respond

to the motion. Worse still, Davis's decision not to respond comes after

this Court granted Davis three deadline extensions. *See* (Dkts. 31, 33,

35). That said, the District Court should adopt Westmiller's SOMF as

true.

### B. Westmiller was not deliberately indifferent to Davis's medical needs because she evaluated him and found that he was not a risk to commit suicide.

The District Court should grant Westmiller summary judgment.

To establish a deliberate-indifference-to-medical-needs claim,

incarcerated individuals must show that the defendant knew of the

incarcerated individual's risk of suicide and intentionally disregarded

that risk. Here, Westmiller evaluated Davis, found that he was neither

a threat to harm himself nor others, and determined that he did not

need to be moved to RCTP. This mundane sequence of events does not

violate the Eighth Amendment. As a result, the District Court should grant Westmiller summary judgment.

To state a cognizable deliberate-indifference-to-medical-needs claim, incarcerated persons "must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 106 (1976). This standard "includes both subjective and objective components." *Mallet v. New York State Dep't of Corr. & Cmty. Supervision*, 126 F.4th 125, 132 (2d Cir. 2025) (quotation omitted).

The objective prong is satisfied when an incarcerated person proves the alleged deprivation is sufficiently serious. *See Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998). "There is no single metric" to determine whether a medical condition is sufficiently serious. *Mallet*, 126 F.4th at 132. To be a sufficiently serious medical condition, the condition must be one "of urgency" and one that "may result in degeneration or extreme pain, significantly affect[] daily activities," or the condition "involves chronic and substantial pain." *Id.* (quotations omitted). "A serious medical need can also" exist where the "failure to treat" an incarcerated person's "condition" results "in further significant

injury or the unnecessary and wanton infliction of pain." *Webster v. Fisher*, 694 F. Supp. 2d 163, 191 (N.D.N.Y. 2010). But "not every lapse in prison medical care will rise to the level of a constitutional violation." *Smith v. Carpenter*, 316 F.3d 178, 184 (2d Cir. 2003).

To satisfy the subjective prong in the risk of suicide context, incarcerated individuals must show "the defendant: (1) subjectively knew the prisoner was at substantial risk of committing suicide; and (2) intentionally disregarded that risk." *Est. of King by & through King v. Annucci*, 693 F. Supp. 3d 310, 325 (N.D.N.Y. 2023) (cleaned up). "In this setting, deliberate indifference may exist" in two "scenarios." *Id.* First, "a defendant could be deliberately indifferent to the risk of suicide by failing to discover an individual's suicidal tendencies[.]" *Id.* Second, a defendant can "have discovered and have been aware of the" incarcerated individual's "suicidal tendencies, but could be deliberately indifferent in the manner by which they respond to the recognized risk of suicide." *Id.*

The District Court should find the objective prong met. Westmiller does not dispute that suicidal ideations and actions are a sufficiently serious medical condition. (Westmiller Mem. of Law, Dkt. 27-4, at pg.

6). Similarly, courts routinely find that suicidal ideation satisfies the objective prong. *See, e.g., Diaz v. Smith*, No. 19-CV-1438 (LEK/TWD), 2022 WL 17752358, at *5 (N.D.N.Y. 2022); *see also Jean v. Barber*, No. 09-CV-430 (MAD/GHL), 2011 WL 2975218, at *5 (N.D.N.Y. 2011) (finding the objective prong met and affirming a report and recommendation where Defendant did not challenge whether suicidal ideation satisfies the objective prong). That said, the District Court should find the objective prong satisfied.

The District Court should find that Davis cannot satisfy the subjective prong. To start, Westmiller went to Davis's cell after a corrections officer notified her that Davis reported suicidal thoughts. (Davis Depo., Dkt. 27-2, pg. 56, at lns. 6-7). When she arrived, Westmiller evaluated Davis for suicidal ideation. (*Id.*). Documenting the evaluation, Westmiller noted that Davis had good insight, good understanding of current circumstances, good judgment, organized, rational, and logical thought, and no thoughts or intent to harm others. (Westmiller Exh. A., Dkt. 28-2, at pg. 2). Westmiller also noted that Davis did not report being suicidal, having a plan to commit suicide, or an intent to commit suicide. (*Id.*). So Westmiller determined that Davis

did not qualify for the RCTP. (Westmiller SOMF, Dkt. 27-3, pg. 4, at ¶25). Blow by blow, the incident shows a medical professional exercising professional judgment as to whether Davis should have been sent to RCTP. Yet Davis argues that Westmiller's failure to treat him the way *he* wanted to be treated violates the Eighth Amendment. Not so. *See, e.g., Robinson v. Taylor*, No. 16-CV-285 (DJS), 2019 WL 1429529, at *6 (N.D.N.Y. 2019) ("Given that Plaintiff's sole claim is that he requested particular treatment from [Defendant and] that was not provided, he has failed to establish deliberate indifference."). So the District Court should find that Davis cannot satisfy the subjective prong.

Even if the District Court does not adopt Westmiller's SOMF as true and adopts Davis's version of events, the analysis does not change. The decision to move an incarcerated individual into RCTP is discretionary. Davis knew this. *See* (Davis Depo., Dkt. 27-2, at pg. 45) ("mental health staff will sit here and make a determination . . . you qualify to be placed in the observation unit for whatever"). Westmiller evaluated Davis and determined that he did not qualify to be moved to RCTP. Again that is a medical professional exercising their judgment, which does not violate the Eighth Amendment. *Randolph v. Kalies*, No.

19-CV-1161 (DNH/TWD), 2021 WL 5605557, at *8 (N.D.N.Y. Nov. 10, 2021) (cleaned up) ("A plaintiff's disagreement with prescribed treatment does not rise to the level of a constitutional claim."). Davis's decision to cut himself *after* Westmiller evaluated him does not change the analysis. That decision "reflect[s] an attempt[] at manipulation rather than true crisis." *Sims v. Gorman*, No. 09-CV-6643, 2012 WL 566875, at *5 (W.D.N.Y. 2012) (denying Eighth Amendment deliberate indifference to suicide risk claim). Even more damning, Davis noted that he self-harmed because he was mad and stressed, not suicidal. *See* (RCTP initial observation form, Dkt. 28, at pg. 1) (Davis "reported that[:] [I] 'cut up' because 'I was mad, I was stressed. I ain't suicidal.'"). That said, the District Court should grant Westmiller summary judgment even if it declines to adopt Westmiller's SOMF as true.

* * *

To quickly conclude, Davis argues that Westmiller violated his Eighth Amendment rights because he did not agree with Westmiller's initial evaluation of his mental state. But that claim has no legs. Westmiller exercised professional judgment when evaluating Davis. When information changed (Davis harmed himself) Westmiller's

decision changed (she decided that Davis should be moved to RCTP). A medical professional's reasonable exercise of judgment is not a constitutional violation. And because it is not, this Court recommends the District Court grant Westmiller summary judgment.

## V. CONCLUSION

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that the District Court **GRANT** Westmiller's summary judgment motion (Dkt. 27); and it is

**ORDERED** that the Clerk provide Plaintiff with copies of the unpublished decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2008) (*per curiam*).

In accordance with 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989) (*per curiam*)); 28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 72, 6(a).

Dated: January 21, 2026

Hon. Mitchell J. Katz
U.S. Magistrate Judge

Diaz v. Smith, Not Reported in Fed. Supp. (2022)

Case 9:24-cv-00384-AJB-MJK    Document 36    Filed 01/21/26    Page 16 of 75

2022 WL 17752358
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Miguel DIAZ, Plaintiff,

v.

Eric J. SMITH, et al., Defendants.

9:19-CV-1438 (LEK/TWD)
|
Signed December 19, 2022

**Attorneys and Law Firms**

Miguel Diaz, Romulus, NY, Pro Se.

Lauren Rose Eversley, David C. White, Office of Attorney General—Albany State of New York, Albany, NY, for Defendants Eric J. Smith, Trevor Dunning, Adam J. Gallagher, Joshua Tulip, Robert J. Lamica, II, Geraldine M. Wilson, James B. Trombley, Bryan T. LeClair, Captain Stacy Dominic, Eric E. Marshall, Gabriel Obregozo, S. Salls.


**MEMORANDUM-DECISION AND ORDER**

LAWRENCE E. KAHN, United States District Judge

**I. INTRODUCTION**

 *1  Plaintiff Miguel Diaz commenced this action pro se on November 20, 2019. Dkt. No. 1. On August 4, 2021, Plaintiff filed an amended complaint, pursuant to 42 U.S.C. § 1983, alleging violations of his constitutional rights at Upstate Correctional Facility ("Upstate Correctional") by Stacy Dominic, Trevor Dunning, Adam J. Gallagher, Robert J. Lamica II, Bryan T. LeClair, Eric J. Smith, James B. Trombley, Joshua Tulip, Geraldine M. Wilson, Eric E. Marshall, Gabriel Obregozo, Steven Salls (collectively, "Defendants"), Gary Gettmann, and Donald G. Uhler. [1] Dkt. No. 119 ("Amended Complaint").

On November 1, 2021, Plaintiff filed a motion for summary judgment. Dkt. No. 156 ("Plaintiff's Motion"). On January 31, 2022, Defendants filed a cross-motion for summary judgment in response to Plaintiff's Motion. Dkt. No. 166 ("Defendants' Cross-Motion"). On June 21, 2022, the Honorable Judge Thérèse W. Dancks, United States Magistrate Judge, issued a Report-Recommendation recommending that Plaintiff's Motion be denied and further recommending that Defendants' Cross-Motion be granted in part and denied in part. Dkt. No. 199 ("Report-Recommendation"). On August 23, 2022, this Court issued a Memorandum-Decision and Order approving and adopting portions of the Report-Recommendation and rejecting other portions of the Report-Recommendation. August 2022 Order at 15–16.

Now before the Court is Defendants' motion for reconsideration as to the Court's August 2022 Order, filed on September 2, 2022. Dkt. No. 215 ("Motion for Reconsideration"). On September 12, 2022, Plaintiff filed a response. Dkt. No. 217 ("Plaintiff's Response"). For the reasons set forth below, the Court denies Defendants' Motion for Reconsideration.


**II. BACKGROUND**

The factual allegations in this case are detailed in the Report-Recommendation, familiarity with which is assumed. R. & R. at 3–10.

This Court's August 2022 Order adopted the Report-Recommendation to the extent that it (1) recommended denying Plaintiff's Motion; (2) granting Defendant's Cross-Motion as to Plaintiff's Eighth Amendment excessive force and failure-to-intervene claims against Uhler, Gettmann, and Wilson for lack of personal involvement; (3) denying Defendants' Cross-Motion as to the excessive force and failure-to-intervene claims against Dominic, Trombley, Tulip, Dunning, Smith, Lamica, Gallagher, Marshall, Obregozo, and Salls; (4) denying Defendants' Cross-Motion as to the Eighth Amendment excessive force and failure-to-intervene claims against LeClair, Trombley, Tulip, Lamica, Smith, and Dunning; and (5) denying Defendants' Cross-Motion as to the Eighth Amendment sexual assault claim against Smith. August 2022 Order at 15. The Court rejected the other portions of the Report-Recommendation. Id. at 16. In particular, the August 2022 Order denied Defendants' Cross-Motion as to Plaintiff's Eighth Amendment medical indifference claim against Wilson. Id.

**\*2** Defendants' Motion for Reconsideration seeks review of the August 2022 Order's denial of Defendants' Cross-Motion as to Plaintiff's Eighth Amendment deliberate medical indifference claim against Wilson. Dkt. No. 215-1 at 1 ("Defendants' Memorandum of Law").

## III. LEGAL STANDARD

Defendants seek to bring this Motion for Reconsideration pursuant to Federal Rule of Civil Procedure 60. Mot. for Recons. at 1. While Defendants do not specify which provision of Rule 60 applies to the Motion for Reconsideration, it appears that Defendants are arguing that this is a Rule 60(b) motion for grounds for relief from a final judgment, order, or proceeding, rather than a Rule 60(a) motion for corrections based on clerical mistakes. See Fed. R. Civ. P. 60(a)–(b). However, Rule 60(b) is inapplicable to Defendants' Motion for Reconsideration because the Court did not enter a judgment following its August 2022 Order. See generally Docket; see also Buczakowski v. 1199SEIU, No. 18-CV-0812, 2020 U.S. Dist. LEXIS 76931, at \*2 (N.D.N.Y. May 1, 2020) (Kahn, J.) ("As an initial matter, '[w]hile [Plaintiff] purports to bring this motion under Rule 60(b) of the Federal Rules of Civil Procedure, Rule 60(b) [is] inapplicable to the pending motion because ... as pursuant to Rule 54(b), this Court did not enter a judgment following its ruling on the motions to dismiss.' " (cleaned up) (quoting Ferring B.V. v. Fera Pharms., LLC, No. 13-CV-4640, 2015 U.S. Dist. LEXIS 120771, at \*4 n.3 (E.D.N.Y. Sept. 10, 2015))). Instead, "Rule 54(b) governs the analysis of the instant Motion for Reconsideration." Buczakowski, 2020 U.S. Dist. LEXIS 76931, at \*2. [2]

Rule 54(b) states:

> When an action presents more than one claim for relief—whether as a claim, counterclaim, crossclaim, or third-party claim—or when multiple parties are involved, the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay. Otherwise, any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.

Fed. R. Civ. P. 54(b). Thus, "[i]n a case with multiple parties and claims, an adjudication as to one or more but fewer than all of the parties and claims is interlocutory, unless the court makes the proper certification pursuant to Rule 54(b)." Burke v. Warren Cnty. Sherrif's Dep't, 916 F. Supp. 181, 183 (N.D.N.Y. 1996). "It does not matter if the partial adjudication is denominated a summary judgment." Id.

**\*3** "The standard for granting a motion for reconsideration [pursuant to Rule 54(b)] 'is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court.' " Brooks v. Hogan, No. 14-CV-0477, 2017 U.S. Dist. LEXIS 37439, at \*3 (N.D.N.Y. Mar. 15, 2017) (Kahn, J.) (quoting Shrader v. CSX Transp., Inc., 70 F.3d 255, 257 (2d

Cir. 1995)). "Motions under Rule 54(b) are subject to the law-of-the-case doctrine." Kaufman v. Columbia Mem. Hosp., No. 11-CV-667, 2014 U.S. Dist. LEXIS 83344, at *6 (N.D.N.Y. June 19, 2014). "This means that the decisions referenced in Rule 54(b) 'may not usually be changed unless there is an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent a manifest injustice.' " Id. (cleaned up) (quoting Off. Comm. of Unsecured Creditors of the Color Tile, Inc. v. Coopers & Lybrand, LLP, 322 F.3d 147, 167 (2d Cir. 2003)).

"Thus, reconsideration 'should not be granted where the moving party seeks solely to relitigate an issue already decided.' " Brooks, 2017 U.S. Dist. LEXIS 37439, at *3 (quoting Shrader, 70 F.3d at 257). Accordingly, courts do not give litigants a second bite at the apple when addressing Rule 54(b) motions. See Appleby v. JPMorgan Chase Bank, N.A., No. 19-CV-10947, 2021 U.S. Dist. LEXIS 146032, at *29 (S.D.N.Y. Aug. 4, 2021) ("Nor is Rule 54(b) 'a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a second bite at the apple[.]' " (cleaned up) (quoting Analytical Surveys, Inc. v. Tonga Partners, L.P., 684 F.3d 36, 52 (2d Cir. 2012))); In re Ski Train Fire, 224 F.R.D. 543, 548 (S.D.N.Y. 2004) ("[T]his Court will not exercise its discretion under Rule 54(b) to reward plaintiff's failure to diligently and promptly develop its case for jurisdiction in California by giving it a second bite at the apple.").

## IV. DISCUSSION

Defendants argue that "the Court's application of the law to the facts in the record before it amounts to clear error and a gross injustice to Defendant Wilson." Defs.' Mem. of Law at 2. Clear error is an exacting standard of review for Defendants to meet: "Although 'courts ordinarily have not defined precisely what constitutes clearly erroneous or manifest injustice for reconsideration purposes, at least one court has held that reconsideration is not warranted unless the prior decision is 'dead wrong.' " Brinkmann v. Town of Southold, No. 21-CV-02468, 2022 U.S. Dist. LEXIS 157357, at * 5–6 (E.D.N.Y. Aug. 31, 2022) (quoting Corpac v. Rubin & Rothman, LLC, 10 F. Supp. 3d 349, 354 (E.D.N.Y. 2013)).

In the August 2022 Order, the Court conducted a de novo review of the Magistrate Judge's determination as to Plaintiff's Eighth Amendment medical indifference claim against Wilson, because Plaintiff specifically objected to this portion of the Report-Recommendation. August 2022 Order at 7–8.

### A. Summary Judgment

As noted above, the Court's August 2022 Order dealt with the summary judgment stage of the litigation. August 2022 Order at 8. The Court will reiterate the standard for summary judgment here because it is relevant to the Reconsideration Motion. Pursuant to Federal Rule of Civil Procedure 56: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law" while "[f]actual disputes that are irrelevant or unnecessary will not be counted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A "dispute about a material fact is 'genuine,' ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248, 106 S.Ct. 2505. "Only when no reasonable trier of fact could find in favor of the nonmoving party should summary judgment be granted." Taggart v. Time, Inc., 924 F.2d 43, 46 (2d Cir. 1991). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." Gallo v. Prudential Residential Servs., Ltd. Pshp., 22 F.3d 1219, 1224 (2d Cir. 1994). When assessing a summary judgment motion, "[t]he Court construes all evidence in the light most favorable to the non-moving party and draws all inferences in the non-moving party's favor." Senno v. Elmsford Union Free Sch. Dist., 812 F. Supp. 2d 454, 458 (S.D.N.Y. 2011). Additionally, when a party "is a pro se litigant, [courts] read [the party's] supporting papers liberally, and will interpret them to raise the strongest arguments that they suggest." Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994).

### B. Eighth Amendment Medical Indifference

Diaz v. Smith, Not Reported in Fed. Supp. (2022)

Case 9:24-cv-00384-AJB-MJK    Document 36    Filed 01/21/26    Page 19 of 75

**\*4** Likewise, while the Court set forth the standard for Eighth Amendment medical indifference claims in the August 2022 Order, the Court will reiterate it here because Defendants have put this analysis at issue in the Motion for Reconsideration. August 2022 Order at 8–10. The Eighth Amendment to the United States Constitution prohibits "cruel and unusual punishments...." U.S. Const. amend. VIII. As the Supreme Court has repeatedly stated: "[W]e have held repugnant to the Eighth Amendment punishments which are incompatible with 'the evolving standards of decency that mark the progress of a maturing society.' " Estelle v. Gamble, 429 U.S. 97, 102, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (citations omitted) (quoting Trop v. Dulles, 356 U.S. 86, 101, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958)). "In order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove 'deliberate indifference to [his] serious medical needs.' " Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998) (quoting Estelle, 429 U.S. at 104, 97 S.Ct. 285). "The standard of deliberate indifference includes both subjective and objective components." Chance, 143 F.3d at 702. " 'First, the alleged deprivation must be, in objective terms, sufficiently serious.' " Id. (cleaned up) (quoting Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994)). "Second, the defendant 'must act with a sufficiently culpable state of mind.' " Chance, 143 F.3d at 702 (quoting Hathaway, 37 F.3d at 66). "An official acts with requisite deliberate indifference when that official 'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' " Chance, 143 F.3d at 702 (quoting Farmer v. Brennan, 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)).

*1. Eighth Amendment Objective Prong*

Defendants challenge the Court's analysis of the objective prong by arguing that: "[T]he Court improperly considered Plaintiff's suicidal actions as an element of its analysis of the deliberate indifference claims against Defendant Wilson." Defs.' Mem. of Law at 6.

"Determining whether a deprivation is an objectively serious deprivation entails two inquiries." Salahuddin v. Goord, 467 F.3d 263, 279 (2d Cir. 2006). "The first is whether the prisoner was actually deprived of adequate medical care." Id. "As the Supreme Court has noted, the prison official's duty is only to provide reasonable care." Id. (citing Farmer, 511 U.S. at 844–47, 114 S.Ct. 1970). "Thus, 'prison officials who act reasonably [in response to an inmate-health risk] cannot be found liable under the Cruel and Unusual Punishments Clause,' and, conversely, failing 'to take reasonable measures' in response to a medical condition can lead to liability." Salahuddin, 467 F.3d at 279–80 (internal citations omitted) (quoting Farmer, 511 U.S. at 845, 847, 114 S.Ct. 1970).

"Second, the objective test asks whether the inadequacy in medical care is sufficiently serious. This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." Salahuddin, 467 F.3d at 280.

"[I]f the unreasonable medical care is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is sufficiently serious." Id. "There is no settled, precise metric to guide a court in its estimation of the seriousness of a prisoner's medical condition." Brock v. Wright, 315 F.3d 158, 162 (2d Cir. 2003). However, the Second Circuit has explained that "[t]he standard for Eighth Amendment violations contemplates 'a condition of urgency' that may result in 'degeneration' or extreme pain.' " Chance, 143 F.3d at 702 (quoting Hathaway, 37 F.3d at 66); see also Salahuddin, 467 F.3d at 280 ("Factors relevant to the seriousness of a medical condition include whether 'a reasonable doctor or patient would find [it] important and worthy of comment,' whether the condition 'significantly affects an individual's daily activities,' and whether it causes 'chronic and substantial pain.' " Id. (quoting Chance, 143 F.3d at 702)).

"In cases where the inadequacy is in the medical treatment given, the seriousness inquiry is narrower." Salahuddin, 467 F.3d at 280. "For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, the seriousness inquiry 'focus[es] on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone.' " Id. (quoting Smith v. Carpenter, 316 F.3d 178, 185 (2d Cir. 2003)).

Diaz v. Smith, Not Reported in Fed. Supp. (2022)

Case 9:24-cv-00384-AJB-MJK   Document 36   Filed 01/21/26   Page 20 of 75

**\*5**  Defendants disagree with the Court's finding that "a reasonable jury, if that jury chose to believe Plaintiff over Wilson, could find under the objective prong of the test for medical indifference under the Eighth Amendment that Plaintiff was deprived of medical treatment for the injury to the eye, and that this injury was sufficiently serious to cause Plaintiff extreme pain, which Plaintiff says was so excruciating that it led to his suicide attempt." August 2022 Order at 12–13. Specifically, Defendants contest "Plaintiff's allegations that he tried to kill himself due to the delay in care for his eye" by arguing that this is not a " 'fast-degenerating condition' " and that "this is not the type of scenario that is contemplated by the relevant case law...." Defs.' Mem. of Law at 6. Thus, the Defendants question whether Plaintiff's medical conditions constituted " 'a condition of urgency' that may result in 'degeneration' or extreme pain.' " Chance, 143 F.3d at 702 (quoting Hathaway, 37 F.3d at 66).

As the Second Circuit stated in Chance: "[I]f prison officials deliberately ignore the fact that a prisoner has a five-inch gash on his cheek that is becoming infected, the failure to provide appropriate treatment may well violate the Eighth Amendment." 143 F.3d at 702. Thus, a gash to the face—such as the gash at issue in the case before this Court—can be considered "sufficiently serious" under the Eighth Amendment if the cut causes "degeneration" or "extreme pain." Id. Additionally, an inmate's suicide attempt is an injury that can create a deliberate indifference claim under the Eighth Amendment. See Allah v. Kemp, No. 08-CV-1008, 2010 U.S. Dist. LEXIS 141905, at *22–23 (N.D.N.Y. Nov. 9, 2010) (stating that "[i]n an inmate suicide context, there are two scenarios where deliberate indifference may exist[;]" "[f]irst, 'officials could be deliberately indifferent to the risk of suicide by failing to discover an individual's suicidal tendencies[;]' " "[s]econd, officials 'could have discovered and have been aware of the suicidal tendencies, but could be deliberately indifferent in the manner by which they responded to the recognized risk of suicide.' " (quoting Kelsey v. City of New York, No. 03-CV-5978, 2006 U.S. Dist. LEXIS 91977, at *16 (E.D.N.Y. Dec. 18, 2006)), report and recommendation adopted in 2011 U.S. Dist. LEXIS 17308 (N.D.N.Y. Feb. 22, 2011). Accordingly, an inmate's suicide attempts can be considered "sufficiently serious" under the Eighth Amendment. See Allah v. Kemp, No. 08-CV-1008, 2010 U.S. Dist. LEXIS 25781, at *19–20 (N.D.N.Y. Feb. 25, 2010) (allowing an inmate-plaintiff to proceed on an Eighth Amendment deliberate indifference claim based on his suicide attempts because "Plaintiff's mental health needs were unmet and were, objectively, sufficiently serious" (citing Salahuddin, 467 F.3d at 280)), report and recommendation adopted in 2010 U.S. Dist. LEXIS 25714 (N.D.N.Y. Mar. 18, 2010). Because a suicide attempt, on its own, can meet the objective prong of the Eighth Amendment inquiry, the Court declines to adopt Defendants' argument that when courts are determining whether medical conditions—such as Plaintiff's wound at issue in this case—are "sufficiently serious" under the objective prong of deliberate indifference, courts cannot consider related suicide attempts. Instead, the Court finds that this case is analogous to the situation described by the Second Circuit in Chance. A "gash ... that is becoming infected" and a gash that is so agonizing it causes the inmate to attempt to commit suicide are both instances of medical conditions exemplifying "degeneration" or "extreme pain" that meet the sufficiently serious requirement of the objective prong of the deliberate indifference standard under the Eighth Amendment. Chance, 143 F.3d at 702.

Defendants' citations to cases regarding delay in treatment are also inapposite. Defendants cite to Palacio v. Ocasio, No. 02-CV-6726, 2006 U.S. Dist. LEXIS 57339 (S.D.N.Y. Aug. 11, 2006), arguing that Palacio demonstrates that Wilson should be insulated from liability because of a "less than two-hour delay in treatment...." Defs.' Mem. of Law at 5–6. Palacio is inapplicable here because the Court is dealing with the claim that "Plaintiff was deprived of medical treatment" by Wilson, August 2022 Order at 12–13, not a delay in treatment claim. As discussed above, when "the unreasonable medical care is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is sufficiently serious." Salahuddin, 467 F.3d at 280. In contrast, "where the inadequacy is in the medical treatment given, the seriousness inquiry is narrower." Id. This applies when "the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment[,]" id., at which time the "the seriousness inquiry 'focus[es] on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone[,]' " id. (quoting Smith, 316 F.3d at 185). Because Palacio dealt with delay in treatment, 2006 U.S. Dist. LEXIS 57339 at *39–40, which applies a "narrower" seriousness inquiry, Salahuddin, 467 F.3d at 280, Defendants' reliance on Palacio is misplaced, since delay in treatment is not at issue here.

**\*6**  Defendants also rely on Lee v. Frederick, 519 F. Supp. 2d 320 (W.D.N.Y. 2007) in their discussion of delay in treatment. Defs.' Mem. of Law at 5–6. In Lee, the court repeatedly emphasized that any delay in treatment was caused by the fact that the

Diaz v. Smith, Not Reported in Fed. Supp. (2022)

Case 9:24-cv-00384-AJB-MJK    Document 36    Filed 01/21/26    Page 21 of 75

plaintiff had been placed in tuberculosis hold, and that the prison had a " 'legitimate, neutral interest in containing tuberculosis.' " 519 F. Supp. 2d at 326 (quoting Word v. Croce, 230 F. Supp. 2d 504, 511 (S.D.N.Y. 2002)). There is no indication that tuberculosis exposure is at issue in the case pending before this Court. Accordingly, the Defendants have not demonstrated clear error or manifest injustice as to the Court's findings on the Eighth Amendment's deliberate indifference objective prong, nor have Defendants demonstrated that the Court's "prior decision is 'dead wrong.' " Brinkmann, 2022 U.S. Dist. LEXIS 157357, at *6.


### 2. Eighth Amendment Subjective Prong

Defendants also challenge the Court's findings on the subjective prong of Eighth Amendment deliberate indifference. Defs.' Mem. of Law at 4.

"The second requirement for an Eighth Amendment violation is subjective: the charged official must act with a sufficiently culpable state of mind." Salahuddin, 467 F.3d at 280. "Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law." Id. "This mental state requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." Id. As the Second Circuit has explained:

> Although less blameworthy than harmful action taken intentionally and knowingly, action taken with reckless indifference is no less actionable. The reckless official need not desire to cause such harm or be aware that such harm will surely or almost certainly result. Rather, proof of awareness of a substantial risk of the harm suffices.

Id.

Defendants argue that the August 2022 Order "indicates that, at the very most, Defendant Wilson could be found guilty of negligence, which the Court agrees does not amount to a constitutional violation." Defs.' Mem. of Law at 4. First, this is a reiteration of Defendants' earlier arguments in their Cross-Motion. Defs.' Cross-Mot. at 11–12. Indeed, as Defendants acknowledge, the Court explicitly recognized in the August 2022 Order that a medical malpractice claim brought by a prisoner does not automatically rise to the level of an Eighth Amendment claim: " 'Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.' " August 2022 Order at 13 (quoting Estelle, 429 U.S. at 106, 97 S.Ct. 285). As the Court explained further: " '[M]ere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation.' " August 2022 Order at 13 (quoting Chance, 143 F.3d at 703). Thus, the Court applied the proper legal standard when assessing Eighth Amendment deliberate indifference claims brought by a prisoner—Defendants simply disagree with the Court's determination that Wilson's failure to provide care meets the Eighth Amendment deliberate indifference standard. As stated above, Defendants' attempt to relitigate an issue that was already decided weighs against granting the Motion for Reconsideration. See Brooks, 2017 U.S. Dist. LEXIS 37439, at *3.

Furthermore, to the extent that the Court could construe Defendants' assertion that "at the very most, Defendant Wilson could be found guilty of negligence" as a new argument, Defs.' Mem. of Law at 4, that argument is insufficient for the Court to find clear error or manifest injustice. As the Second Circuit has stated:

**\*7** [W]hile "mere medical malpractice" is not tantamount to deliberate indifference, certain instances of medical malpractice may rise to the level of deliberate indifference; namely, when the malpractice involves culpable recklessness, i.e., an act or a failure to act by the prison doctor that evinces "a conscious disregard of a substantial risk of serious harm." Accordingly, not every instance of medical malpractice is, *a priori*, precluded from constituting deliberate indifference.

Diaz v. Smith, Not Reported in Fed. Supp. (2022)

Case 9:24-cv-00384-AJB-MJK    Document 36    Filed 01/21/26    Page 22 of 75

Hathaway, 99 F.3d at 553 (emphasis in original) (citation omitted) (quoting Farmer v. Brennan, 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). Thus, although Estelle said that "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner[,]" Estelle, 429 U.S. at 106, 97 S.Ct. 285, "[t]he Supreme Court's statement [in Estelle] cannot be construed to mean that there are no instances of malpractice that can rise to the level of deliberate indifference." Hathaway, 99 F.3d at 554.

As the Court stated in the August 2022 Order, when Wilson discussed the "nickel size hole over [Plaintiff's] eye" with Plaintiff several hours after her initial assessment, she " 'walk[ed] away [and] mumble[d]' the phrase 'Well, let it dry.' " August 2022 Order at 13 (quoting Dkt. No. 166-3, Ex. A at 25 ("Plaintiff's Deposition")). Plaintiff testified that "this was 'when the act of desperation kicked in,' and he decided he was 'going to hang up,' meaning 'attempt to kill [him]self and put something around [his] neck....' " August 2022 Order at 13 (quoting Pl.'s Dep. at 56, 57). Construing all evidence in the light most favorable to the non-moving party—Plaintiff—and reading Plaintiff's pro se papers liberally to raise the strongest arguments they suggest, the Court concluded in the August 2022 Order that a reasonable jury could "cho[o]se to credit Plaintiff's testimony, that Wilson was subjectively aware of Plaintiff's injury and, rather than treating that injury, consciously disregarded it and failed to treat it, and instead walked away." August 2022 Order at 14. Thus, assuming, *arguendo*, that Wilson committed medical malpractice, the Court would still conclude, pursuant to the Second Circuit's decision in Hathaway, that a reasonable jury could credit Plaintiff's testimony and determine that "the malpractice involves culpable recklessness" because Wilson's failure to act evinced "a conscious disregard of a substantial risk of serious harm." Hathaway, 99 F.3d at 553. Accordingly, the Court does not find clear error or manifest injustice in denying Defendants' Cross-Motion for summary judgment.

To the extent that Defendants construe the Court's determination that "Wilson merely 'walked away' after her conversation with Plaintiff at his cell" as "a credibility determination[,]" this construal is misplaced. Defs.' Mem. of Law at 5. As the Court's August 2022 Order stated, "a reasonable jury *could* infer, if they *chose* to credit Plaintiff's testimony...." August 2022 Order at 14 (emphasis added). The Court's language is conditional and hypothetical. A reasonable jury could choose to believe Plaintiff's testimony, or a reasonable jury could choose to believe Wilson's testimony. As the Second Circuit has observed: "Whether a course of treatment was the product of sound medical judgment, negligence, or deliberate indifference depends on the facts of the case." Chance, 143 F.3d at 703. In this case, the Court found that there was a genuine dispute of material fact as to whether Wilson's actions were the product of deliberate indifference. Accordingly, because the Court "is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them[,]" Gallo, 22 F.3d at 1224, the Court denied Defendants' Cross-Motion for summary judgment and left the determination of the disputed material facts to the factfinder at trial. Once again, the Court finds no clear error or manifest injustice, and for this reason Defendants' Motion for Reconsideration is denied.

## V. CONCLUSION

 **\*8**  Accordingly, it is hereby:

**ORDERED**, that Defendants' Motion for Reconsideration (Dkt. No. 215) is **DENIED**; and it is further

**ORDERED**, that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

## All Citations

Not Reported in Fed. Supp., 2022 WL 17752358

Diaz v. Smith, Not Reported in Fed. Supp. (2022)

Case 9:24-cv-00384-AJB-MJK    Document 36    Filed 01/21/26    Page 23 of 75

## Footnotes

1    The Court notes that its August 23, 2022, Memorandum-Decision and Order terminated Uhler and Gettmann from this action. Dkt. No. 213 at 16 ("August 2022 Order"). As such, they are no longer considered defendants in this case.

2    The Local Rules state that "a party may file and serve a motion for reconsideration or reargument no later than **FOURTEEN DAYS** after the entry of the challenged ... order...." L.R. 60.1 (emphasis in original). The Defendants' Motion for Reconsideration was timely filed in accordance with the Local Rules.

**End of Document**                                      © 2026 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2026 Thomson Reuters. No claim to original U.S. Government Works.    8

Jackson v. Moore, Not Reported in Fed. Supp. (2023)

2023 WL 4710869

2023 WL 4710869
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Dumar JACKSON, Plaintiff,

v.

N. MOORE, Defendant.

9:21-CV-1001 (GTS/ATB)
|
Signed April 14, 2023

**Attorneys and Law Firms**

DUMAR JACKSON, Plaintiff, pro se.

RACHAEL S. OUIMET, Assistant Attorney General, for Defendant.

### REPORT-RECOMMENDATION

ANDREW T. BAXTER, United States Magistrate Judge

**\*1** In this pro se civil rights action, plaintiff alleges that the defendant violated his Eighth Amendment rights when he failed to protect plaintiff from another inmate. Presently before the court is defendant Correctional Officer ("C.O.") Moore's motion for summary judgment. (Dkt. No. 16). This matter has been referred to me for Report and Recommendation by United States District Judge Glenn T. Suddaby, pursuant to 28 U.S.C. § 636(b) and Local Rule N.D.N.Y. 72.3(c). For the reasons set forth below, this court will recommend granting defendant's motion and dismissing the complaint in its entirety.

### I. Background

#### A. Procedural History

In this civil rights action, plaintiff alleges a constitutional violation occurred while he was incarcerated at Clinton Correctional Facility ("Clinton C.F."), in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). Plaintiff filed the original complaint on September 10, 2021. (Dkt. No. 1). On October 25, 2021, the court issued a Decision and Order granting plaintiff's application to proceed in the action in forma pauperis ("IFP"), and conditionally dismissing the original complaint because it failed to state a claim upon which relief may be granted pursuant to 28 U.S.C. § 1915 and 28 U.S.C. § 1915A. (Dkt. No. 4). The court granted plaintiff leave to amend his complaint to "correct[ ] the pleading defects" identified with his original complaint. (*Id.* at 10). Plaintiff availed himself of the opportunity to amend, and the court received plaintiff's amended pleading on or about November 18, 2021. (Dkt. No. 6, "Am. Compl.").

On February 9, 2022, I determined, pursuant to my initial review of the complaint, that plaintiff's amended complaint was accepted for filing and that the only active defendant was C.O. Moore. (Dkt. No. 7 at 3). C.O. Moore filed an answer to the amended complaint on April 14, 2022. (Dkt. No. 12). On December 15, 2022, defendant filed this instant motion for summary judgment (Dkt. No. 16), to which plaintiff responded on February 16, 2023 (Dkt. No. 20).

#### B. Summary of Complaint

2023 WL 4710869

The complaint alleges that on September 6, 2018, while plaintiff was confined in Clinton C.F., he was attacked by another inmate when they were released from their keep-lock cells at the same time. (Am. Comp. at 4). Although facility policies and procedures prohibited C.O. Moore from releasing the other inmate "until [plaintiff] was ... back in general population," C.O. Moore nevertheless released both inmates simultaneously, knowing that plaintiff did not have an escort at the time. *Id.* C.O. Moore also "knew there was a race war going on in [Clinton C.F.] with the bloods and the Spanish gangs and let [plaintiff] out of [his] cell with a known gang member posed [sic] a substantial risk of serious harm to [him]." *Id.* Although C.O. Moore observed the inmate run into plaintiff's cell and attack him, C.O. Moore "did nothing to prevent it from happening." Plaintiff was returned to keep-lock after the incident and remained there for an additional 70 days, until November 15, 2018. (Dkt. No. 16-3, Pl.'s Dep. at 18, 27, 79, 88, 95; Internal Movement History, Dkt. No. 20-1 at 31).

## II. Summary Judgment

**\*2** Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006). Rule 56(b) provides that a party may file a motion for summary judgment "at any time until 30 days after the close of all discovery." Fed. R. Civ. P. 56(b). Thus, a party may move for summary judgment in lieu of an answer. *See, e.g.*, *Anderson v. Rochester-Genesee Reg'l Transp. Auth.*, 337 F.3d 201, 202 (2d Cir. 2003); *Crenshaw v. Syed*, 686 F. Supp. 2d 234, 236 (W.D.N.Y. 2010); *Riehl v. Martin*, No. 9:13-CV-439 (GLS/TWD), 2014 WL 1289601, at \*1-2 (N.D.N.Y. Mar. 31, 2014).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord*, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Salahuddin*, 467 F.3d at 272. "Only disputes over ['material'] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

While courts are required to give due deference to a plaintiff's pro se status, that status "does not relieve plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003). Where a party has failed to respond to the movant's statement of material facts as required by Local Rule 7.1(a) (3), the facts in the movant's statement will be accepted as true (1) to the extent they are supported by evidence in the record, and (2) the non-movant, if proceeding pro se, has been specifically advised of the possible consequences of failing to respond to the motion. *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996).

Although plaintiff received proper notice of his obligation to respond to defendant's summary judgment motion in accordance with Local Rules, the plaintiff did not file a Statement of Material Facts that addressed many of the factual allegations in defendant's Statement, as required by Local Rule 7.1(a)(3). [1] Consequently, the court may accept the properly supported facts contained in the defendants' Rule 7.1 statement (Dkt. No. 16-2) as true for purposes of this motion. *See Govan v. Campbell*, 289 F. Supp. 2d 289, 295-96 (N.D.N.Y. 2003).

## III. Exhaustion of Administrative Remedies

### A. Legal Standards

**\*3** The Prison Litigation Reform Act, ("PLRA"), 42 U.S.C. § 1997e(a), requires an inmate to exhaust all available administrative remedies prior to bringing a federal civil rights action. The exhaustion requirement applies to all inmate suits

Jackson v. Moore, Not Reported in Fed. Supp. (2023)

Case 9:24-cv-00384-AJB-MJK    Document 36    Filed 01/21/26    Page 26 of 75

2023 WL 4710869

about prison life, whether they involve general circumstances or particular episodes, and regardless of the subject matter of the claim. *See Giano v. Goord*, 380 F.3d 670, 675-76 (2d Cir. 2004), (citing *Porter v. Nussle*, 534 U.S. 516, 532 (2002)), *abrogated on other grounds, Ross v. Blake*, 578 U.S. 632 (2016). Inmates must exhaust their administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings. *Id.* at 675.

In order to properly exhaust an inmate's administrative remedies, the inmate must complete the administrative review process in accordance with the applicable state rules. *Jones v. Bock*, 549 U.S. 199, 218-19 (2007) (citing *Woodford v. Ngo*, 548 U.S. 81 (2006)). In *Woodford*, the court held that "proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court. *Woodford,* 548 U.S. at 90-103.

The grievance procedure in New York is a three-tiered process. The inmate must first file a grievance with the Incarcerated [2] Grievance Resolution Committee ("IGRC"). N.Y. Comp. Codes R. & Regs., tit. 7 §§ 701.5(a)(1) and (b). An adverse decision of the IGRC may be appealed to the Superintendent of the Facility. *Id.* § 701.5(c). Adverse decisions at the Superintendent's level may be appealed to the Central Office Review Committee ("CORC"). *Id.* § 701.5(d). The court also notes that the regulations governing the Incarcerated [3] Grievance Program ("IGP") encourage the inmate to "resolve his/her complaints through the guidance and counseling unit, the program area directly affected, or other existing channels (informal or formal) prior to submitting a grievance." *Id.* § 701.3(a) (Inmate's Responsibility). There is also a special section for complaints of harassment. *Id.* § 701.8. Complaints of harassment are handled by an expedited procedure which provides that such grievances are forwarded directly to the Superintendent of the facility, after which the inmate must appeal any negative determination to the CORC. *Id.* §§ 701.8(h) and (I), 701.5.

Prior to *Ross v. Blake*, *supra*, the Second Circuit utilized a three-part inquiry to determine whether an inmate had properly exhausted his administrative remedies. *See Brownell v. Krom*, 446 F.3d 305, 311-12 (2d Cir. 2006) (citing *Hemphill v. State of New York*, 380 F.3d 680, 686 (2d Cir. 2004)). The *Hemphill* inquiry asked (1) whether the administrative remedies were available to the inmate; (2) whether defendants' own actions inhibiting exhaustion estops them from raising the defense; and (3) whether "special circumstances" justify the inmate's failure to comply with the exhaustion requirement. *Id.*

In *Ross*, the Supreme Court made it clear that courts may not excuse a prisoner's failure to exhaust because of "special circumstances." *Ross v. Blake*, 578 U.S. 632, 640 (2016). "[M]andatory exhaustion statutes like the PLRA establish mandatory exhaustion regimes, foreclosing judicial discretion." *Riles v. Buchanan*, 656 F. App'x 577, 580 (2d Cir. 2016) (quoting *Ross*, 578 U.S. at 639). Although *Ross* has eliminated the "special circumstances" exception, the other two factors in *Hemphill* – availability and estoppel – are still valid. The court in *Ross* referred to "availability" as a "textual exception" to mandatory exhaustion, and "estoppel" has become one of the three factors in determining availability. *Ross*, 578 U.S. at 642. Courts evaluating whether an inmate has exhausted his or her administrative remedies must also consider whether those remedies were "available" to the inmate. *Id.*; *see also Riles*, 2016 WL 4572321 at *2.

## B. Analysis

**\*4** Defendant C.O. Moore argues that plaintiff's failure-to-protect claim is subject to dismissal, for failure to exhaust administrative remedies, because plaintiff did not file an initial grievance prior to bringing suit, nor did he appeal the denial of any grievance concerning this claim to CORC. (Dkt. No. 16-1, Defendant's Memorandum of Law at 14). In support of his position, defendant has attached to his motion papers the sworn declarations of Rachael Seguin ("Seguin Decl.") (Dkt. No. 16-7), the Director of the IGP for DOCCS, and Christine Gregory, the IGP Supervisor at Clinton C.F. ("Gregory Decl.") (Dkt. No. 16-6). These declarations, and the evidence attached as exhibits thereto, indicate that plaintiff neither filed an initial grievance related to his claim that C.O. Moore failed to protect him from another inmate on September 6, 2018, nor did plaintiff submit an appeal to CORC. (*See* Gregory Decl. ¶¶ 16-20; Seguin Decl. ¶¶ 12-14, Ex. A).

Case 9:24-cv-00384-AJB-MJK   Document 36   Filed 01/21/26   Page 27 of 75

Jackson v. Moore, Not Reported in Fed. Supp. (2023)
2023 WL 4710869

In opposition to defendant's motion, plaintiff alleges that, while confined in his keep-lock cell, he attempted to file a grievance relating to the incident with C.O. Moore by putting a sealed letter on the gate for mail pickup. (Dkt. No. 20 at 2-3; Pl.'s Dep. at 87-89). Plaintiff testified that he remembered the grievance being picked up by an unnamed officer, but does not remember the exact day he mailed the grievance. [4] (Dkt. No. 16-3, Pl.'s Dep. at 87-89, 93). Plaintiff speculates that an unnamed officer on duty threw his grievance away. (Dkt. No. 20 at 2-3; Pl.'s Dep. at 87-89)

Plaintiff acknowledged that he never followed up with respect to his grievance for the 70 days after the incident when he was confined on keeplock; but he alleges that he asked sergeants, officers, and counselors about the status of his grievance and they told plaintiff "they'll get back to you." (Pl.'s Dep. at 93-94). Plaintiff admitted that he did not retain any copies of the purported grievances relative to his complaints against C.O. Moore. (*Id.* at 88). [5]

Plaintiff further testified that he not only understood the grievance process, but also that he participated in an orientation program at Clinton C.F. about how the grievance process works at the facility. (*Id.* at 85-86). He admitted that he filed "a couple" of grievances after the incident concerning other matters, while still residing at Clinton C.F. (*Id.* at 90).

The record before this court clearly established that the defendant did not exhaust administrative remedies with respect to the failure-to-protect claim against C.O. Moore. Given that an initial grievance was never filed, nor was the claim ever appealed to CORC, the question becomes whether plaintiff's failure to exhaust should be excused.

The defendant has satisfied his initial burden of "establishing ... that a grievance process exist[ed] and applie[d] to the underlying dispute." *Hubbs v. Suffolk County Sheriff's Dep't*, 788 F.3d 54, 59 (2d Cir. 2015) (citation omitted). [6] Thus, plaintiff assumes the burden of producing evidence that one of the exceptions to the administrative exhaustion requirement applies, excusing his failure to exhaust and permitting his claim to survive summary judgment. *Id.* ("If the defendants meet this initial burden, administrative remedies may nonetheless be deemed unavailable if the plaintiff can demonstrate that other factors ... rendered a nominally available procedure unavailable as a matter of fact.") [7]

**\*5** Liberally construed, plaintiff appears to argue that administrative remedies were unavailable to him as a result of C.O. Moore trying "to cover his mistakes up". (Dkt. No. 20 at 2-3). Plaintiff does not offer any support for his claim other than his statement "officers talk like inmates talk. So knowing the incident, knowing I put in a grievance, they wanted to be nosey [sic], and they opened it and never let it get to where it was supposed to go once it was read." (Pl.'s Dep. at 89). During his deposition, plaintiff specifically stated that C.O. Moore was not the person who picked up the grievance. (Pl.'s Dep. at 88-89). Furthermore, plaintiff testified the alleged grievance was sealed, so the unnamed C.O. would have no way of knowing what conduct the grievance was referring to unless (s)he opened the envelope. (Pl.'s Dep. at 92).

As noted above, plaintiff was on keep-lock status when he allegedly attempted to submit a grievance relating to the claim in this action by leaving a sealed envelope for C.O.s to deliver. "Keeplock is a form of disciplinary confinement segregating an inmate from other inmates and depriving him of participation in normal prison activities." *Green v. Bauvi*, 46 F.3d 189, 192 (2d Cir. 1995); N.Y. Comp. Codes R. & Regs. tit. 7, § 301.6. While "[k]eep-lock is similar to serving time in a Special Housing Unit ... [with the inmate] remain[ing] in their assigned cell" (Dkt. No. 16-5, Terry Allen Declaration ¶ 7), plaintiff acknowledged that keep-lock status is "not like if you were in the SHU" (Pl.'s Dep. at 35).

In *Williams v. Priatno*, 829 F.3d 118, 123-27 (2d Cir. 2016), the Second Circuit considered whether administrative remedies had been "actually available" to an inmate plaintiff under *Ross*, after the district court granted the defendants' motion to dismiss for failure to exhaust. The plaintiff alleged that, while housed in a SHU, he drafted a grievance that he delivered to a correction officer to forward to the grievance office on his behalf. *Id.* at 120-121. Approximately two weeks later, the plaintiff was transferred to a different facility. *Id.* at 121. He never received a response to his grievance, and alleged that it was never filed by the officer to whom he had given it. It was undisputed that plaintiff never appealed the grievance. *Id.*

Jackson v. Moore, Not Reported in Fed. Supp. (2023)

Case 9:24-cv-00384-AJB-MJK    Document 36    Filed 01/21/26    Page 28 of 75

2023 WL 4710869

The defendants in *Williams* argued that even if the grievance was never filed, the plaintiff was required to appeal it and complete the grievance process. *Id.* at 124. The defendants relied on a DOCCS regulation that provided that "an inmate may appeal a grievance 'to the next step' if he does not receive a timely response." *Id.* (quoting N.Y. Comp. Codes R. & Regs. tit. 7, § 701.6(g)(2)). The Second Circuit rejected this argument and held that, for an inmate in the plaintiff's situation, the regulatory scheme was so "opaque" and "confusing" as to be practically unavailable. *Id.* The Second Circuit found that DOCCS regulations "only contemplate appeals of grievances that [have been] actually filed ... [and] give no guidance whatsoever to an inmate whose grievance was never filed." *Id.* Thus, *Williams* holds that "the process to appeal an unfiled and unanswered grievance is prohibitively opaque, such that no inmate could actually make use of it." *Id.* at 126. [8] *See also Medina v. Napoli*, 725 F. App'x 51, 53-54 (2d Cir. 2018) (following *Williams* in the context of a summary judgment motion).

Some district court cases in the Second Circuit suggest that *Williams* should be limited to its particular facts, *e.g.*, by not applying its holding to plaintiffs who are not confined in a SHU. [9] *See, e.g.*, *Shaw v. Ortiz*, No. 15-CV-8964, 2016 WL 7410722, at *6 (S.D.N.Y. Dec. 21, 2016) ("the factual scenario here is different from that in *Williams* where the Second Circuit found that part of the IGP's regulatory scheme was 'so opaque and so confusing that ... no reasonable prisoner c[ould] use' it.") (citing *Mena v. City of New York*, No. 13-CV-2430, 2016 WL 3948100, at *5 (S.D.N.Y. July 19, 2016) (finding that the Second Circuit's decision in *Williams* "hinged on the 'extraordinary circumstances' specific to the case before it")); *Blake v. Porlier*, No. 9:18-CV-1008 (DNH/CFH), 2019 WL 7484052, at *6 (N.D.N.Y. Oct. 4, 2019) ("Courts have taken an inmate's housing and level of segregation from the general population into account when determining the availability of grievance procedures.") (citing *Rodriguez v. Cross*, No. 15-CV-1079 (GTS/CFH), 2017 WL 2791063, at *7 (N.D.N.Y. May 9, 2017) (holding that a plaintiff in keeplock was not entitled to an exhaustion exception when he alleged that his grievance had not been filed due to mail tampering, and subsequently never inquired about it), *report and recommendation adopted*, 2017 WL 2790530 (N.D.N.Y. June 27, 2017)).

**\*6** In any event, unsupported assertions that a plaintiff "filed a grievance but that it was somehow lost or destroyed" have generally been found "insufficient to establish a genuine issue of fact." *Blake v. Porlier*, 2019 WL 7484052, at *5 ("Courts within the Second Circuit have continuously held that 'mere contentions or speculation of grievances being misplaced by officers do not create a genuine issue of material fact when there is no evidence to support the allegations.' ") (quoting *Rodriguez v. Cross*, 2017 WL 2791063, at *5); *Artis v. Dishaw*, No. 9:14-CV-1116 (MAD/ATB), 2016 WL 11266599, at *7 n.13 (N.D.N.Y. Sept. 12, 2016) (finding the plaintiff's failure to exhaust was not excusable, in part, because while the plaintiff "state[d] that some grievances were destroyed ... he ha[d] not submitted any copies of these grievances, nor d[id] he specify when he attempted to file them"), *report and recommendation adopted*, 2017 WL 1076343 (N.D.N.Y. Mar. 22, 2017); *Engles v. Jones*, No. 6:13-CV-6461, 2018 WL 6832085, at *10 (W.D.N.Y. Dec. 28, 2018) ("Plaintiff's unsupported assertion that he filed a grievance but that it was somehow lost or destroyed is insufficient to establish a genuine issue of material fact.") (citing *Scott v. Kastner-Smith*, 298 F. Supp. 3d 545, 555 (W.D.N.Y. 2018)).

Moreover, courts in this Circuit have granted summary judgment for failure to exhaust administrative remedies, even for a prisoner confined to a SHU whose ability to directly file a grievance or make a copy may be limited, when the plaintiff provided no documentation or minimal corroborative details. *See, e.g.*, *Sankara v. Montgomery*, No. 9:16-CV-00885 (FJS/TWD), 2018 WL 4610686, at *8 (N.D.N.Y. June 25, 2018) ("Plaintiff's conclusory allegations that the DOCCS IGP was unavailable to him [while confined to the SHU] were insufficient to withstand summary judgment," where the plaintiff "provided no evidence that he actually did write grievances; when they were written; the content of the grievances ... the officers named in the grievance(s) ...; the specific steps taken by Plaintiff to provide them to an officer to send to the grievance office; and any specific follow up with the grievance office[.]"), *report and recommendation adopted*, 2018 WL 3408135 (N.D.N.Y. July 13, 2018); *Simpson v. Price*, No. 9:19-CV-1413 (MAD/ATB), 2021 WL 7367083, at *9 (N.D.N.Y. Dec. 29, 2021) (in the absence of any documentary evidence to corroborate plaintiff's alleged attempt to file a grievance from the SHU, the court concludes that plaintiff's completely unsupported, unclear, and vague implication that the grievance was not properly processed does not suffice to avoid summary judgment), *report and recommendation adopted*, 2022 WL 336540 (N.D.N.Y. Feb. 4, 2022); *Ozzborn v. Cornell*, No. 9:17-CV-1039 (MAD/ATB), 2021 WL 2227829, at *5 (N.D.N.Y. June 2, 2021) (Plaintiff claimed that he filed a grievance from the SHU by leaving a plain envelope addressed to the grievance committee for the mail personnel to collect; but, because he never received a response, he presumed that the grievance was never submitted. Because plaintiff never followed

Case 9:24-cv-00384-AJB-MJK    Document 36    Filed 01/21/26    Page 29 of 75
Jackson v. Moore, Not Reported in Fed. Supp. (2023)
2023 WL 4710869

up on his grievance and successfully filed numerous other grievances in the recent past, he has failed to demonstrate that his administrative remedies were unavailable to him). [10]

Here, the court does not merely rely on plaintiff's lack of direct evidence, such as copies of the relevant grievances, in finding that he has failed to establish a genuine issue of material fact as to unavailability. Plaintiff in this case has done nothing more than allege in conclusory fashion that he attempted to file a grievance concerning a the September 6, 2018 incident. Plaintiff's testimony about when he attempted to submit the grievance was vague and he did not identify the officer who allegedly collected it. Likewise, he has not supported his claim that unnamed sergeants, officers, and counselors told him "not to worry" with any documentary evidence. *See, e.g.*, *Belile v. Griffin*, No. 9:11-CV-0092 (TJM/DEP), 2013 WL 1776086, at *8 (N.D.N.Y. Feb. 12, 2013) ("Plaintiff's mere threadbare allegations that his grievances were intercepted and discarded, without evidence to support such allegation, including any evidence that identifies which defendant, in particular, is responsible for discarding the grievances, are insufficient to excuse his failure to comply with the IGP [process]"), *report and recommendation adopted*, 2013 WL 1291720 (N.D.N.Y. Mar. 27, 2013).

 **\*7** For the above reasons, the court concludes that plaintiff's completely unsupported and vague claim that a grievance he attempted to file against C.O. Moore relative to the September 6, 2018 incident was not properly processed does not suffice to avoid summary judgment. Accordingly, the court recommends that C.O. Moore be granted summary judgment and the second amended complaint be dismissed against him, on the ground that plaintiff failed to exhaust his administrative remedies.

Dismissal with prejudice is appropriate where the plaintiff had the opportunity to exhaust administrative remedies, failed to do so, and is unable to cure his failure to exhaust. *Berry v. Kerik*, 366 F.3d 85, 87 (2d Cir. 2004). Here, plaintiff's time to file the relevant grievance to CORC in accordance with the rules and regulations has already passed, [11] rendering his failure to exhaust his administrative remedies incurable at this time. As a result, I recommend that plaintiff's complaint be dismissed with prejudice as to these claims. *See Livingston v. Hoffnagle*, No. 17-CV-1158 (MAD/DEP), 2019 WL 409366, at *7 (N.D.N.Y. Feb. 1, 2019) (dismissing without leave to amend, where the exhaustion error would not be cured by permitting the plaintiff leave to amend).

## IV. Eighth Amendment Failure to Protect Claim

Defendant also seeks summary judgment on the merits of plaintiff's failure to protect claim, arguing, among other things, that plaintiff has failed to establish C.O. Moore was acting with deliberate indifference to conditions that posed a substantial risk of serious harm to plaintiff. For the following reasons, the court agrees that summary judgment is warranted, in the alternative, on the merits of plaintiff's Eighth Amendment claim.

### A. Legal Standards

In order to state an Eighth Amendment claim for failure to protect an inmate, the plaintiff must show that he was incarcerated under conditions posing a substantial risk of serious harm, and prison officials acted with deliberate indifference to that risk and the inmate's safety. *Farmer v. Brennan*, 511 U.S. 825, 836, 114 S. Ct. 1970 (1994). The plaintiff must show that prison officials actually knew of and disregarded an excessive risk of harm to the inmate's health and safety. *Id.* at 837, 114 S. Ct. 1970. The defendant must be aware of the facts from which the inference can be drawn that a substantial risk of serious harm exists, and the defendant must also draw that inference. *Id.*

The failure of corrections officers to employ reasonable measures to protect an inmate from violence by other inmates may rise to the level of an Eighth Amendment violation. *See Ayers v. Coughlin*, 780 F.2d 205, 209 (2d Cir. 1985) (citing *United States v. Bailey*, 444 U.S. 394, 423 (1980)). "Reckless disregard" of plaintiff's right to be free from attacks by other inmates may be shown by the existence of a "pervasive risk of harm to inmates from other prisoners and a failure by prison officials to reasonably respond to that risk." *Knowles v. New York City Dep't of Corr.*, 904 F. Supp. 217, 221-22 (S.D.N.Y. 1995) (citing *Rucco v. Howard*, No. 91 Civ. 6762, 1993 WL 299296, at *4 (S.D.N.Y. Aug. 4, 1993); *Martin v. White*, 742 F.2d 469, 474 (8th Cir. 1984)).

Jackson v. Moore, Not Reported in Fed. Supp. (2023)

Case 9:24-cv-00384-AJB-MJK    Document 36    Filed 01/21/26    Page 30 of 75

2023 WL 4710869

**\*8**  An isolated omission by corrections officers generally does not support a claim for deliberate indifference absent circumstances involving evil intent, recklessness, or deliberate indifference. *Coronado v. Goord*, No. 99 Civ. 1674, 2000 WL 1372834, at \*4 (S.D.N.Y. Sept. 25, 2000) (citing *Ayers v. Coughlin*, 780 F.2d at 209). Plaintiff may allege a constitutional claim by alleging that the substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and that the officials being sued were exposed to information concerning the risk and thus, must have known about it. *Id.* (citing *Farmer*, 511 U.S. at 842-43).

## B. Analysis

With due regard for plaintiff's status as a pro se litigant, plaintiff has failed to establish that C.O. Moore knew of a particular risk to plaintiff's safety or that C.O. Moore was deliberately indifferent for failing to protect plaintiff. Plaintiff merely offers conclusory, general allegations that C.O. Moore knew about an alleged gang and/or race war happening at Clinton C.F. (Dkt. No. 20 at 2). However, C.O. Moore has, in his sworn declaration, denied having any knowledge about a race war at Clinton C.F. or having any access to information regarding an inmate's gang status. (Moore Decl. ¶¶ 21, 23). Even if C.O. Moore did have access to such records, plaintiff testified that he is not a member of a gang. (Jackson Dep. at 19). Thus, there is nothing in the record other than plaintiff's conclusory allegations establishing that C.O. Moore knew plaintiff was at a substantial risk of harm because of an alleged gang war.

Plaintiff's claim is further undermined by his sworn testimony admitting that he had not had any prior interactions with the inmate who attacked him before the underlying incident. (Jackson Dep. at 19-20); *Gillard v. Jarvis*, No. 9:11-CV-1021 (LEK/ATB), 2012 WL 7037734, at \*7 (N.D.N.Y. Nov. 6, 2012), *report and recommendation adopted*, 2013 WL 474384 (N.D.N.Y. Feb. 7, 2013) ("If plaintiff did not know the inmate who assaulted him, he cannot claim that defendants "knew" and disregarded the serious risk that plaintiff would be assaulted at Clinton by this unknown individual."). Plaintiff has not alleged that he was threatened by the other inmate, or any member of the other inmate's race or gang, prior to this incident. Additionally, neither inmate was in protective custody when they were released form their cells. (Moore Decl. ¶ 14). Plaintiff also testified he never asked for protective custody before or after the incident. (Jackson Dep. at 73).

"Courts routinely deny deliberate indifference claims based upon surprise attacks." *Zimmerman v. Macomber*, No. 95 Civ. 0882, 2001 WL 946383, at \*5 (S.D.N.Y. Aug. 21, 2001) (granting summary judgment in favor of the defendants where the plaintiff failed to carry his burden to establish that the defendant had knowledge of a substantial risk to plaintiff's health or safety from an inmate attacker). Here, plaintiff has failed to allege defendants knew of a prior altercation between the plaintiff and his attacker, or of any threats that had been made against the plaintiff. *Fernandez v. N.Y.C. Dep't of Corr.*, No. 08 Civ. 4294, 2010 WL 1222017, at \*4 (S.D.N.Y. Mar. 29, 2010); *Clark v. Gardner*, 256 F. Supp.3d 154, 168 (N.D.N.Y. 2017). Because plaintiff has alleged no facts suggesting that C.O. Moore knew of a particular risk to the plaintiff's safety, he has failed to raise a material question of fact as to whether C.O. Moore was deliberately indifferent, and summary judgment is warranted. *Parris v. New York State Dep't Corr. Servs.*, 947 F. Supp.2d 354, 363 (S.D.N.Y. 2013).

**\*9  WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that Defendant's motion for summary judgment (Dkt. No. 16) be **GRANTED,** and the complaint be **DISMISSED WITH PREJUDICE**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Hum. Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Jackson v. Moore, Not Reported in Fed. Supp. (2023)
Case 9:24-cv-00384-AJB-MJK    Document 36    Filed 01/21/26    Page 31 of 75
2023 WL 4710869

**All Citations**

Not Reported in Fed. Supp., 2023 WL 4710869

---

## Footnotes

1    Defense counsel specifically advised plaintiff of the consequences of failing to respond to the summary judgment motion. (Dkt. No. 16). Counsel forwarded, to plaintiff, a copy of the court's form Notification of the Consequences of Failing to Respond to a Summary Judgment Motion, which provided in pertinent part:

      If you do not file a proper response to this motion, the Court may grant the motion and dismiss some or all of your claims. Under Local Rules 7.1(b) and 56.1(b), to file a proper response to this motion, you must submit the following papers:

      (1) A response to the defendants' statement of material facts that admits and/or denies each of the defendants' assertions in matching numbered paragraphs, 1 and that supports each denial with citations to record evidence.

      * * *

      WARNING: If you do not submit a proper response to the defendants' statement of material facts, the Court may deem you to have admitted the defendants' factual statements.

      (Dkt. No. 16 at 4).

2    This committee was formerly known as the "Inmate Grievance Resolution Committee," but has recently been renamed.

3    The program was formerly known as the "Inmate Grievance Program," but has recently been renamed.

4    Plaintiff testified that he filed the grievance "it was in like the same – I want to say around like the 22[nd] or so." (Pl.'s Dep. at 87-88).

5    Plaintiff alleges that he was told "it was a code 49 and that it had to go to the superintendent office." (Dkt. No. 20 at 3).

6    IGP Supervisors Gregory and Seguin stated Clinton C.F. had a fully functioning IGP program at all times relevant to the complaint. (Gregory Decl. ¶ 16; Seguin Decl. ¶ 11). Plaintiff also testified that he filed a grievance for an unrelated matter after the incident and received an unfavorable decision and appealed that decision. (Pl.'s Dep. 90-91).

7    I agree with Magistrate Judge Peebles' cogent analysis that, while the burden of production may shift to a plaintiff with respect to certain aspects of the exhaustion issue, "the ultimate burden of proof with respect to the exhaustion defense remains, at all times, with the defendant." *See, e.g.*, *Bailey v. Fortier*, No. 9:09-CV-0742 (GLS/DEP), 2012 WL 6935254, at *5-6 (N.D.N.Y. Oct. 4, 2012), *report and recommendation adopted*, 2013 WL 310306 (N.D.N.Y. Jan. 25, 2013); *Nelson v. Plumley*, No. 9:12-CV-422 (TJM/DEP), 2015 WL 4326762, at *7-8 (N.D.N.Y. July 14, 2015), *report and recommendation adopted*, 2013 WL 1305338 (N.D.N.Y. Mar. 18, 2013).

8    My summary of *Williams* tracks that of Magistrate Judge Stewart in *Berman v. Durkin*, No. 9:13-CV-136 (LEK/DJS), 2017 WL 1215814, at *8 (N.D.N.Y. Mar. 10, 2017), *report and recommendation adopted*, 2017 WL 1207834 (N.D.N.Y. Mar. 31, 2017).

Jackson v. Moore, Not Reported in Fed. Supp. (2023)

Case 9:24-cv-00384-AJB-MJK    Document 36    Filed 01/21/26    Page 32 of 75

2023 WL 4710869

9    In *Medina v. Napoli*, 725 F. App'x at 53-54, the Second Circuit followed *Williams* in a case involving a SHU inmate, but absent the additional circumstance of a transfer to a different facility, which might have further complicated the inmate's ability to file a grievance.

10    District Judge D'Agostino distinguished *Williams v. Priatno* by noting the various ways in which the plaintiff in *Williams* specified how he followed up with respect to the grievance that he left for delivery from the SHU, which was never filed with the IGP. *Id.* at *4.

11    "Ordinarily, an inmate must first submit 'a complaint,' or grievance, to the facility's IGP clerk within twenty-one days of the alleged occurrence giving rise to his complaint. 7 N.Y.C.R.R. § 701.5(a). Relief from the twenty-one day time limit may be granted by the IGP supervisor based upon mitigating circumstances, provided, however, that '[a]n exception to the time limit may not be granted if the request was made more than 45 days after an alleged occurrence.' " *Nelson v. Plumley*, 2015 WL 4326762, at *2 (citing N.Y.C.R.R. § 701.6(g)(1)(i)(a)).

---

**End of Document**                              © 2025 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag

Distinguished by   Whitley v. Ort,   S.D.N.Y.,   September 28, 2018

2011 WL 2975218

Only the Westlaw citation is currently available.

United States District Court,

N.D. New York.

Gotfried JEAN, Plaintiff,

v.

C.O. BARBER, Correctional Officer, Auburn Correctional Facility; Sgt. Christopher, Auburn Correctional Facility; and Superintendent Graham, Auburn Correctional Facility, Defendants.

No. 9:09–cv–430 (MAD/GHL).

|

July 21, 2011.

**Attorneys and Law Firms**

Gotfried Jean, Malone, NY, pro se.

Office of the New York State Attorney General, Adrienne J. Kerwin, AAG, of Counsel, Albany, NY, for defendants.

### MEMORANDUM–DECISION AND ORDER

MAE A. D'AGOSTINO, District Judge.

### I. INTRODUCTION

**\*1** On April 10, 2009, plaintiff *pro se* filed the present action, alleging that he was denied adequate medical care, in violation of his Eighth and Fourteenth Amendment rights, when defendants failed to provide him with mental health services prior to a suicide attempt. *See* Dkt. No. 1. In a Report–Recommendation and Order dated June 28, 2011, Magistrate Judge Lowe recommended that the Court grant defendants' motion for summary judgment and dismiss the complaint. *See* Dkt. No. 52. [1]

Currently before the Court are plaintiff's objections to Magistrate Judge Lowe's June 28, 2011 Report–Recommendation and Order. [2]

### II. BACKGROUND

**A. Factual background**

In his complaint, plaintiff alleges that his Eighth and Fourteenth Amendment rights were violated during his confinement at the Auburn Correctional Facility ("Auburn C.F."). *See* Dkt. No. 1 at 4. Specifically, plaintiff alleges that, on December 16, 2006, while in his cell, he told defendant Barber that he wanted to commit suicide. *See id.* Plaintiff alleges that he then saw defendant Christopher, who told him that there was nothing wrong with him and that he should "do [his] time like a man." *See id.* at 4–5. Thereafter, plaintiff alleges that defendant Christopher told defendant Barber not to call "any mental health staff." *See id.* One

or two hours later, plaintiff again told defendant Barber that he wanted to commit suicide, but defendant Barber said nothing and walked away. *See* Dkt. No. 39–3 at 10.

Later that day, plaintiff attempted to commit suicide by "trying to sever [his] arm off with a can top." *See* Dkt. No. 1 at 5. Plaintiff cut his arm five times. *See* Dkt. No. 39–3 at 12. At that point, a non-defendant officer arrived and took plaintiff to receive medical attention. *See id.* at 13. Plaintiff was placed in a cell in the Mental Health Unit ("MHU") at Auburn C.F. and later spoke to a non-defendant individual from the Office of Mental Health ("OMH"). *See id.* at 14. Thereafter, plaintiff was released to the Special Housing Unit. *See id.* at 16.

In his complaint, plaintiff alleges that defendants acted with deliberate indifference in violation of his Eighth Amendment rights by leaving him in his cell after he threatened to commit suicide. *See* Dkt. No. 1 at 5. Plaintiff claims that he saw mental health personnel only after he injured himself. *See id.* Moreover, plaintiff asserts that his suicide threat and his self-inflicted wounds "are consistent with a serious medical need."

On October 1, 2010, the remaining defendants moved for summary judgment. *See* Dkt. No. 39. In their motion, defendants argued that (1) plaintiff cannot prevail on his Eighth Amendment claim because defendants were not deliberately indifferent to plaintiff's serious medical needs; and (2) they are entitled to qualified immunity as to each of plaintiff's claims. *See* Dkt. No. 39–7 at 2–6.

**B. Magistrate Judge Lowe's Report–Recommendation and Order**

**\*2**  In his Report–Recommendation and Order, Magistrate Judge Lowe found that it was unclear whether plaintiff experienced any previous suicidal thoughts. *See* Dkt. No. 52 at 6. Citing to his obligation to resolve all ambiguities and draw all reasonable inferences against the non-moving party, however, Magistrate Judge Lowe still recommended that the Court find that a question of fact has been raised as to whether plaintiff suffered from a sufficiently serious medical need. *See id.*

Regarding deliberate indifference, Magistrate Judge Lowe recommended that the Court find that "there is no indication that Defendants *intentionally* delayed access to medical care. Instead, the record shows that Defendants responded quickly to Plaintiff and took steps to assist him." *See id.* Specifically, Magistrate Judge Lowe set forth the following in support of his conclusion:

> When Plaintiff told Defendant Barber at approximately 7:00 a.m. that he wanted to commit suicide, Defendant Barber "immediately informed the first officer on the shift, who then informed [Defendant] Christopher." Barber Dec. at ¶ 5. The logbook entry confirms that Defendant Barber conveyed this information and that Defendant Christopher was notified at 7:10 a.m. Ex. F. Defendant Christopher saw Plaintiff at approximately 7:50 a.m. Christopher Dec. at ¶ 4. Defendant Barber continued to observe Plaintiff until the conclusion of his shift at 3:00 p.m. Barber Dec. at ¶ 8. Plaintiff cut his arm after Defendant Barber finished his shift. *Id.* at ¶ 7; Jean Dep. at 10.

*See id.* at 7.

Thereafter, Magistrate Judge Lowe recommended that the Court dismiss plaintiff's Fourteenth Amendment claim because it "overlaps" with the Eighth Amendment claims and, therefore, " 'will be subsumed by the Eighth Amendment claim as the Eighth Amendment offers greater protection to prisoners.' " *See id.* at 8 (quotation and other citation omitted). Finally, Magistrate Judge Lowe declined to reach the qualified immunity issue because plaintiff failed to establish any violations of his constitutional rights. *See id.* at 8–9.

**C. Plaintiff's objections to Magistrate Judge Lowe's Report–Recommendation and Order**

In his objections to Magistrate Judge Lowe's Report–Recommendation and Order, plaintiff puts forth the following seven arguments:

1) Plaintiff objects to the Report and Recommendation that summary judgment be granted to the Defendants.

2) Plaintiff objects to the deliberate indifference decision rendered by the Judge. There are genuine issues of material fact which include but are not limited to the following:

    A) Defendants presented no proof whatsoever that mental health staff was notified.

    B) Defendant Barber agrees that Plaintiff notified him on more than one occasion of his suicidal thoughts and need for assistance.

3) Defendant Barber failed to notify mental health staff as is the policy of DOCS.

4) Defendant Barber made numerous false and contradictory statements as to the monitoring of the Plaintiff. *See* Affidavit in Opp. of Def. Summary Judgment Motion).

  **\*3** 5) Defendant Barber left the Plaintiff in his cell. There is no suicide log book. No monitoring of Plaintiff as per DOCS Directive No. 4101 Section 4A(1), (2), (3), (4).

6) Defendant Sgt. Christopher never reported Plaintiff or referred Plaintiff to mental health.

7) The inference was drawn by the Def. Barber (*see* Exhibits I4 Mem. of Law).

*See* Dkt. No. 53 at 2–3. Moreover, plaintiff asserts that he was never taken to a common area for supervision or suicide watch, even after he made defendants aware of his suicidal thoughts. *See id.* at 3. As such, plaintiff asserts that there are questions of material fact precluding summary judgment. *See id.*

## III. DISCUSSION

### A. Standard of review

When a party files specific objections to a magistrate judge's report-recommendation, the district court makes a *"de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). However, when a party files "[g]eneral or conclusory objections or objections which merely recite the same arguments [that he presented] to the magistrate judge," the court reviews those recommendations for clear error. *O'Diah v. Mawhir,* No. 9:08–CV–322, 2011 WL 933846, *1 (N.D.N.Y. Mar. 16, 2011)* (citations and footnote omitted). After the appropriate review, "the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b) (1). [3]

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 36 (2d Cir.1994) (citations omitted). When analyzing a summary judgment motion, the court " 'cannot try issues of fact; it can only determine whether there are issues to be tried.' " *Id.* at 36–37 (quotation and other citation omitted). Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleading. *See Celotex Corp. v. Catrett,* 477 U .S. 317, 324 (1986) (quoting Fed.R.Civ.P. 56(c), (e)).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers,* 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986)) (other citations omitted). Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather, the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of N.Y.,* 322 F.3d 139, 143 n. 5 (2d Cir.2003) (holding that not

verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

**\*4**  "[I]n a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.' " *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2007) (quoting *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972)) (other citations omitted). "However, a *pro se* party's 'bald assertion,' completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin,* 902 F.Supp. 424, 429 (S.D.N.Y.1995) (citing *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991)).

## B. Deliberate indifference to a serious medical need

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment." U.S. Const. amend. VIII. This includes the provision of medical care and punishments involving "the unnecessary and wanton infliction of pain." *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (citations omitted). A prisoner advancing an Eighth Amendment claim for denial of medical care must allege and prove deliberate indifference to a serious medical need. *See Wilson v. Seiter,* 501 U.S. 294, 297 (1991); *Hathaway,* 37 F.3d at 66. More than negligence is required "but less than conduct undertaken for the very purpose of causing harm." *Hathaway,* 37 F.3d at 66.

The test for a § 1983 claim is twofold. First, the prisoner must show that there was a sufficiently serious medical need. *See Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). Second, the prisoner must show that the prison official demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm. *See id.* "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer v. Brennan,* 511 U.S. 825, 844 (1994).

" 'Because society does not expect that prisoners will have unqualified access to healthcare,' a prisoner must first make [a] threshold showing of serious illness or injury" to state a cognizable claim. *Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003) (quotation omitted). Since there is no distinct litmus test, whether a medical condition is serious depends on certain factors, such as "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain." *Brock v. Wright,* 315 F.3d 158, 162–63 (2d Cir.2003) (citing *Chance,* 143 F.3d at 702). The court should also judge the severity of the denial of care within the context of the surrounding facts and circumstances of the case. *See Smith,* 316 F.3d at 185.

Deliberate indifference requires the prisoner "to prove that the prison official knew of and disregarded the prisoner's serious medical needs." *Chance,* 143 F.3d at 702. Thus, prison officials must be "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble,* 429 U.S. 97, 104, (1976). "Mere disagreement over proper treatment does not create a constitutional claim," as long as the treatment was adequate. *Id .* at 703. Furthermore, allegations of negligence or malpractice do not constitute deliberate indifference unless the malpractice involved culpable recklessness. *See Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).

### *1. Objective prong*

**\*5**  Plaintiff did not object to, nor does the Court find error with, Magistrate Judge Lowe's determination that plaintiff has satisfied the objective prong of his Eighth Amendment challenge. *See Hamilton v. Smith,* No. 9:06–cv–805, 2009 WL 3199531, \*14 (N.D.N.Y. Jan. 13, 2003) (citing *Guglielmoni v. Alexander,* 583 F.Supp. 821, 826 (D.Conn.1984)); *see also Loadholt v. Lape,* No. 9:09–CV–658, 2011 WL 1135934, \* 3 (N.D.N.Y. Mar. 3, 2011) (citing cases).

### *2. Subjective prong*

Although plaintiff met his burden with respect to the objective prong of his Eighth Amendment claim, the Court finds that Magistrate Judge Lowe correctly determined that there is no genuine issue of material fact showing that defendants were deliberately indifferent to plaintiff's serious medical need.

Non-medical personnel may engage in deliberate indifference if they intentionally deny or delay access to medical care. *See Zimmerman v. Burge,* No. 9:06–cv–176, 2009 WL 3111429, *8 (N.D.N.Y. Sept. 24, 2009) (citation omitted); *see also Baumann v. Walsh,* 36 F.Supp.2d 508, 512 (N.D.N.Y.1999) (citations omitted). "Courts which have considered the issue have ruled that in the context of suicide, jailers are not required to safeguard every inmate; only those presenting a 'strong likelihood of suicide' are entitled to protection." *Burke v. Warren County Sheriff's Dept.,* No. 90–CV–597, 1994 WL 6755042, *6 (citing *Schmelz v. Monroe County,* 954 F.2d 1540, 1545 (11th Cir.1992); *Colburn v. Upper Darby,* 946 F.2d 1017, 1024 (3d Cir.1991) (*Colburn II* ); *Bell v. Stigers,* 937 F.2d 1340, 1343 (8th Cir.1991); *Torraco v. Maloney,* 923 F.2d 231, 236 (1st Cir.1991); *Edwards v. Gilbert,* 867 F.2d 1271, 1276 (11th Cir.1989); *Molton v. City of Cleveland,* 839 F.2d 240, 243 (6th Cir.1988)). "In order to establish a strong likelihood of suicide, a detainee must have made a previous threat or an earlier attempt at suicide." *Id.* (citing *Elliott v. Cheshire County,* 940 F.2d 7, 11 (1st Cir.1991) ("In the absence of a previous threat of or an earlier attempt at suicide, we know of no federal court in the nation that has concluded that failing to prevent a suicide constitutes deliberate indifference"); *Bufington v. Baltimore County,* 913 F .2d 113, 119 (4th Cir.1990) (holding that liability could not be premised on the officers' failure to act on a speculative suicide risk); *Rellergert v. Cape Girardeau County,* 724 F.Supp. 662, 666 (E.D.Mo.1989) ("Obviously, in the absence of a previous threat or an earlier attempt at suicide, official misconduct in failing to prevent a suicide does not constitute deliberate indifference")).

In the present matter, the record does not indicate that plaintiff made any previous suicide threats. Moreover, the record makes clear that defendants promptly responded to plaintiff's suicide threat, and that defendant Barber continued to observe plaintiff until the conclusion of his shift at 3:00 p.m. *See* Dkt. No. 39–4 at ¶ 8. Further, defendant Christopher stated that, when he interviewed plaintiff at 7:50 a.m., plaintiff indicated that he had no intention of harming himself. *See* Dkt. No. 39–5 at ¶ 5. Thereafter, defendant Christopher notified mental health personnel of plaintiff's original suicide threat to defendant Barber and the fact that he also told defendant Christopher that he had no intention of harming himself. *See id.* at ¶ 6. Defendant Christopher finished his shift at 3:00 p.m. and had no other contact with plaintiff on the day in question. *See id.* at ¶ 7.

**\*6** Contrary to plaintiff's assertions, this conduct does not constitute deliberate indifference and is in compliance with DOCS' Directive regarding suicide prevention. *See* Dkt. No. 39–3 at 44. Specifically, the directive requires non-medical personnel to notify mental health staff of an inmate who may be a suicide risk. *See id.* at § IV(A). Once notified, mental health staff must respond with an evaluation **"within one business day."** *See id.* at § IV(B). Although such an evaluation had not yet occurred, defendant Barber continued to monitor plaintiff, despite the fact that he informed defendant Christopher that he no longer intended to commit suicide.

As Magistrate Judge Lowe correctly concluded, viewing the facts in the light most favorable to plaintiff, defendants' conduct does not rise to the level of deliberate indifference. [4] *See Kelsey v. City of New York,* 306 Fed. Appx. 700, 703 (2d Cir.2009) (holding that, in the pretrial detainee context, "deliberate indifference [is] lacking where officers take affirmative and reasonable steps to protect detainees from suicide" (citations omitted)).

## C. Plaintiff's Fourteenth Amendment claim

Plaintiff did not object to Magistrate Judge Lowe's conclusion that, "[w]here, as here, a plaintiff's Eighth Amendment and Fourteenth Amendment due process claims ' "overlap," the due process claim will be subsumed by the Eighth Amendment claim as the Eighth Amendment offers greater protections to prisoners.' " *See* Dkt. No. 52 at 8 (quotations and other citation omitted).

The Court has reviewed this claim and finds that Magistrate Judge Lowe correctly determined that the claim should be dismissed. *See Felix–Torres v. Graham,* 521 F.Supp.2d 157, 164 (N.D.N.Y.2007) (quoting *Graham v. Connor,* 490 U.S. 386, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986)).

## IV. CONCLUSION

After carefully considering Magistrate Judge Lowe's Report–Recommendation and Order, plaintiff's objections thereto, and the applicable law, and for the reasons stated herein, the Court hereby

**ORDERS** that Magistrate Judge Lowe's June 28, 2011 Report–Recommendation and Order is **ADOPTED** in its entirety for the reasons stated therein; and the Court further

**ORDERS** that defendants' motion for summary judgment is **GRANTED** and that plaintiff's complaint is **DISMISSED WITH PREJUDICE;** and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in defendants' favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve the parties with a copy of this Memorandum–Decision and Order in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 2975218

---

### Footnotes

1      By Order dated January 11, 2010, Judge David N. Hurd granted defendant Graham's motion to dismiss and dismissed him from the case. *See* Dkt. No. 20.

2      Plaintiff labeled his objections to Magistrate Judge Lowe's Report–Recommendation and Order as a "Notice of Appeal" and stated that he is hereby appealing Magistrate Judge Lowe's decision "to the United States Court of Appeal[s] for the Second Circuit." *See* Dkt. No. 53 at 1. Throughout the filing, however, plaintiff repeatedly states that he "objects to the Report and Recommendation" in general and then "objects" to specific findings made by Magistrate Judge Lowe. *See id.* at 2–3. In light of plaintiff's *pro se* status and the fact that "a party's failure to object to any purported error or omission in a magistrate judge's report waives further judicial review of the point," *Cephas v. Nash,* 328 F.3d 98, 107 (2d Cir.2003) (citation omitted), the Court will treat plaintiff's filing as timely filed objections to Magistrate Judge Lowe's June 28, 2011 Report–Recommendation and Order.

3      Despite the conclusory nature of most of plaintiff's objections, the Court will still person a *de novo* review.

4      Significantly, plaintiff's suicide attempt did not occur until after defendants were no longer on duty.

---

**End of Document**                              © 2026 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Distinguished by Sheffer v. Fleury,   N.D.N.Y.,   September 18, 2019

2014 WL 4146276
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Chris PRICE, Plaintiff,

v.

J. OROPALLO, Sergeant, Upstate Corr. Facility; Norman H. Bezio, Dir. of Shu, Inmate
Disciplinary Program, Nys Docs; and Phillip Battiste, Dir. of Security Staff, Nys Docs, Defendants.

No. 9:13–CV–0563 (GTS/TWD).
|
Signed Aug. 19, 2014.

**Attorneys and Law Firms**

Chris Price, Auburn, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the State of New York, Keith J. Starlin, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants.

*DECISION and ORDER*

GLENN T. SUDDABY, District Judge.

 **\*1**  Currently before the Court, in this *pro se* prisoner civil rights action filed by Chris Price ("Plaintiff") against the three above-captioned New York State correctional employees ("Defendants"), are Defendants' motion for summary judgment, and United States Magistrate Judge Therese Wiley Dancks' Report–Recommendation recommending that Defendants' motion be granted. (Dkt.Nos.25, 28.) Plaintiff has not filed an Objection to the ReportRecommendation, and the deadline by which to do so has expired. (*See generally* Docket Sheet.) After carefully reviewing the relevant filings in this action, the Court can find no clear error in the Report–Recommendation: Magistrate Judge Dancks employed the proper standards, accurately recited the facts, and reasonably applied the law to those facts. (Dkt. No. 28.) To that analysis, the Court would add only two points.

First, with regard to Plaintiff's claims against Defendants Battiste and Bezio, the Court notes that the verified Complaint does not allege facts plausibly suggesting, or adduce admissible evidence establishing, that Plaintiff sent letters to Battiste or Bezio at an appropriate address *and* by appropriate means. (Dkt. No. 1, at ¶ 6.) In any event, even if he had done so, the Complaint alleges facts plausibly suggesting, or adduces admissible evidence establishing, that a response by officials at his correctional facility followed the sending of the letters. (*Id.*)

Second, as an alternative ground for the dismissal of the Complaint, the Court accepts Defendants' failure-to-exhaust argument because, even assuming Plaintiff was in fact told that his complaint was not grievable, he filed the grievance and knew he was "suppose[d] to ... receive[ ]" a response to it. (Dkt. No. 1, at 4.) More important, he could have, and should have, filed an appeal from his non-response (which he did not do). 7 N.Y.C.R.R. § 701.6(g) ("[M]atters not decided within the time limits may be appealed to the next step."); *see also Smith v. Kelly,* 985 F.Supp.2d 275, 281–82 (N.D.N.Y.2013) (collecting cases). Such an appeal could have proved fruitful, given that the issue was indeed grievable. (Dkt. No. 25, Attach. 5. at ¶ 3 [Hale Decl.].)

For all of these reasons, Defendants' motion is granted, and Plaintiff's Complaint is dismissed.

**ACCORDINGLY,** it is

**ORDERED** that Magistrate Judge Dancks' Report–Recommendation (Dkt. No. 28) is ***ACCEPTED*** and ***ADOPTED*** in its entirety; and it is further

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 25) is ***GRANTED;*** and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is ***DISMISSED*** in its entirety.

### ORDER and REPORT–RECOMMENDATION

THÉRÈSE WILEY DANCKS, United States Magistrate Judge.

*Pro se* Plaintiff Chris Price, an inmate currently confined in the Auburn Correctional Facility, has commenced this action pursuant to 42 U.S.C. § 1983 alleging Defendants failed to protect him in violation of his Eighth Amendment rights by placing a member of a rival gang in his cell. (Dkt. No. 1.) Plaintiff has sued Corrections Sergeant Jon Oropallo ("Oropallo"); Phillip Battiste ("Battiste"), New York State Department of Corrections and Community Supervision ("DOCCS") Director of Security Staff; and Norman R. Bezio ("Bezio"), DOCCS Director of Special Housing/Inmate Disciplinary Program *Id.* at 1.

**\*2** Defendants filed an Answer to Plaintiff's Complaint (Dkt. No. 12) and have now moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. (Dkt. No. 25.) Plaintiff has not opposed the motion or sought additional time within which to do so. For the reasons set forth below, the Court recommends that Defendants' motion for summary judgment be granted.

### I. BACKGROUND

While Plaintiff was confined at the Upstate Correctional Facility ("Upstate"), his membership in the Crips gang was known to prison officials. (Dkt. No. 1 at ¶ 7.) Plaintiff expressed concerns for his safety to officials at Upstate, at least in part because according to Plaintiff, Defendant Oropallo had previously forced him to fight with members of the Bloods, a rival gang. *Id.* at 6. In a Declaration submitted in support of Defendants' motion for summary judgment, Oropallo denies ever having forced Plaintiff to fight with another inmate. (Dkt. No. 25–4 at ¶ 4.)

The evidence shows that Oropallo did issue a misbehavior report on Plaintiff on December 8, 2011, after observing Plaintiff and his cell mate Williams fighting. (Dkt. No. 25–4 at ¶ 8 and p. 23.) [1] The fight investigation form reveals that Plaintiff did not want protection and neither he nor Williams wanted to press charges in connection with the fight. *Id.* at p. 24. Donald Uhler ("Uhler"), Deputy Superintendent of Security at Upstate, reviewed Plaintiff's security file and found no request by him for protective custody. (Dkt. No. 25–3 at ¶ 10.)

Plaintiff claims that as a result of being forced to fight members of the Bloods gang, he filed a grievance and began speaking with officials at Upstate regarding his safety in the fall of 2011. (Dkt. No. 1 at ¶ 6.) Plaintiff's file from Upstate contains a December 12, 2011, "To Whom it May Concern" letter in which Plaintiff disclosed that he had been forced to fight on December 8, 2011, and had been threatened with a scalpel by members of the Bloods. (Dkt. No. 25–3 at ¶ 4 and p. 6.) In his December 12, 2011, letter Plaintiff indicated that he was writing to create a paper trail regarding safety issues he had raised with corrections officers and sergeants. (Dkt. No. 25–3 at p. 6.) Plaintiff wrote:

I used to be a well known crip gang member. The bloods still label me as being a crip gang member. So to back myself up, I'm [writing] to all people that I think should be notified of my situation of safety. On the 8th of this month for this particular reasons I stated above, I was [threatened] and forced to fight. I fear for my life while I'm here [incarcerated]. I just wanna do the time that I have and hopeful[ly] get a reversal on my appeals. Are there any ways that, I can be bunked up with someone who isn't labeled a bloods gang member, because I was threatened with a scalpel. I notified the proper personnel and I wasn't taken serious [ly] until I started kicking the cell door I was in, I was taken out to be forced to fight in another cell. I fear I'm a get hurt or I'm a hurt someone. Can you help me? Thank you for your time and [patience].

**\*3** *Id.*

According to Uhler, Lt. Lumbard ("Lumbard") investigated the letter on December 21, 2011. *Id.* at ¶ 5. Lumbard reported that Plaintiff told him that he was a member of the Crips gang and had been having trouble with members of the Bloods gang. *Id.* at p. 5. When asked about being threatened with a scalpel, Plaintiff refused to provide any information. *Id.* Plaintiff did tell Lumbard that he was getting along well with his current cell mate, and that they had no issues. *Id.* Lumbard indicated that the cell block staff had been notified about the situation and advised to leave Plaintiff with his cell mate and, if possible, to move the cell mate with him when he was moved upstairs. *Id.*

Plaintiff was dissatisfied with the resolution of his grievance and claims to have written to Defendants Battiste and Bezio about his safety concerns. *Id.* Plaintiff was subsequently told by Upstate officials that the safety issues of which he had complained would be handled, and he would not have to worry about being placed in the same cell with known members of the Bloods. *Id.* Nonetheless, on August 9, 2012, inmate Adams, a member of the Bloods, was brought in to bunk with Plaintiff. (Dkt. No. 1 at ¶ 6 .) Plaintiff and Adams got into what both described as a gang related fight in the cell within minutes after the officer placing Adams in the cell left, and Plaintiff sustained a non-displaced fracture of his nose and a laceration on his nose which required stitches. *Id .;* Dkt. Nos. 25–3 at 12; 25–4 at 8–9; 26 at 8–12.

Prior to Adams being placed in the cell with Plaintiff, Oropallo had no personal knowledge or information that would have led him to believe that Adams was gang related or would pose a threat to Plaintiff. (Dkt. No. 25–4 at ¶ 7.) Adams had never told Oropallo he was in a gang, and nothing about the December 8, 2011, fight between Plaintiff and Williams led Oropallo to believe Adams was a threat to Plaintiff. *Id.* at ¶ 10. Furthermore, the assignment of inmates for double cell housing was not within the scope of Oropallo's authority. *Id.* at ¶ 9.

DOCCS maintains an "enemies" list for inmates based upon information provided by the inmate and from his disciplinary record. *Id.* at ¶ 6. Uhler has explained in his Declaration that DOCCS does not recognize street gangs, and inmates frequently do not disclose gang affiliations to prison officials, although if there is information of gang affiliation, a notation might appear on the inmate's personal characteristics screen, his security file, or be made by a counselor during intake. *Id.* at ¶ 7. Uhler reviewed the DOCCS files on Adams and found no notations indicating that he was gang affiliated. *Id.* at ¶ 8; *see also* Adams' Personal Characteristics Form and Inmate Security Classification Form, neither of which identifies him as a member of the Bloods gang. *Id.* at pp. 9–10.

A misbehavior report was filed against Plaintiff as a result of the August 9, 2012, fight. (Dkt. No. 25–4 at 8.) Plaintiff was found guilty of violent conduct and assault and was given four months in the Special Housing Unit, loss of packages, commissary, ear phones, recreation, and good time, with two months suspended as an incentive for Plaintiff to improve his behavior. *Id.* at 5–6.

## II. APPLICABLE LEGAL STANDARDS

### A. General Legal Standards for Summary Judgment Motions

**\*4**  Summary judgment may be granted only if the submissions of the parties taken together "show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.

Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin,* 467 F.3d at 272–73. The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "Conclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact. *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir.1998).

A party opposing summary judgment is required to submit admissible evidence. See *Spiegel v. Schulmann,* 604 F.3d 72, 81 (2d Cir.2010) ("It is well established that in determining the appropriateness of a grant of summary judgment, [the court] ... may rely only on admissible evidence.") (citation and internal quotation marks omitted). A plaintiff's verified complaint is to be treated as an affidavit. [2] *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) ("A verified complaint is to be treated as an affidavit ... and therefore will be considered in determining whether material issues of fact exist ....") (citations omitted).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.,* 542 F.3d 290, 309 (2d Cir.2008). Where a party is proceeding *pro se,* the court is obliged to "read [the *pro se* party's] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994). However, "a *pro se* party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz,* No. 93 Civ. 5981(WHP)(JCF), 1999 WL 983876 at \*3, 1999 U .S. Dist. LEXIS 16767 at \*8 (S.D.N.Y. Oct. 28, 1999) (citing *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991)). [3]

### B. Summary Judgment When a *Pro Se* Plaintiff Fails to Oppose the Motion

Plaintiff has not opposed Defendants' summary judgment motion. N .D.N.Y. L.R. 56.2 requires the moving party to notify a *pro se* litigant of the consequences of failing to respond to the summary judgment motion. [4] Where a party has been given satisfactory notice of the consequences of failing to respond to a motion for summary judgment, the nonmovant's failure to respond to the movant's statement of material facts will result in the facts set forth in the statement being accepted as true to the extent they are supported by the evidence in the record. [5] *See* L.R. 7.1(a) (3) (*"The Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."*) (emphasis in original).

**\*5**  A *pro se* plaintiff's failure to oppose a summary judgment motion does not mean that the defendant's motion is to be granted automatically. An unopposed summary judgment motion may properly be granted "only if the facts as to which there is no genuine dispute show that the moving party is entitled to judgment as a matter of law." *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996) (internal quotes and citations omitted).

A district court has no duty to perform an independent review of the record to find proof of a factual dispute where the nonmovant fails to respond to a summary judgment motion. See *Amnesty America. v. Town of West Hartford,* 288 F.3d 467, 470 (2d Cir.2000). This is so even where a plaintiff is appearing *pro se* because even *pro se* plaintiffs must obey the Court's procedural rules. *See McNeil v. United States,* 508 U.S. 106, 113, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993). Although not obligated to do so, the Court

has elected to conduct a review of the entire record in this case. *See Monahan v. New York City Dept. of Corrections,* 214 F.3d 275, 292 (2d Cir.2000) (a court may, in its discretion, "choose to conduct an assiduous review of the record" even when a party has failed to file a statement of material facts). Because Plaintiff's Complaint is verified, the Court will treat it as an affidavit in opposition to Defendants' motion. *See Colon,* 58 F.3d at 872.

## III. ANALYSIS

### A. Administrative Exhaustion

Defendants argue that they are entitled to summary judgment based upon Plaintiff's failure to exhaust his administrative remedies with regard to Defendants' alleged failure to protect him from a Bloods gang member in violation of his Eighth Amendment rights. (Dkt. No. 25–6 at 5–6.)

#### 1. *Exhaustion Under The Prison Litigation Reform Act*

The Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under section 1983 ... or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U .S.C. § 1997(e). The PLRA requires "proper exhaustion" of prison administrative remedies, which includes compliance with agency deadlines and procedural rules. *See Woodford v. Ngo,* 548 U.S. 81, 90, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006). "[P]roper exhaustion ... means using all steps that the agency holds out and doing so properly (so that the agency addresses the issues on the merits)." *Id.* Exhaustion is mandatory, and an inmate cannot satisfy the PLRA's exhaustion requirement by filing an untimely or administratively defective grievance or appeal. *Id.* at 84–85.

The DOCCS Inmate Grievance Procedure ("IGP") has three stages which prison inmates must complete. *See* N.Y. Comp.Codes R. & Regs. tit. 7, § 701.5; *see also Hernandez v. Coffey,* 582 F.3d 303, 305 (2d Cir.2009). First a grievance complaint must be submitted to the Inmate Grievance Resolution Committee ("IGRC") for an initial determination within twenty-one calendar days of the alleged occurrence. *Id.* at § 701.5(a). Next, if the IGRC decision is adverse to the inmate, he has seven calendar days to appeal to the prison superintendent. *Id.* at § 701.5(c). If dissatisfied with the superintendent's decision, the inmate has another seven calendar days to appeal the superintendent's decision to the Central Office Review Committee ("CORC"). *Id.* at § 701 .5(d).

**\*6** An inmate must follow through on all three steps to complete the exhaustion process. *See Morrison v. Stefaniak,* 523 F. App'x 51 (2d Cir.2013) (summary order) (upholding dismissal of complaint because plaintiff failed to appeal IGRC's decision); *Belile v. Griffin,* No. 9:11–CV0092 (TJM/DEP), 2013 WL 1776086, at *3–4, 7, 2013 U.S. Dist. LEXIS 47137, at *10, 22–23 (N.D.N.Y. Feb.12, 2013) (plaintiff failed to exhaust his administrative remedies because he had not followed through on all of the steps, *i.e.,* he did not appeal to the superintendent of the facility or appeal any unfavorable decision of the superintendent to CORC).

Because failure to exhaust is an affirmative defense, defendants bear the burden of showing that a plaintiff has failed to exhaust his available administrative remedies. *See Murray v. Palmer,* No. 9:03–CV–1010 (GTS/GHL), 2010 WL 1235591, at *4, 2010 U.S. Dist. LEXIS 32014, at * 16 (N.D.N.Y. Mar.31, 2010). If a defendant meets that burden, however, a plaintiff's failure to exhaust does not end the review. "[O]nce a defendant has adduced reliable evidence that administrative remedies were available to Plaintiff and that Plaintiff nevertheless failed to exhaust those administrative remedies, Plaintiff must then 'counter' Defendants' assertion by showing exhaustion unavailability, estoppel, or 'special circumstances' [under *Hemphill v. State of New York,* 380 F.3d 680, 686 (2d Cir.2004) ]." *Murray,* 2010 WL 1235591, at *4. *Hemphill* sets forth a three-part inquiry for district courts. [6] First, courts must determine if administrative remedies were in fact available to plaintiff. In *Hemphill,* the Second Circuit stated that "[t]he test for deciding whether the ordinary grievance procedures were available must be an objective one: that is, would 'a similarly situated individual of ordinary firmness' have deemed them available." *Hemphill,* 380 F.3d at 688.

Second, courts must determine if the defendants are estopped from presenting nonexhaustion as an affirmative defense because they prevented the plaintiff inmate from exhausting his administrative remedies by conduct such as " 'beating him, threatening him, denying him grievance forms and writing implements, and transferring him to another correctional facility.' " *Hemphill,* 380 F.3d at 688 (citing *Ziemba v. Wezner,* 366 F.3d 161, 162 (2d Cir.2004)). Generally, defendants cannot be estopped from asserting a non-exhaustion affirmative defense based upon the actions or inaction of other individuals. *Murray,* 2010 WL 1235591, at *5 & n. 26 (collecting cases); *McCloud v. Tureglio,* No. 07–CV–0650, 2008 WL 1772305, at * 12, 2008 U.S. Dist. LEXIS 124388, at *44 (N.D.N.Y. Apr. 15, 2008) (Lowe, M.J.) ("None of those documents allege facts plausibly suggesting that Defendant's own actions inhibited Plaintiff's exhaustion of remedies during the time in question."). Third, the Second Circuit explained in *Hemphill* that there are certain "special circumstances" in which even though administrative remedies may have been available and the defendants may not be estopped from asserting a nonexhaustion defense, the inmate's failure to exhaust may be justified. *Hemphill,* 380 F.3d at 686.

### 2. *Exhaustion Analysis*

**\*7**  In his Complaint, Plaintiff has alleged that he asked to file a grievance with regard to the placement of a known Bloods gang member in his cell. (Dkt. No. 1 at ¶ 4.) According to Plaintiff, he was told by the grievance officer that the issue was not grievable and, as a result, never received a response to his grievance. *Id.* Jeffrey Hale ("Hale"), Assistant Director for the DOCCS IGP, has stated in his Declaration that the IGP is the appropriate vehicle for inmates to use to address issues regarding the person with whom they are housed and complaints against staff. (Dkt. No. 25–5 at ¶ 3.) Defendants have not, however, submitted evidence disputing Plaintiff's claim that he was told his complaint was not grievable.

Instead, Defendants have focused on a grievance filed by Plaintiff with regard to the medical care he received for the injuries he sustained in the fight with Adams and have relied upon Plaintiff's failure to appeal from the denial of that grievance as evidence of failure to exhaust the claim asserted in this lawsuit. (Dkt. Nos. 25–3 at ¶ 9 and pp. 11–13; 25–6 at 6.) In Grievance No. UST–50552, Plaintiff referenced the fight in his cell but only in the context of the fight as the cause of his broken nose. *Id.* at p. 11. Plaintiff's complaint was that it took five days for the medical staff at Upstate to send him out for x-rays. *Id.* The investigative report on the grievance references only the medical care given Plaintiff, and the grievance was denied solely on the grounds that there was no urgent need for an x-ray. *Id.* at p. 13. In short, the grievance has no direct relevance to Plaintiff's exhaustion of the failure to protect claim asserted in this lawsuit.

The relevant exhaustion issue on this motion is whether the allegation in Plaintiff's Complaint regarding his unsuccessful attempt to grieve the failure to protect issue is sufficient by itself to raise an issue of fact under any of the *Hemphill* considerations. A number of district courts in the Second Circuit have found either that the IGP is unavailable to an inmate who has been told by a prison official that his complaint was not grievable, or that the misinformation constitutes a special circumstance excusing exhaustion under *Hemphill.* [7]  *See, e.g., Partee v. Goord,,* No. 06–15528, 2007 WL 2164529(SAS), at *4, 2007 U.S. Dist. LEXIS, at *14 (S.D.N.Y. July 25, 2007) (excusing exhaustion requirement because plaintiff was told in reply to his grievance that his claim was outside the purview of the IGRC, and he reasonably understood this to mean his dispute was not grievable); *Lewis v. Cunningham,* No. 05–9243(GBD), 2007 WL 2412258, at *2, 2007 U.S. Dist. LEXIS 62346, at *5 (S.D.N.Y. Aug.23, 2007) (finding special circumstances justifying failure to exhaust remedies because a supervisor told plaintiff that filing a grievance was not the proper way to address a complaint, and to instead write a letter to the Chief Medical Officer at the Department of Health, which he did); *Jeffers v. Goord,* No. 9:99–CV–0335 (FJS/GHL), 2005 WL 928628, at *6, 2005 U.S. Dist. LEXIS 39309, at *16–17 (N.D.N.Y. Apr.4, 2005) ("[p]rison official may prevent a prisoner from utilizing a remedy by incorrectly representing to the prisoner that his complaint is not grievable, or that it is grievable only through another avenue.").

**\*8**  Defendants' failure to submit evidence refuting or explaining Plaintiff's claim that he was told his complaint was not grievable leaves material issues of fact regarding the applicability of one or more of the *Hemphill* considerations. Therefore, the Court recommends that Defendants' request for summary judgment on the grounds that Plaintiff failed to exhaust his administrative remedies be denied without prejudice.

**B. Battiste and Bezio**

The Eighth Amendment to the United States Constitution "requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody." *Hayes v. New York City Dep't of Corr.,* 84 F.3d 614, 620 (2d Cir.1996). Prison officials are liable under the Eighth Amendment for harm incurred by an inmate if they act with deliberate indifference to the inmate's safety. *Morales v. New York State Dep't of Corr.,* 842 F.2d 27, 30 (2d Cir.1988) ("[A] state prison guard's deliberate indifference to the consequences of his conduct for those under his control and dependent upon him may support a claim under § 1983."); *see also Hendricks v. Coughlin,* 942 F.2d 109, 113 (2d Cir.1991) ("[A]n inmate's claim that prison officials failed, as a result of their deliberate indifference, to protect [the inmate] from the violent actions of other inmates may state a viable § 1983 cause of action."); *Ayers v. Coughlin,* 780 F.2d 205, 209 (2d Cir.1985) ("The failure of custodial officers to employ reasonable measures to protect an inmate from violence by other prison residents has been considered cruel and unusual punishment"); *Wassmann v. County of Ulster,* 528 F. App'x 105, 106 (2d Cir.2013) ("Officers at correctional facilities have a duty to protect inmates from violence at the hands of other inmates.") (citing *Farmer v. Brennan,* 511 U.S. 825, 833, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)).

To prevail on a failure to protect claim, an inmate must show that (1) he was incarcerated under conditions posing a substantial risk of serious harm; and (2) prison officials exhibited deliberate indifference. *Farmer,* 511 U.S. at 837. In order to establish deliberate indifference where a prison official has failed to protect an inmate from violence by another inmate, a plaintiff must prove that the defendant official actually knew of and disregarded an excessive risk of harm to the plaintiff's safety. *Hayes,* 84 F.3d at 620. Even assuming that the allegations in Plaintiff's Complaint are sufficient to satisfy, or at least raise a question of fact on the issue of substantial risk of harm, the summary judgment record is devoid of evidence that Battiste and Bezio exhibited deliberate indifference to Plaintiff's safety in placing Adams in his cell.

The law is clear that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977). "Because vicarious liability is inapplicable to ... § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal,* 556 U.S. 662, 676, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). ("Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior.*"). "Holding a position in a hierarchical chain of command, without more, is insufficient to support a showing of personal involvement." *Groves v. Davis,* No. 9:11–CV–1317 (GTS/RFT), 2012 WL 651919, at *6, 2012 U.S. Dist. LEXIS 25367, at *22–23 (N.D.N.Y. Feb.28, 2012) (citing *McKinnon,* 568 F.2d at 934); *see also Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003) (a "mere 'linkage in the prison chain of command' is insufficient to implicate a state commissioner of corrections ... in a § 1983 claim") (citing *Ayers,* 780 F.2d at 210). Therefore, "a plaintiff must ... allege a tangible connection between the acts of a defendant and the injuries suffered ." *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

**\*9** The Second Circuit has held that personal involvement by a supervisor necessary to state a claim under § 1983 may be found where: "(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *Colon,* 58 F.3d at 873.[8]

Plaintiff claims that he wrote to Defendants Battiste and Bezio with respect to his safety concerns with regard to sharing a cell with a Bloods gang member after he was dissatisfied with the response of Upstate officials to his complaints in the fall or winter of 2011. (Dkt. No. 1 at ¶ 6.) According to Plaintiff after he sent the letters to Battiste and Bezio he was told by Upstate officials that his safety issue had been addressed. *Id.*

Battiste and Bezio did not submit evidence regarding whether they received letters from Plaintiff and, if so, took any action in response. Instead, they rely upon an attorney's declaration stating upon information and belief that a search was made of

records in the DOCCS Central Office and no correspondence to or from Plaintiff was found. (Dkt. No. 25–2 at ¶ 3.) The source of counsel's information and belief appears to be the July 25, 2013, unsworn letter from a DOCCS senior attorney annexed as an exhibit. *Id.* at p. 4.

"[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment." *Raskin v. Wyatt Co.,* 125 F.3d 55, 66 (2d Cir.1997); *see also Salahuddin,* 467 F.3d at 272–73 (movant bears the initial burden of showing through the production of admissible evidence that he is entitled to judgment as a matter of law). An attorney's affidavit that is not based upon personal knowledge and relies upon an attached letter not sworn as required by Rule 56(e) is not admissible evidence and not properly considered on a summary judgment motion. [9] *See Beyah v. Coughlin,* 789 F.2d 986, 989 (2d Cir.1986); *see also Sepanski v. Jani–King, Inc.,* No. 10–CV–518S, 2013 WL 4455412, at *2–3, *8, 2013 U.S. Dist. LEXIS 116437, at *8 (W.D.N.Y. Aug.16, 2013) (holding that three unsworn letters submitted by plaintiff could not be considered in connection with a motion for summary judgment).

A movant's burden of demonstrating the absence of a question of material fact remains the same where the motion is unopposed. *See Vt. Teddy Bear Co. v. 1–800 Beargram Co.,* 373 F.3d 241, 244 (2d Cir.2004) ("If the evidence submitted in support of the summary judgment motion does not meet the movant's burden of production, then summary judgment must be denied even if no opposing evidentiary matter is presented.") (citation and internal quotation marks omitted). Defendants have not satisfied their burden of production with respect to Plaintiff's claim that he wrote to Battiste and Bezio regarding his concerns about Bloods.

**\*10** Nonetheless, because Plaintiff has not alleged facts in his Complaint showing that Battiste or Bezio had knowledge of, or personal involvement in, Adams being placed in a cell with him, or that they were aware of Adams' Bloods affiliation, he has failed to state an Eighth Amendment claim against the two supervisory officials for failure to protect him from the injuries he sustained in the fight with Adams. *See McKinnon,* 568 F.2d at 934 (personal involvement in constitutional deprivation is a prerequisite to an award of damages under § 1983); *Hayes,* 84 F.3d at 620 (defendant official must actually have known of and disregarded an excessive risk of harm to the plaintiff's safety to establish deliberate indifference).

Therefore, the Court recommends that Battiste and Bezio be granted summary judgment dismissing the Complaint as against them.

### C. Oropallo

Even assuming, *arguendo,* that the allegations in Plaintiff's Complaint are sufficient to satisfy, or at least raise a question of fact, on the issue of substantial risk of harm, the evidence in the summary judgment record establishes that Defendant Oropallo did not know of and disregard an excessive risk of harm to Plaintiff's safety in connection with Adams being placed in Plaintiff's cell. *See Hayes,* 84 F.3d at 620. The prison files on inmate Adams contained no notations indicating that he was gang related. (Dkt. No. 25–3 at ¶ 8.) The DOCCS "enemies" list did not identify Plaintiff and Adams as enemies. *Id.* at ¶ 6. Moreover, Plaintiff's security file contained no requirements for protective custody. *Id.* at ¶ 10.

According to Oropallo, prior to the altercation between Plaintiff and Adams, he had no personal knowledge or information that would have led him to believe that Adams was gang affiliated or would pose a threat to Plaintiff. (Dkt. No. 25–4 at ¶ 7.) Adams had not told Oropallo he was in a gang before being placed in Plaintiff's cell. *Id.* at ¶ 10. Moreover, the assignment of inmates in double cell housing was not within Oropallo's authority. *Id.* at ¶ 9.

Since Plaintiff has failed to submit opposition to Defendants' motion, the Court can look only to his verified Complaint for evidence demonstrating that a genuine issue of material fact exists as to whether Oropallo knew of and disregarded an excessive risk of harm to the plaintiff's safety. *Id.* Mere allegations in Plaintiff's Complaint, especially conclusory allegations or conjecture and speculation, are insufficient to create a genuine issue of fact. *See Matsushita,* 475 U.S. at 585–86; *Kerzer,* 156 F.3d at 400.

None of the allegations in Plaintiff's verified Complaint contradicts Defendants' evidence that prison records did not identify Adams as a member of the Bloods gang, that Oropallo had no knowledge that Adams was a member of the Bloods gang at the time he was placed in Plaintiff's cell, and that Oropallo had no authority with regard to the assignment of inmates in double cells. Therefore, Plaintiff has failed to raise a question of fact as to whether Oropallo was deliberately indifferent to his safety, a necessary element of proof on an Eighth Amendment claim for cruel and inhuman punishment based upon a failure to protect. *See Farmer,* 511 U.S. at 837. Therefore, the Court recommends that Oropallo's motion for summary judgment be granted.

**\*11  ACCORDINGLY,** it is hereby

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 25) be **GRANTED;** and it is further

**ORDERED** that the Clerk provide Plaintiff with copies of the unpublished decisions cited herein.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892F.2d 15 (2d Cir.1989) (per curiam); 28 U.S.C. § 636(b) (1); Federal Rules of Civil Procedure 72, 6(a).

Filed June 18, 2014.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 4146276

---

**Footnotes**

1    Page numbers cited herein are those assigned by the Case Management/Electronic Case File (CM/ECF) system.

2    Plaintiff's Complaint (Dkt. No. 1) was properly verified under 28 U.S.C. § 1746. *See LeBoeuf, Lamb, Greene & MacRae, L.L.P. v. Worsham,* 185 F.3d 61, 65–66 (2d Cir.1999) (use of the language "under penalty of perjury" substantially complies with 28 U.S.C. § 1746).

3    Copies of unpublished decisions cited herein will be provided to Plaintiff in accordance with *Lebron v. Sanders,* 557 F.3d 76, 79 (2009) (*per curiam* ). [Editor's Note: Attachments of Westlaw case copies deleted for online display.]

4    A Notice of the Consequences of Failing to Respond to a Summary Judgment Motion was served with Defendants' motion papers in this case. (Dkt. No. 25 at 3.)

5    *See Vermont Teddy Bear Co., Inc. v. 1–800 Beargram Co.,* 373 F.3d 241, 244 (2d Cir.2004) ("[I]n determining whether the moving party has met [its] burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts contained in the moving party's Rule 56.1 Statement. It must be satisfied that the citation to evidence in the record supports the assertion.") (citation omitted).

6    Subsequent to *Hemphill,* the Supreme Court decided *Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006). The question addressed in *Woodford* was whether "a prisoner can satisfy the [PLRA's] exhaustion requirement by filing an untimely or otherwise procedurally defective administrative grievance or appeal." *Id.* at 83–84. The Supreme Court resolved the question in the negative, explaining that PLRA requires "proper exhaustion"—"using all steps that the agency holds out, and doing so properly (so that the agency addressed the issues on the merits)." *Id.* at 90 (citation

omitted). Although the Second Circuit has acknowledged that there is some question as to whether the estoppel and special circumstances inquiries in *Hemphill* survived *Woodford,* the Court has as yet found it unnecessary to decide the issue and appears to still be considering all three *Hemphill* inquiries in exhaustion cases. *See, e.g., Amador v. Andrews,* 655 F.3d 89, 102–03 (2d Cir.2011) (finding it unnecessary to decide whether *Hemphill* is still good law because plaintiff had failed to establish that defendants were estopped from raising non-exhaustion as an affirmative defense) (internal quotation marks omitted).

7    Courts have noted that there is significant overlap in the three *Hemphill* considerations. *See, e.g., Barksdale v. Frenya,* No. 9:10–CV–00831 (MAD/DEP), 2012 WL 4107805, at *6 n. 11, 2012 U.S. Dist. LEXIS 134738, at *21 n. 11 (N.D.N.Y. Sept.19, 2012) ("In practicality these three prongs of the prescribed test, though perhaps intellectually distinct, plainly admit of significant overlap."). A failure to exhaust as a result of being given false information on whether a complaint was grievable by a non-defendant could arguably fit within either the first or third consideration.

8    The Supreme Court's decision in *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) has arguably nullified some of the categories set forth in *Colon. See Sash v. United States,* 674 F.Supp.2d 531, 543–44 (S.D.N.Y.2009) (collecting cases). However, the Second Circuit has yet to issue a decision addressing *Iqbal's* effect on the *Colon* categories, and I will assume for purposes of this motion that *Colon* remains good law.

9    Statements in Defendants' Statement Pursuant to Rule 7.1(a)(3) are deemed admitted on an unopposed summary judgment motion only to the extent they are supported by admissible evidence. *See Amaker v. Foley,* 274 F.3d 677, 681 (2d Cir.2001) ("court may not rely solely upon statement of undisputed facts in determining whether movant has met this burden of showing the absence of a genuine issue for trial; court must be satisfied that the citation to evidence in the record supports the assertion). Paragraph 13 of Defendants' Rule 7.1(a)(3) Statement (Dkt. No. 25–1), stating that "[t]here is no evidence to demonstrate that Defendants Bezio or Battiste received correspondence from Plaintiff," relies upon an attorney's declaration that is not based upon personal knowledge and an unsworn letter, neither of which constitutes admissible evidence. *See Beyah v. Coughlin,* 789 F.2d 986, 989 (2d Cir.1986).

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:24-cv-00384-AJB-MJK    Document 36    Filed 01/21/26    Page 49 of 75

Randolph v. Kalies, Not Reported in Fed. Supp. (2021)

2021 WL 5605557
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Edward RANDOLPH, Plaintiff,

v.

Lisa KALIES, et al., Defendants.

9:19-cv-1161 (DNH/TWD)
|
Signed 11/10/2021

**Attorneys and Law Firms**

EDWARD RANDOLPH, Plaintiff, pro se, 9002100192- B&C, AMKC, 18-18 Hazen Street, East Elmhurst, New York 11370.

OF COUNSEL: DAVID C. WHITE, ESQ., Assistant Attorney General, HON. LETITIA JAMES, Attorney General for the State of New York, Counsel for Defendants, The Capitol, Albany, New York 12224.

## ORDER AND REPORT-RECOMMENDATION

THÉRÈSE WILEY DANCKS, United States Magistrate Judge

## I. INTRODUCTION

*1  Edward Randolph ("Plaintiff"), who was at all relevant times in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"), commenced this *pro se* civil rights action under 42 U.S.C. § 1983 asserting claims arising out of his incarceration at Auburn Correctional Facility ("Auburn"). (Dkt. No. 19 (the "amended complaint").) Plaintiff alleges Office of Mental Health ("OMH") Forensic Unit Chief Lisa Kalies ("Kalies"), OMH Licensed Clinical Social Worker and Residential Crisis Treatment Program ("RCTP") Coordinator Stephanie Agosh ("Agosh"), and social worker Jane Doe were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment. (Dkt. Nos. 19, 23, 55.) Kalies and Agosh (together "Defendants") now move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. (Dkt. No. 62.) Plaintiff filed a response. (Dkt. No. 72.) Defendants filed a reply. (Dkt. No. 76.)

Defendants' motion has been referred for a Report-Recommendation by the Honorable David N. Hurd, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). For reasons explained below, the Court recommends granting Defendants' motion.

## II. BACKGROUND

Plaintiff claims he was denied adequate care for his serious mental health needs at Auburn from August 2017 through November 2017. (Dkt. No. 19.) Plaintiff also claims Defendants were deliberately indifferent to his mental health needs by discharging him from the RCTP resulting in his attempted suicide on November 21, 2017. *Id.* In support of their motion, Kalies and Agosh submitted declarations, along with relevant medical records, which the Court summarizes below.

On August 24, 2017, Plaintiff was housed in the Special Housing Unit ("SHU") at Auburn and alerted a corrections officer that he was depressed and having suicidal thoughts. (Dkt. No. 62-2 at ¶ 6. [1]) He was then transferred from the SHU to the RCTP, where he remained for twelve days for observation and treatment. *Id.*

Randolph v. Kalies, Not Reported in Fed. Supp. (2021)

Case 9:24-cv-00384-AJB-MJK    Document 36    Filed 01/21/26    Page 50 of 75

Agosh evaluated Plaintiff on September 5, 2017. (Dkt. No. 62-2 at ¶ 7.) It was noted Plaintiff had been resting comfortably throughout the day, there were no reports of any disruptive sleep behaviors throughout the night, he was not tearful or crying, he had not engaged in any self-harming behaviors, he had no behavioral issues, he had been eating all meals, and he had been socializing with his peers. *Id.* Plaintiff was talkative and engaged and they discussed potential triggers/stressors in Plaintiff's life, including his sentence, his anger at his children's mother regarding missed visitation, thoughts about his children's wellbeing, the loss of his grandmother who was his emotional and financial support, and issues with his sister's health. *Id.* Overall, Agosh found Plaintiff's objective presentation was incongruent with his prior reports of thoughts of self-harm. *Id.* Based upon this comprehensive evaluation and collaboration with the treatment team, Plaintiff was discharged from the RCTP. *Id.* [2]

**\*2** Plaintiff, however, refused orders to return to the SHU and was forcibly extracted by corrections staff. (Dkt. No. 62-1 at ¶ 6.) Thereafter, Plaintiff threatened self-harm in his SHU cell and was re-admitted to the RCTP. *Id.* at ¶ 8.

Plaintiff remained under observation and was evaluated by Agosh on September 6, 2017. (Dkt. No. 62-2 at ¶ 9.) Plaintiff was resting comfortably and exhibited no signs of mental distress or self-harm. *Id.* Security advised Agosh that Plaintiff had been eating meals, had not had any behavioral issues, had not engaged in any self-harming behaviors, and was witnessed socializing with his peers. *Id.* Agosh consulted with the treatment team, and it was determined Plaintiff would remain in the RCTP overnight and would be discharged the following day pending any notable changes to his mental status. *Id.*

The next day, security reported that Plaintiff had no issues sleeping through the night, he was witnessed on several occasion socializing and laughing with peers, and was overheard discussing plans to remain in the RCTP rather than returning to the SHU. *Id.* Although Plaintiff reported that he wanted to hurt himself, Agosh found his presentation continued to be incongruent with such statements. *Id.* Plaintiff displayed no objective signs of depression or anxiety and only presented angry when discussion of returning to the SHU was mentioned. *Id.* After being informed of the treatment team's decision to discharge him from the RCTP, Plaintiff responded, "I'm not fucking leaving." *Id.* After Agosh left, Plaintiff smeared feces on his body, refused to leave the RCTP, and was forcibly extracted from his cell. *Id.* Thereafter, Kalies accompanied Plaintiff from the RCTP to the SHU. (Dkt. No. 62-3 at ¶ 9. [3])

Once in his SHU cell, Plaintiff fashioned a noose with a bed sheet and threatened self-harm. *Id.* Plaintiff was then transferred to another SHU cell under a cell property deprivation order. (Dkt. No. 19 at 19.) There, Plaintiff located a "stereo headphone jack" in the wall, broke it apart, and used pieces of metal to cut his wrist "viciously." *Id.* at 20; *see also* Dkt. No. 62-6 at 26-28. Plaintiff swallowed the pieces of metal and received medical attention for his injuries, which did not require a Band-Aid or other form of closure. (Dkt. No. 62-3 at ¶ 10.)

Kalies was notified that Plaintiff had used a piece of a headphone jack to "superficially" scratch himself and she authorized Plaintiff's readmission to the RCTP. *Id.* Plaintiff was placed on a 1:1 watch in the infirmary for both mental health observation and contraband watch, pending retrieval of the piece of metal. *Id.* [4] Plaintiff was evaluated by mental health staff daily. *Id.* Plaintiff claims his requests for "special mental health treatment" and an appointment with a psychiatrist were denied. (Dkt. No. 19 at 22.)

On September 8, 2017, Kalies performed a comprehensive sixty-minute evaluation of Plaintiff. (Dkt. No. 62-3 at ¶ 11.) Plaintiff vented his frustrations to Kalies and discussed his grandmother's passing. *Id.* Over the course of the next two weeks, Plaintiff was housed in the infirmary, where he was evaluated daily by medical professionals, and was generally sleeping throughout the night, eating meals, and socializing throughout the day. *Id.* He showed no active signs of distress, significant depression, or anxiety. *Id.* Kalies evaluated Plaintiff on September 20, 2018, during which time he resisted her attempts to counsel him on ways to feel better, including taking his medications and implementing coping skills. *Id.* at ¶ 12.

**\*3** Plaintiff was also examined by non-party Jesse Palermo ("Palermo"), a licensed master social worker, on September 29, 2017. (Dkt. No. 62-1 at ¶ 24.) Plaintiff reported that he had been engaging in self-harming behavior, such as scratching and picking at his scabs, because he "needed treatment" and help. *Id.*

Agosh examined Plaintiff on October 2, 2017, and Plaintiff expressed his frustration that the mental health treatment was not helping. *Id.* at ¶ 25. Agosh noted Plaintiff continued to be resistant to engage in therapeutic discussions. *Id.*

On October 17, 2017, security reported Plaintiff had used his mattress to cover himself and was picking his scabs. *Id.* at ¶ 23. He also had blocked the hatch on the cell door for several hours. *Id.* Nursing staff indicated Plaintiff refused psychiatric medications. *Id.* Thereafter, Kalies and the treatment team determined Plaintiff would be moved from the infirmary to an observation cell in the RCTP. (Dkt. No. 62-3 at ¶ 13.) As set forth in her declaration, Kalies made this determination based upon Plaintiff's mental state at that time, and determined that the MHU observation cell offered the best means by which to treat Plaintiff as he could be monitored and observed at all times. *Id.* Plaintiff refused this transfer and was extracted by security. *Id.*

On October 25, 2017, Plaintiff refused to meet with Agosh. (Dkt. No. 62-2 at ¶ 35.) Security advised Plaintiff had no behavioral issues that day, had not engaged in any self-harm, and continued to eat his meals. *Id.* (Dkt. No. 62-2 at ¶ 35.)

On November 3, 2017, Plaintiff was temporarily transferred to the RCTP at Five Points Correctional Facility ("Five Points"). (Dkt. No. 62-10 at 2.) There, Plaintiff engaged in no self-harming behavior, was seen by a psychiatrist three times, and was offered interviews with OMH clinicians during his admission, which he mostly refused. (Dkt. No. 62-2 at ¶ 29.) It was noted Plaintiff showed no signs of any distress, was socializing with peers, and was overheard discussing that he wanted to remain in the RCTP. *Id.* The treatment team at Five Points did not find any clinical indication to warrant Plaintiff's continued admission in the RCTP and discharged Plaintiff back to Auburn on November 15, 2017. *Id.*; *see also* Dkt. No. 72-2 at 61. [5]

Plaintiff was discharged from Auburn's RCTP to the SHU on November 16, 2017. (Dkt. No. 62-2 at ¶ 29.) However, Plaintiff failed his SHU screening and was readmitted to the RCTP almost immediately after cutting his arm and swallowing a small piece of metal in front of staff. (Dkt. No. 63-6 at 4. [6] )

Agosh evaluated Plaintiff on November 21, 2017. (Dkt. No. 62-2 at ¶ 30.) During this interview, Plaintiff discussed his past history of significant time in the SHU. *Id.* Plaintiff reported, "I never minded it ... my lawyer said the longer I stay in the SHU ... the bigger the payout I get". *Id.* Agosh asked Plaintiff why he felt that coming to Auburn had triggered him as he had never before threatened self-harm. *Id.* Plaintiff responded, "I asked for help ... and you people cleared me". *Id.*

**\*4**  Later that evening, Plaintiff attempted to commit suicide by lacerating his antecubital fossa with a sharp object and was taken to Erie County Medical Center ("ECMC") for further treatment. (Dkt. No. 62-1 at ¶ 38.) Plaintiff was discharged from ECMC on November 22, 2017, and subsequently transferred to Wende Correctional Facility. *Id.* at ¶ 39.

## III. DISCUSSION

### A. Legal Standard

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue of fact is material for purposes of this inquiry if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Gourd*, 467 F.3d 263, 272–73 (2d Cir. 2006). The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin*, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "Conclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

The Second Circuit has reminded that on summary judgment motions "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005). "At the summary judgment stage, a nonmoving party must offer some hard evidence showing that [his] version of the events is not wholly fanciful." *Id.* (citation and internal quotation marks omitted). Accordingly, statements "that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). Where a party is proceeding *pro se*, the court is obligated to "read [the *pro se* party's] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994).

### B. Plaintiff's Failure to Comply with Local Rules

Pursuant to this District's Local Rules, "[t]he Court may deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." N.D.N.Y. L.R. 56.1(b). Where a party has failed to respond to the movant's statement of material facts as required by the Local Rules, the facts in the movant's statement will be accepted as true (1) to the extent they are supported by evidence in the record, and (2) the nonmovant, if proceeding *pro se*, has been specifically advised of the possible consequences of failing to respond to the motion. *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996).

**\*5** As required by the Local Rules, Defendants advised Plaintiff of the consequences of failing to file a response to Defendants' Statement of Material Facts. (Dkt. No. 62 at 3.) While Plaintiff submitted a response to Defendants' motion, he failed to do so in the manner required under the Local Rules. [7] "Although a *pro se* litigant is entitled to a liberal construction of his filings, *see Sykes v. Bank of America*, 723 F.3d 399, 403 (2d Cir. 2013), his *pro se* status does not relieve him of his obligation to comply with the relevant procedural rules." *Marino v. Watts*, No. 9:12-CV-801 (NAM/DJS), 2018 WL 3121612, at *1 (N.D.N.Y. Mar. 7, 2018), *report-recommendation adopted sub nom. Marino v. Schult*, 2018 WL 1578163 (N.D.N.Y. Mar. 30, 2018), *aff'd*, 764 F. App'x 73 (2d Cir. 2019) (summary order).

Although this Circuit adheres to the view that nothing in Rule 56 imposes an obligation on a court to conduct a searching and independent review of the record to find proof of a factual dispute where a non-movant willfully fails to respond to a properly filed summary judgment motion, *Amnesty Am. v. Town of West Hartford*, 288 F.3d 467, 470 (2d Cir. 2002), the Second Circuit has ruled that "[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules," including local rules relating to requirements regarding the submission of and response to statements of material facts on summary judgment motions, and whether to "conduct an assiduous review of the record." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001) (citation and quotation marks omitted). In deference to Plaintiff's *pro se* status, the Court has opted to review the entire summary judgment record. [8]

### C. Deliberate Indifference

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment." U.S. Const. amend. VIII. This prohibition encompasses the provision of medical care involving "the unnecessary and wanton infliction of pain." *Hathaway*

Case 9:24-cv-00384-AJB-MJK     Document 36     Filed 01/21/26     Page 53 of 75

Randolph v. Kalies, Not Reported in Fed. Supp. (2021)

*v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994) (citations omitted). However, not "every injury" a prisoner suffers "translates into constitutional liability for prison officials." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). In order to establish an Eighth Amendment claim for medical indifference, a plaintiff must allege that the defendant was deliberately indifferent to a serious medical need. *See id.* This standard requires proof of both an objective and subjective element.

**\*6** The objective component "requires that the alleged deprivation must be sufficiently serious, in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain exists." *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011) (quoting *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996)) (internal quotation marks omitted). Courts have found that "[t]reatment of mental disorders of mentally disturbed inmates is ... a serious medical need....' " *Fontaine v. Cornwall*, No. 9:15-CV-432 (DNH), 2019 WL 4257136, at \*4 (N.D.N.Y. Sept. 9, 2019) (alternations in original) (quoting *Hamilton v. Smith*, No. 06-CV-805 (GTS/DRH), 2009 WL 3199531, at \*14 (N.D.N.Y. Jan. 13, 2009)); *see also Helijas v. Corr. Med. Care, Inc.*, No. 115-CV-1049 (GTS/DJS), 2016 WL 5374124, at \*13 (N.D.N.Y. Sept. 26, 2016) ("With respect to the objective prong of an Eighth Amendment claim, courts have found that depression with suicidal ideation, or severe anxiety attacks are sufficiently severe conditions to meet the objective element of the deliberate indifference standard." (quotation marks and citation omitted)).

Under the subjective component, medical mistreatment rises to the level of deliberate indifference only when it "involves culpable recklessness, i.e., an act or a failure to act ... that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Chance v. Armstrong*, 143 F. 3d 698, 703 (2d Cir. 1998) (quoting *Hathaway*, 99 F.3d at 553). Thus, the defendant "official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [the official] must also draw the inference." *Farmer*, 511 U.S. at 837. Satisfying this standard "entails something more than mere negligence ... [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* at 835. Accordingly, "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 838; *see also Estelle v. Gamble*, 429 U.S. 97, 105-06 (1976) (holding that an "inadvertent failure to provide adequate medical care" does not constitute "deliberate indifference"); *Chance*, 143 F.3d at 703 (holding that "[m]ere disagreement over proper treatment does not create a constitutional claim," as long as the treatment was adequate); *Hathaway*, 99 F.3d at 553 (holding that "mere medical malpractice" does not constitute deliberate indifference unless the malpractice involved "culpable recklessness").

"In an inmate suicide context, there are two scenarios where deliberate indifference may exist." *Allah v. Kemp*, No. 9:08-CV-1008 (NAM/GHL), 2010 WL 5860290, at \*7 (N.D.N.Y. Nov. 9, 2010). "First, officials could be deliberately indifferent to the risk of suicide by failing to discover an individual's suicidal tendencies." *Id.* (quotation marks and citation omitted). "Second, officials could have discovered and have been aware of the suicidal tendencies, but could be deliberately indifferent in the manner by which they respond to the recognized risk of suicide." *Id.* (quotation marks and citation omitted). "The second scenario focuses on the adequacy of preventive measures." *Id.* (quotation marks and citation omitted). However, even if a medical defendant's "treatment decision was erroneous, deliberate indifference cannot be inferred [where] the decision was not such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment." *Sims v. Gorman*, No. 09-CV-6643, 2012 WL 566875, at \*6 (W.D.N.Y. Feb. 21, 2012) (quotation marks and citation omitted).

**\*7** Here, Defendants argue that assuming, *arguendo*, Plaintiff has satisfied the objective prong of the analysis, Plaintiff has failed to satisfy the subjective component. (Dkt. No. 62-4 at 7-12.) According to Defendants, the record evidence establishes that they treated Plaintiff in accordance with their professional judgment at all times and did not act with deliberate indifference in the care provided to Plaintiff at any time. Defendants contend Plaintiff has not, and cannot, establish that any actions by them rise to the level of deliberate indifference. At best, Defendants assert Plaintiff's claim amounts to a difference in opinion as to the mental health treatment Plaintiff required.

Generally, in opposition, Plaintiff argues Defendants have "fabricated a lot of the information" they provided, "fudged [their] notes'", "falsified" information, and have not "truthfully reported" their encounters with Plaintiff. (Dkt. No. 72-3 at 2, 3, 11, 27, 36; *see also* Dkt. No. 72 at 59-60.) Plaintiff further claims Defendants were "deliberately indifferent" to Plaintiff's

established emotional and psychological instabilities, including by discharging him from the RCTP, refusing to refer Plaintiff to a psychiatrist or other medical professional, and relying on "hearsay" information from unidentified security and treatment team staff, which resulted in his suicide attempt. *Id.*

After carefully considering the entire record, the Court finds Defendants have met their initial burden of establishing that there is no genuine issue of material fact to be decided. Insofar as Plaintiff contends that Defendants failed to provide him with adequate or appropriate mental health treatment, his claim is belied by the record. To that end, Agosh's sworn declaration and treatment notes establish that during each of her twenty-four visits with Plaintiff, she performed, or attempted to perform, a medical evaluation of Plaintiff:

> Throughout the time period at issue, I continuously evaluated and treated plaintiff for his mental health issues, including suicidal thoughts, statements, and self harming behaviors. Not only did I personally evaluate and treat plaintiff, but I consulted with multiple members of the treatment team who also treated plaintiff, as well as other OMH licensed staff whether through consultation and when he was transferred to Five Points RCTP for evaluation by another treatment team. At no time did I act with deliberate indifference toward plaintiff regarding his mental issues and self-harming behaviors. The records in this matter conclusively establish that my treatment of plaintiff, and associated treatment decisions, were based upon comprehensive and constant evaluations of plaintiff and my professional judgment as a licensed master social worker.

(Dkt. No. 62-2 at ¶ 31.) For her part, Kalies declares:

> Plaintiff was seen and treated multiple times per day for his mental health issues and no actions were taken with deliberate indifference to plaintiff's ongoing complaints and threats of self-harm. In fact, just the opposite, as myself and the treatment team members treated plaintiff continuously and to the best of our abilities. Further, all treatment and associated decisions I made were based upon my professional judgment and plaintiff's condition with the intent of providing plaintiff with the best possible care.

(Dkt. No. 62-3 at ¶ 14.) Kalies further states that "[t]he records of my treatment and that of my co-workers establish that the treatment provided to plaintiff was appropriate and thorough at all times." *Id.* at ¶ 5. Additionally, Plaintiff was evaluated on a daily basis and received nursing visits at least twice per day to provide medication and to check on his welfare. (Dkt. No. 62-6 at 18, 29.) In sum, the declarations of Agosh and Kalies submitted in support of their motion for summary judgment establish that the treatment they provided to Plaintiff during the time period at issue was reasonable, appropriate, and based upon their professional judgment. (Dkt. No. 62-2 at ¶¶ 5, 31, Dkt. No. 62-3 at ¶¶ 5, 14.)

 **\*8**  In this case, although Plaintiff has submitted over 148 pages of opposition papers, Plaintiff does not offer the testimony or report of any other mental health professional to demonstrate the treatment provided was inappropriate or not responsive to any recognized risk of suicide, which may show that there is a genuine unresolved issue of material fact for trial. Instead, in conclusory and speculative terms, Plaintiff claims the medical records at issue were "fudged" and "falsified" and contain "conflicting" testimony that cannot be resolved on summary judgment. (*See, e.g.*, Dkt. No. 72-3 at 2, 3, 11, 27, 36.)

Moreover, as pointed out by Defendants in their reply, while Plaintiff contends that Defendants were involved in some sort of conspiracy with unknown members of the Auburn staff, at no point in Plaintiff's voluminous opposition papers does Plaintiff cite

Case 9:24-cv-00384-AJB-MJK    Document 36    Filed 01/21/26    Page 55 of 75

Randolph v. Kalies, Not Reported in Fed. Supp. (2021)

to or produce any admissible evidence or facts in support of his contention that Defendants acted with deliberate indifference to his Eighth Amendment rights and instead Plaintiff relies on unfounded conspiracy theories and speculation. (Dkt. No. 76 at 5. [9])

Further, while Plaintiff clearly takes issue with the medical attention and treatment he received at Auburn, prison officials have broad discretion in determining the nature and character of medical treatment afforded to inmates. *Sonds v. St. Barnabas Hosp. Corr. Health Servs.*, 151 F. Supp. 2d 303, 311 (S.D.N.Y. 2001) (citations omitted). A plaintiff's disagreement with prescribed treatment does not rise to the level of a constitutional claim. *Id.* As such, disagreements over medications, forms of treatment, the need for specialists, and the timing of medical intervention implicate medical judgment and do not rise to the level of a constitutional violation. *Sonds*, 151 F. Supp. 2d at 312 (citing *Estelle*, 429 U.S. at 107); *see also Sims v. Gorman*, 2012 WL 566875, at *5 (finding no deliberate indifference despite an eventual suicide attempt by the plaintiff because "the decisions made by mental health professionals 'are issues within a professional medical judgment' which does not form a basis for an Eighth Amendment claim"); *see also Robinson v. Taylor*, No. 9:16-CV-285 (DJS), 2019 WL 1429529, at *6 (N.D.N.Y. Mar. 29, 2019) ("In making a decision about whether [the plaintiff] could be medically cleared for SHU admission, [the doctor-defendant] was clearly exercising medical judgment.").

**\*9** As to Plaintiff's claims that he was "denied" medical treatment that he "felt" he "needed", and that Agosh was "indifferent" to his serious medical needs because, among other things, she denied Plaintiff access to medical treatment, specifically psychiatric care, Plaintiff's subjective belief that "more" should have been done for him is insufficient to establish deliberate indifference. *See Burgos*, 418 F. Supp. 2d at 265; *see also Sereika v. Patel*, 411 F. Supp. 2d 397, 407 (S.D.N.Y. 2006) ("allegations that [plaintiff] ... was not referred to a specialist ... do not state a claim for deliberate indifference"). As discussed, a "mere disagreement over the proper treatment does not create a constitutional claim." *Chance*, 143 F.3d at 70.

In this case, although Plaintiff claims he was "improperly" discharged from the RCTP to the SHU, the record demonstrates Plaintiff was discharged from the RCTP on multiple occasions based upon the comprehensive psychiatric evaluation by the Auburn treatment team, including Defendants, both of whom were exercising medical judgment. (Dkt. No. 62-2 at ¶ 31.) In any event, the record demonstrates that from Plaintiff's initial admission to the RCTP in August of 2017 through November of 2017, he spent virtually no time outside of the RCTP. (Dkt. No. 62-6 at 72.) Moreover, as the summary of the treatment records as outlined above show, Plaintiff was frequently evaluated and/or examined by Defendants or someone else on the treatment team.

Contrary to Plaintiff's assertions, that "[t]here is absolutely nothing in the record to support that there were even treatment team meetings, or how many people participated, if any did, in these alleged meetings[,]" (Dkt. No. 72-3 at 13), the sworn declarations of both Agosh and Kalies constitute such evidence. (Dkt. Nos. 62-2, 62-3.) Further, to the extent Plaintiff takes issue with Defendants relying on "security" and "staff" and other "hearsay information" (Dkt. No. 72-3 at 20, 33, 40), "medical opinions are often based upon the representations of third parties as to a patient's conduct or exhibition of symptoms[.]" *Zimmerman v. Racette*, No. 9:17-CV-375 (TJM/CFH), 2020 WL 1329138, at *7 (N.D.N.Y. Mar. 23, 2020) (granting summary judgment to doctor-defendant where, *inter alia*, the doctor-defendant's declaration indicated "staff informed [him] that while in the RCTP, plaintiff had been eating and sleeping well without any problems"). Here, like in *Zimmerman*, Defendants' opinions were based upon a number of factors including their personal observations during examinations and their discussions with Plaintiff; any references to third-party representations were not the central basis of Defendants' medical opinions.

In sum, the undisputed *material* facts demonstrate that Defendants consistently and reasonably treated Plaintiff's serious medical needs. While Plaintiff is clearly dissatisfied with his medical care and believes that additional treatment and care were warranted based on his complaints, threats of self-harm, and suicidal actions, the record evidence demonstrates that Defendants did not ignore, refuse, or fail to treat Plaintiff's conditions. Rather, as detailed above, the record evidence demonstrates that Defendants, together with other medical professionals at Auburn, were responsive to Plaintiff's mental health, threats of self-harm, and actions and were *not* deliberately indifferent to Plaintiff's serious medical needs. *See Gumbs v. Dynan*, No. 11-CV-857, 2012 WL 3705009, *14 (E.D.N.Y. Aug. 26, 2012) ("[A] medical judgment is not deliberate indifference just because it is not the inmate's preferred course of treatment.").

Case 9:24-cv-00384-AJB-MJK    Document 36    Filed 01/21/26    Page 56 of 75

**Randolph v. Kalies, Not Reported in Fed. Supp. (2021)**

**\*10**  Lastly, while Plaintiff claims deliberate indifference is established because "Defendants misjudged the plaintiff's psychological instability" and he "nearly succeeded in taking his own life," (Dkt. No. 72 at 60), contrary to Plaintiff's assertion, "[t]he fact that Plaintiff attempted suicide after medical professionals had examined him and found him not to be a risk of harm to himself does not itself establish deliberate indifference." *Robinson v. Taylor*, 2019 WL 1429529, at \*7 (finding no deliberate indifference where medical professionals released the plaintiff from the OBS unit who attempted suicide because mere fact that defendants "might have ultimately been wrong in [their] professional judgment does not support a showing of deliberate indifference").

After careful review of the record evidence, the Court finds no reasonable juror could conclude Defendants acted with deliberate indifference to Plaintiff's serious medical needs. Accordingly, the Court recommends granting Defendants' motion for summary judgment.

## IV. CONCLUSION

For the reasons stated above, Plaintiff fails to raise any triable question of material fact that Defendants were acting with deliberate indifference rather than in exercise of their medical judgment.

**WHEREFORE**, it is hereby

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 62) be **GRANTED**; and it is further

**ORDERED** that the Clerk provide to Plaintiff a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (*per curiam*).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. [10] Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

**All Citations**

Not Reported in Fed. Supp., 2021 WL 5605557

---

## Footnotes

1    Page references to documents identified by docket number are to the page numbers assigned by the CM/ECF docketing system maintained by the Clerk's Office. Paragraph numbers are used where documents identified by the CM/ECF docket number contain consecutively numbered paragraphs. Unless noted, excerpts from the record are reproduced exactly as they appear in the original and errors in spelling, punctuation, and grammar have not been corrected.

2    As set forth in Agosh's declaration, the determination to discharge inmates, including Plaintiff, from the RCTP is made by the treatment team with a final decision made by the treating psychiatrist/psychiatric nurse practitioner, or the Unit Chief. (Dkt. No. 62-2 at ¶ 8.)

Case 9:24-cv-00384-AJB-MJK    Document 36    Filed 01/21/26    Page 57 of 75

Randolph v. Kalies, Not Reported in Fed. Supp. (2021)

3      As Chief Forensic Officer, Kalies was charged with supervision of administrative and clinical services provided within the MHU. (Dkt. No. 62-3 at ¶¶ 1, 2.)

4      As set forth in Agosh's declaration, DOCCS is in charge of any contraband watch and makes any decision in regard to placing an inmate on a watch or removing the inmate from one. (Dkt. No. 62-2 at ¶ 8.)

5      Plaintiff testified he did not receive any mental health treatment, was not examined by a psychiatrist, and did not speak to any inmates at Five Points. (Dkt. No. 62-6 at 70-71.)

6      Plaintiff claims social worker Jane Doe, "cleared" him for SHU admission. (Dkt. No. 19 at 30-31.) In his opposition submission, Plaintiff states Jane Doe is "known now" as "Doe McLeod". (Dkt. No. 72 at 57.) To date, Plaintiff had not moved to substitute "Doe McLeod" in place of Jane Doe. (*See* Docket Report.)

7      Local Rule 56.1(b) requires the opposing party to file a response to the movant's statement of material facts. Under the rule, the response "shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in a short and concise statement, in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises." (*See* Dkt. No. 72-3.) Additionally, pursuant to Local Rule 10.1, a response memorandum of law is limited to 25 pages without leave of Court. Plaintiff's memorandum of law in opposition to Defendants' motion is 61 pages in length. (Dkt. No. 72.)

8      *See Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d. Cir. 2004) ("[I]n determining whether the moving party has met [the] burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts contained in the moving party's [Statement of Material Facts]. It must be satisfied that the citation to evidence in the record supports the assertion.") (citations omitted). As to any facts not contained in Defendants' Statement, in light of the procedural posture of this case, the Court is "required to resolve all ambiguities and draw all permissible factual inferences" in favor of Plaintiff. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

9      For example, Plaintiff "firmly believes ... [Agosh] was providing falsely contrived misinformation within her daily progress notes in order to make it appear as if she had been right in her clinical assessments of the plaintiff and within her professional judgments when making the recommendations to have the plaintiff cleared and discharged from the RCTP." (Dkt. No. 72-3 at 18-19.) Plaintiff further claims Agosh has a "history" and "pattern of behavior" of discharging inmates from the RCTP and her "only concern" was to "clear out the RCTP observation unit ... and she was dead set on doing that regardless of the likely consequences to which she had become clearly adapted to working around and explaining away were her usual explanations." *Id.* at 20. Plaintiff claims Defendants "acted in conjunction with one another, but not to provide the claimant with adequate or meaningful mental health care/treatment. They acted in conjunction with each other's personal views that plaintiff may have been attempting to manipulate the OMH system...." (Dkt. No. 72 at 59-60.) However, such conclusory statements of deliberate indifference and conspiracy do not create a genuine issue of material fact to survive summary judgment. *See, e.g., Morales v. Fischer*, 46 F. Supp. 3d 239, 250 (W.D.N.Y. 2014).

10     If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

---

**End of Document**                                                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:24-cv-00384-AJB-MJK    Document 36    Filed 01/21/26    Page 58 of 75

Robinson v. Taylor, Not Reported in Fed. Supp. (2019)

2019 WL 1429529
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Rendell ROBINSON, Plaintiff,

v.

James TAYLOR, et al., Defendants.

9:16-CV-285 (DJS)
|
Signed 03/29/2019

**Attorneys and Law Firms**

RENDELL ROBINSON, Plaintiff, Pro Se, 400 East 30th Street, New York, NY 10016.

HON. LETITIA JAMES, OF COUNSEL: RYAN L. ABEL, ESQ., Assistant Attorney General, New York State Attorney General, The Capitol, Albany, New York 12224, Attorney for Defendants.

## MEMORANDUM-DECISION and ORDER [1]

Daniel J. Stewart, U.S. Magistrate Judge

**\*1** Plaintiff, formerly an inmate in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"), brings this *pro se* action pursuant to 42 U.S.C. § 1983, alleging that Defendants violated his rights while incarcerated at the Great Meadow Correctional Facility. Dkt. No. 1, Compl. Presently pending is Defendants' Motion for Partial Summary Judgment. Dkt. No. 82. Defendants additionally filed various medical records in support of the Motion. Dkt. Nos. 83 & 84. Plaintiff made several submissions in opposition to the Motion. Dkt. Nos. 96, 98, 101, & 103. Defendants filed a Reply Memorandum of Law. Dkt. No. 102. For the reasons which follow, Defendants' Motion is granted.

## I. LEGAL STANDARD FOR SUMMARY JUDGMENT

Pursuant to FED. R. CIV. P. 56(a), summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any," that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ).

To defeat a motion for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial and cannot rest merely on allegations or denials of the facts submitted by the movant. FED. R. CIV. P. 56(c); *see also Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525-26 (2d Cir. 1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin,* 344 F.3d at 289 (citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983) and *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) ).

Case 9:24-cv-00384-AJB-MJK    Document 36    Filed 01/21/26    Page 59 of 75

Robinson v. Taylor, Not Reported in Fed. Supp. (2019)

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 742 (2d Cir. 1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994). Furthermore, where a party is proceeding *pro se*, the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994); *see also Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995). Nonetheless, summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## II. FACTUAL BACKGROUND

**\*2**  The allegations in the Complaint, as relevant to this Motion, concern events in March 2013 at Great Meadow Correctional Facility where Plaintiff was then confined, Compl. at ¶ 25, and are outlined in summary form below. This factual recitation sets forth the general timeline and substance of the allegations at issue in the present Motion. The Court acknowledges that many particular facts related to these events are clearly disputed by the parties. The parties dispute, for example, who was present during certain medical appointments, whether Plaintiff cooperated during his medical examinations, whether Plaintiff made genuine threats of self-harm, whether Plaintiff actually attempted to commit suicide on March 20th or merely feigned that attempt, and whether other inmates refused to testify at Plaintiff's disciplinary hearing. *Compare generally* Dkt. No. 82-1, Defendants' Statement of Material Facts ("Defs.' 7.1 Statement") *with* Dkt. No. 96, Plaintiff's Response to Defendants' Statement of Material Facts ("Pl.'s' 7.1 Statement"). In addressing Defendants' arguments in favor of the Motion, the Court has, as it must, construed those factual disputes in the light most favorable to the Plaintiff. *Quaratino v. Tiffany & Co.*, 71 F.3d 58, 64 (2d Cir. 1995). For the reasons set forth in Part III of this Opinion, however, many of those factual disputes do not present disputes as to "material facts" which preclude summary judgment.

### *1. Plaintiff's Medical Claims*

On March 12th, Plaintiff was involved in a use of force incident with a number of correctional staff. *Id.* at ¶¶ 53-65. [2]  Following that incident, Plaintiff was seen by Physician's Assistant Nesmith. Dkt. No. 82-3, Declaration of Fisher Nesmith ("Nesmith Decl."), ¶¶ 1-2. Nesmith's examination noted no apparent injuries and no need for treatment, although Plaintiff alleges that he was suffering pain and requested, but was denied, treatment for that pain. *Id.* at ¶ 3; Dkt. No. 96-1, Declaration of Rendell Robinson ("Robinson Decl."), ¶¶ 14-15.

Within Great Meadow Correctional Facility there is a Residential Crisis Treatment Program ("RCTP") for the treatment of inmates whose mental health condition necessitates special treatment. Dkt. No. 82-7, Declaration of Kalyana Battu ("Battu Decl."), ¶¶ 3-4. Observation cells within the RCTP are commonly referred to as the "OBS Unit." *Id.* at ¶ 3. Treatment staff in the RCTP are commonly mental health professionals employed by the New York State Office of Mental Health, not DOCCS. *See generally id.* After being seen by Nesmith, the decision was made to admit Plaintiff for observation in the RCTP rather than admit him to Great Meadow's Special Housing Unit ("SHU") because of potential threats of self-harm made by Plaintiff. *See id.* at ¶¶ 11-12. Over the course of the next several days Dr. Battu, who is a psychiatrist, and other OMH employees met with Plaintiff and evaluated his mental health. *Id.* at ¶ 1; 13-29.

On March 14th, Plaintiff was seen during sick call by Nurse Kimberly Lipka. Dkt. No. 82-4, Declaration of Kimberly Lipka ("Lipka Decl."), ¶ 2. Lipka maintains that she examined Plaintiff, who complained of ear pain, but noted no distress, no difficulty hearing, and no drainage from his ear. *Id.* at ¶¶ 3-4. Plaintiff contends that he requested medical treatment from Lipka, which was not provided. Compl. at ¶ 158. Later that day, Defendant Nesmith saw Plaintiff during emergency sick call. Nesmith Decl.,

at ¶ 8. At this time Plaintiff complained of eye, foot, and face pain, but Nesmith found no acute distress. *Id.* at 10; Declaration of Richard Lombardo ("Lombardo Decl."), Ex. A ("Pl.'s Dep.") at p. 209. Plaintiff requested x-rays, ice, and pain medication. *Id.* Nesmith did order that Plaintiff receive pain medication and that Plaintiff be admitted to the facility infirmary. Nesmith Decl. at ¶ 11. The following day, Dr. Raymond Maddocks saw Plaintiff in the infirmary. Dkt. No. 82-5, Declaration of Raymond Maddocks ("Maddocks Decl."), ¶¶ 2 & 4. Plaintiff complained of similar injuries and requested medication and that x-rays be done. Pl.'s Dep. at pp. 212-213. Maddocks observed no significant injuries and discharged Plaintiff from the infirmary. Maddocks Decl. at ¶¶ 4-5.

Between March 12th and March 20th, DOCCS and OMH staff had numerous interactions with Plaintiff assessing whether his mental health conditions required that he remain in the RCTP or be admitted to SHU, which security staff had directed following the March 12th use of force incident. Battu Decl. at ¶¶ 10-29; Dkt. No. 84. On March 20th, Dr. Battu directed that Plaintiff be discharged from the RCTP. Battu Decl. at ¶ 26. Dr. David Karandy, the DOCCS Facility Health Services Director at Great Meadow, reviewed Plaintiff's medical records and cleared Plaintiff for admission to SHU. Dkt. No. 82-6, Declaration of David Karandy ("Karandy Decl.") at ¶¶ 1-4.

 **\*3** Shortly after being admitted to SHU Plaintiff claims he attempted suicide. Pl.'s Dep. at pp. 219-221; Compl. at ¶ 140. Plaintiff was brought back to the facility infirmary where he claims that Karandy and Lipka denied him proper medical treatment. Compl. at ¶¶ 142-151. Karandy contends that he observed no injuries upon examining Plaintiff. Karandy Decl. at ¶¶ 8 & 10.

### *2. Plaintiff's Conditions of Confinement Claim*

The Complaint alleges that while housed in the OBS Unit, Plaintiff was denied food, showers, and access to mental health treatment over a period of approximately eight days. *See* Compl. at ¶¶ 79-80. Plaintiff claims that Defendants falsified the OBS logbook on those occasions when they denied him a meal or other services so that the logbook reflected that Plaintiff refused the meal, shower, or to see medical personnel. *Id.* During this time Corrections Officer Leon Renaud worked in the OBS Unit only four days. Dkt. No. 82-10, Declaration of Leon Renaud ("Renaud Decl."), ¶ 12. Each of those days, Defendant Renaud worked the 4 p.m. to midnight shift. *Id.* On those days, all meals, showers, and mental health treatment was provided prior to Renaud coming on duty in the OBS Unit. *Id.* at ¶¶ 14-38. Also, during that time period, the OBS Unit logbook does not reflect that Plaintiff refused any service while Renaud was on duty. Lombardo Decl., Ex. K.

### *3. Plaintiff's Due Process Claim*

On March 12th, Plaintiff was issued a misbehavior report by Sgt. James Taylor. Lombardo Decl. at Ex. L. That report charged Plaintiff with seven violations of facility rules regarding the use of force on that date. *Id.* Plaintiff was served with a copy of the report and received assistance from an employee prior to a hearing held regarding the report. Lombardo Decl., Ex. P at p. 3. At the hearing, Plaintiff requested certain documentary material, some of which was provided to him, and some of which he was advised did not exist. *Id.* at pp. 16-17 & 33. Plaintiff requested the testimony of three inmate witnesses, all of whom the hearing officer was told refused to testify. *Id.* at p. 24. At the completion of the hearing, Plaintiff was found guilty of five of the charges lodged in the misbehavior report and not guilty of the remaining two charges. Lombardo Decl., Ex. Q at p. 2. Plaintiff was sentenced to disciplinary confinement in SHU where he served approximately 150 days confinement prior to the disciplinary determination being reversed. Dkt. No. 82-11, Declaration of Donald Venettozzi, ¶¶ 8-9.

### III. ANALYSIS OF DEFENDANTS' MOTION

Thirteen Defendants remain in this action following the Court's initial review of the Complaint under 28 U.S.C. §§ 1915(e)(2) (B) and 1915A(b). Dkt. No. 7. Seven of those Defendants, Nesmith, Lipka, Maddocks, Karandy, Battu, Renaud, and Quinn seek

summary judgment here. The allegations against Nesmith, Lipka, Maddocks, Karandy, and Battu are that they were deliberately indifferent to Plaintiff's medical needs in violation of the Eighth Amendment. Plaintiff's claim against Defendant Renaud is also an Eighth Amendment claim, but relates to allegedly unlawful conditions of confinement. Plaintiff alleges that Defendant Quinn denied him due process in violation of the Fourteenth Amendment in the manner through which Quinn conducted a disciplinary hearing involving charges against Plaintiff.

### A. Medical Indifference Claims

 **\*4**  To state an Eighth Amendment claim for denial of adequate medical care, a prisoner must demonstrate that prison officials acted with "deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). "[T]he plaintiff must allege conduct that is 'repugnant to the conscience of mankind' or 'incompatible with the evolving standards of decency that mark the progress of a maturing society.' " *Ross v. Kelly*, 784 F. Supp. 35, 44 (W.D.N.Y. 1992) (quoting *Estelle v. Gamble*, 429 U.S. at 102, 105-06). To state a claim for denial of medical care, a prisoner must demonstrate (1) a serious medical condition and (2) deliberate indifference. *Farmer v. Brennan*, 511 U.S. 825, 834-35 (1994); *Hathaway v. Coughlin* ("*Hathaway I*"), 37 F.3d 63, 66 (2d Cir. 1994).

The first prong is an objective standard and considers whether the medical condition is "sufficiently serious." *Farmer v. Brennan*, 511 U.S. at 834 (quoting *Wilson v. Seiter*, 501 U.S. 294, 297 (1991) ). The Second Circuit has stated that a medical need is serious if it presents "a condition of urgency that may result in degeneration or extreme pain." *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (internal quotation marks and citation omitted). Among the relevant factors to consider are "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Id.* (quoting *McGuckin v. Smith*, 974 F.2d 1050, 1059-60 (9th Cir. 1992) ).

The second prong of the Eighth Amendment analysis is a subjective standard requiring a plaintiff to demonstrate that the defendant acted with the requisite culpable mental state similar to that of criminal recklessness. *Wilson v. Seiter*, 501 U.S. at 301-03; *Hathaway I*, 37 F.3d at 66. A plaintiff must demonstrate that the defendant acted with reckless disregard to a known substantial risk of harm. *Farmer v. Brennan*, 511 U.S. at 836. In order to rise to the level of deliberate indifference, the defendant must have known of and disregarded an excessive risk to the inmate's health or safety. *Wright v. Genovese*, 694 F. Supp. 2d 137, 154 (N.D.N.Y. 2010) (citing *Chance v. Armstrong*, 143 F.3d at 702). The defendant must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he or she must draw that inference. *Chance v. Armstrong*, 143 F.3d at 702 (quoting *Farmer v. Brennan*, 511 U.S. at 837).

### *1. Nesmith*

Following a use of force incident at Great Meadow, Plaintiff was brought to the facility infirmary for an examination which was conducted by Defendant Nesmith. Nesmith Decl. at ¶ 2. Nesmith observed no visible injuries and no acute distress on the part of Plaintiff during this examination. *Id.* at ¶ 3. Accordingly, no treatment was provided. *Id.*; *see also* Dkt. No. 83 at pp. 3-6. Plaintiff claims that he suffered significant injuries during the use of force, including contusions and lacerations, and was suffering from pain. Pl.'s Decl. at ¶ 14. The Court has reviewed photographs and video taken of Plaintiff after the incident, Lombardo Decl., Exs. C & D; Dkt No. 103, and concludes that there are no readily visible injuries which could create questions of fact regarding Defendant Nesmith's recitation of Plaintiff's injuries. The videos also clearly establish that, contrary to his claims, Plaintiff had the opportunity to advise Nesmith of pain he was suffering but did not do so. Lombardo Decl., Ex. C. Nesmith examined Plaintiff and made a medical judgment regarding Plaintiff's condition and need for treatment. In doing so he was not indifferent to any serious medical need.

**\*5** Nesmith saw Plaintiff again on March 14th at which time Plaintiff was complaining of head, ear, eye, face, neck, leg, and foot pain. Compl. at ¶ 158; Pl.'s Dep. at pp. 204-206. Plaintiff claims that Defendant failed to have x-rays taken to assess his condition. Compl. at ¶ 160; Pl.'s Dep. at p. 204. Nesmith's failure to order x-rays is no basis for relief as it is well established that "disagreements over medications, diagnostic techniques (*e.g.*, the need for X-rays), forms of treatment, or the need for specialists or the timing of their intervention, are not adequate grounds for a Section 1983 claim." *Sonds v. St. Barnabas Hosp. Corr. Health Servs.*, 151 F. Supp. 2d 303, 312 (S.D.N.Y. 2001); *see also Revels v. Corr. Med. Care, Inc.*, 2018 WL 1578157, at \*4 (N.D.N.Y. Mar. 28, 2018) ("A mere disagreement with a prescribed course of treatment is not sufficient to establish a violation of the Eighth or Fourteenth Amendment."); *Washington v. Westchester Cty. Dep't of Corr.*, 2014 WL 1778410, at \*6 (S.D.N.Y. Apr. 25, 2014) ("it is well-settled that the ultimate decision of whether or not to administer a treatment or medication is a medical judgment that, without more, does not amount to deliberate indifference.").

In addition, the record fails to support a claim of deliberate indifference given the treatment that was provided. Nesmith performed an examination of Plaintiff during which he observed no acute distress and normal vital signs. Nesmith Decl. at ¶ 10. Nesmith's nonetheless directed that Plaintiff be admitted to the facility hospital and prescribed Tylenol for his pain. *Id.* at ¶ 11; Lombardo Decl., Ex. B at p. 7. Such conduct clearly did not demonstrate that the defendant acted with reckless disregard to a known substantial risk of harm, *Farmer v. Brennan*, 511 U.S. at 836, but instead was aware of Plaintiff's complaints and admitted him to the hospital for further observation by medical staff. Doing so was not deliberately indifferent to Plaintiff's needs.

Accordingly, Defendant Nesmith's Motion for Summary Judgment is granted.

### *2. Lipka*

Plaintiff alleges that Nurse Lipka was deliberately indifferent to his medical needs on March 14, 2013. The record establishes that Plaintiff was seen by Defendant Lipka that day in his cell during sick call rounds. Plaintiff complained of ear pain. Lipka Decl. at ¶ 4. Nurse Lipka examined Plaintiff, found him to be in no acute distress with no difficulty hearing, and she noted no drainage from his ear. Dkt. No. 83 at p. 7. A serious medical need is "a condition of urgency that may result in degeneration or extreme pain." *Chance v. Armstrong*, 143 F.3d 698, 702. Plaintiff makes no allegation that his ear pain worsened with time or was causing him any other difficulty that would raise a question of fact regarding its seriousness. Plaintiff's alleged ear pain, especially in the absence of any difficulty hearing or other obvious sign of trauma to the ear, fails to establish a serious medical condition sufficient to establish an Eighth Amendment claim. *Chavis v. Chappius*, 2015 WL 1472117, at \*17 (W.D.N.Y. Mar. 31, 2015); *Jones v. Furman*, 2007 WL 894218, at \*10 (W.D.N.Y. Mar. 21, 2007) (noting that soreness, small abrasions on the nose, and swelling and pain behind the right ear and back of the head are not serious medical conditions).

Plaintiff also claims that Nurse Lipka was present on March 20th when he was brought to the facility infirmary. Plaintiff claims that Lipka failed to provide Plaintiff with ice and pain medication on that occasion. Even if true, this factual allegation alone is insufficient to establish deliberate indifference. "While Plaintiff did not receive his desired treatment including being provided with an ice pack and receiving pain medication, 'it is well-settled that the ultimate decision of whether or not to administer a treatment or medication is a medical judgment that, without more, does not amount to deliberate indifference.' " *Crouch v. Spaulding*, 2019 WL 1004539, at \*4 (N.D.N.Y. Jan. 24, 2019), *report and recommendation adopted*, 2019 WL 1004357 (N.D.N.Y. Mar. 1, 2019) (quoting *Washington v. Westchester Cty. Dep't of Corr.*, 2014 WL 1778410, at \*6 (S.D.N.Y. Apr. 25, 2014) ); *see also White v. Williams*, 2016 WL 1237712, at \*12 (N.D.N.Y. Jan. 11, 2016), *report and recommendation adopted*, 2016 WL 1239263 (N.D.N.Y. Mar. 29, 2016) (claim that inmate should have been given ice pack and pain medication "amounts to a dispute over the appropriate treatment, and does not state an Eighth Amendment claim.").

**\*6** For these reasons, Defendant Lipka's Motion for Summary Judgment is granted.

*3. Maddocks*

Plaintiff was seen in the facility infirmary on March 15, 2013 by Dr. Maddocks in relation to complaints of head, back, and neck pain after Plaintiff had been admitted to the infirmary the previous day by Nesmith. Maddocks Decl. at ¶ 2. Defendant reviewed Plaintiff's records, including notations that Plaintiff had been ambulating with no apparent difficulty, and examined Plaintiff and noted no apparent injury. *Id.* at ¶¶ 3-4. Maddocks, therefore, ordered Plaintiff discharged from the infirmary. *Id.* at ¶ 5. Plaintiff claims Maddox was indifferent to his medical needs because he failed to provide Plaintiff with ice and pain medication and also failed to order x-rays. Pl.'s Dep. at p. 212. As already discussed "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), [and] forms of treatment ... are not adequate grounds for a Section 1983 claim." *Sonds v. St. Barnabas Hosp. Corr. Health Servs.*, 151 F. Supp. 2d at 312. Given that Plaintiff's sole claim is that he requested particular treatment from Maddox that was not provided, he has failed to establish deliberate indifference. *Crouch v. Spaulding*, 2019 WL 1004539, at *4 (N.D.N.Y. Jan. 24, 2019), *report and recommendation adopted*, No. 2019 WL 1004357 (N.D.N.Y. Mar. 1, 2019); *Washington v. Westchester Cty. Dep't of Corr.*, 2014 WL 1778410, at *6.

Maddocks' Motion for Summary Judgment, therefore, is granted.

*4. Karandy*

Plaintiff alleges that on March 20, 2013 after being admitted to the Special Housing Unit he attempted suicide by trying to hang himself with torn bed sheets. Pl.'s Dep. at pp. 219-221. Plaintiff claims that Dr. Karandy was deliberately indifferent to his medical needs both in clearing Plaintiff for admission to SHU and then in failing to provide adequate treatment after the suicide attempt. *Id.* at pp. 219-224.

On March 20th, Plaintiff was housed in OBS, but had been cleared by OMH staff to be released to SHU. Karandy Decl. at ¶ 2. Plaintiff then needed to be cleared by DOCCS medical staff and Dr. Karandy, the Facility Health Services Director, undertook a review of Plaintiff's records. *Id.* at ¶¶ 2-3. In reviewing the records, Defendant found no evidence of significant or acute injury or ongoing medical problems that would preclude Plaintiff from being admitted to SHU and medically cleared him. *Id.* at ¶¶ 2-4. Plaintiff concedes that Dr. Karandy reviewed his records before clearing Plaintiff to be moved to SHU, but alleges that Defendant was aware of other medical facts that Plaintiff's claims should have precluded him from admission to SHU. Pl.'s 7.1 Statement at ¶ 10. Significantly, not included in the list of other relevant facts is any claim that Plaintiff was then suicidal. *Id.*; Compl. at ¶ 134. In making a decision about whether Plaintiff could be medically cleared for SHU admission, Dr. Karandy was clearly exercising medical judgment. "Issues of medical judgment cannot be the basis of a deliberate indifference claim where evidence of deliberate indifference is lacking." *Hill v. Curcione*, 657 F.3d 116, 123 (2d Cir. 2011). Apart from apparently disagreeing with the determination, Plaintiff offers no evidence that rather than exercising his judgment Karandy knew Plaintiff was not medically able to go to SHU but chose to clear him anyway and so he cannot establish deliberate indifference. *Id.*

 **\*7**  Shortly after his admission to SHU, Plaintiff was discovered by staff with torn bed sheets around his neck. He was transported from SHU to the infirmary at Great Meadow where he was seen by Dr. Karandy. Dr. Karandy examined Plaintiff and noted no apparent injuries, no cervical marks or deformities, and observed that Plaintiff could easily move his neck in multiple directions. Karandy Decl. at ¶¶ 8 & 10. Based on his examination, Dr. Karandy found that no further treatment was necessary, but referred Plaintiff back to the OBS Unit for further evaluation. Karandy Decl. at ¶ 10. Far from deliberate indifference, referring Plaintiff to the supervision of mental health staff following his alleged suicide attempt demonstrates that Defendant was not disregarding a known risk to Plaintiff's health and safety. *Atkins v. Cty. of Orange*, 372 F. Supp. 2d 377, 413 (S.D.N.Y. 2005) (no deliberate indifference when Plaintiff was referred to mental health housing unit after suicide attempt).

Dr. Karandy's Motion for Summary Judgment is granted.

Robinson v. Taylor, Not Reported in Fed. Supp. (2019)

Case 9:24-cv-00384-AJB-MJK    Document 36    Filed 01/21/26    Page 64 of 75

*5. Battu*

Dr. Battu is employed by OMH, not DOCCS, as a psychiatrist. Battu Decl. at ¶ 1. He worked as part of a treatment team evaluating Plaintiff's mental health during admissions to the OBS unit at Great Meadow between March 12 and March 25, 2013. *See generally* Battu Decl. Plaintiff alleges that Dr. Battu was deliberately indifferent to his medical needs during this time period because Plaintiff made multiple statements to Battu that if forced to return to SHU he would attempt suicide, but that Dr. Battu failed to provide appropriate treatment. Pl.'s Dep. at pp. 225-230.

The record establishes that Plaintiff spoke with Dr. Battu on multiple occasions. [3] They first met on March 13th and while Plaintiff suggested that he would try to kill himself on that date, Battu observed Plaintiff to have "no suicidal ideations, behaviors or plans; no acute warning signs or triggers; and no risk factors of suicide." Battu Decl. at ¶ 13. Dr. Battu concluded in his judgment that Plaintiff was not a harm to himself, but prescribed him medication and directed that he remain in the OBS Unit for continued observation. *Id.*

Defendant spoke with Plaintiff again the next day, again noting no suicidal ideations, behaviors or plans; no acute warning signs or triggers; and no risk factors of suicide. *Id.* at ¶ 15. Given his judgment that Plaintiff was not suicidal, Plaintiff was cleared for release from the OBS Unit. *Id.* Between March 14 and March 20, Plaintiff was regularly seen by DOCCS health facility and OMH Staff which ultimately resulted in Plaintiff's readmission to the OBS Unit. *Id.* at ¶¶ 16-25. Dr. Battu spoke again with Plaintiff on the morning of March 20th, the day after being brought back to the OBS Unit. *Id.* at ¶ 26. Dr. Battu again concluded that, based on his medical judgment, Plaintiff did not pose a danger to himself and could be released from the OBS Unit. *Id.*

Later in the day on March 20th, Plaintiff claims to have attempted suicide. Compl. at ¶ 140. The fact that Plaintiff attempted suicide after medical professionals had examined him and found him not to be a risk of harm to himself does not itself establish deliberate indifference. *Sonberg v. Niagara Cty. Jail*, 2012 WL 5617539, at *9 (W.D.N.Y. Nov. 15, 2012). The record establishes that medical providers attending to Plaintiff believed his threats of suicide were an attempt to manipulate staff to avoid being sent to SHU. *See* Battu Decl. at ¶ 38. In that regard this case is similar to *Sims v. Gorman* where mental health professionals named as defendants believed the plaintiff's threats of suicide "reflected attempts at manipulation rather than a true crisis." 2012 WL 566875, at *5 (W.D.N.Y. Feb. 21, 2012). The Court there found no deliberate indifference despite an eventual suicide attempt by the plaintiff because the decisions made by mental health professionals "are issues within a professional medical judgment" which does not form a basis for an Eighth Amendment claim. *Id.* (citing cases). That Defendant Battu "might have ultimately been wrong in his professional judgment does not support a showing of deliberate indifference." *Mercado v. City of New York*, 2011 WL 6057839, at * 5 (S.D.N.Y. Dec. 5, 2011). Given the record in this case of Battu's actions, including initially continuing Plaintiff for observation in the OBS Unit and prescribing him medication, Plaintiff fails to raise any triable question of fact that Defendant was acting out of indifference rather than in exercise of his judgment.

**\*8** For these reasons, Defendant Battu's Motion for Summary Judgment is granted.

### B. Conditions of Confinement Claim

Generally, to state a claim of inadequate prison conditions, a plaintiff must allege facts plausibly suggesting two things: (1) that the conditions of his confinement resulted in deprivation that was sufficiently serious such that the prisoner was denied the minimal civilized measure of life's necessities; and (2) that the defendant acted with deliberate indifference to the plaintiff's health or safety.

**Robinson v. Taylor, Not Reported in Fed. Supp. (2019)**

Case 9:24-cv-00384-AJB-MJK    Document 36    Filed 01/21/26    Page 65 of 75

*Sharpe v. Taylor*, 2009 WL 1743987, at *11 (N.D.N.Y. June 18, 2009) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Trammell v. Keane*, 338 F.3d 155, 161 (2d Cir. 2003) ). Plaintiff alleges that Defendant Renaud is liable under the Eighth Amendment because he denied Plaintiff meals, showers, and access to mental health treatment while Plaintiff was housed in the OBS unit in March 2013. Pl.'s Dep. at p. 178. While such claims potentially could give rise to an Eighth Amendment claim depending upon the circumstances, *see Butler v. Hogue*, 2010 WL 4025886, at *3 (N.D.N.Y. Oct. 13, 2010), the facts do no bear out Plaintiff's claims and as a result Defendant's Motion for Summary Judgment is granted.

During the time in question, Defendant Renaud worked in the OBS Unit on only four days, March 12, 13, 18, and 19, and always on the 4 p.m. to midnight shift. Renaud Decl. at 12; Defs.' 7.1 Statement at ¶ 17; Pl.'s 7.1 Statement at ¶ 17. Plaintiff claims that on these days, Renaud refused to provide Plaintiff with meals, showers, or access to mental health treatment providers and that any notations in facility log books indicating instead that Plaintiff refused these meals or services are falsified. Pl.'s Dep. at pp. 183-184. A review of those facility logbook entries for the time in dispute, however, reveals that on the days that Defendant Renaud worked all meals, showers, and mental health treatment had already been provided before Renaud came to work. *See generally* Lombardo Decl., Ex. K. On each of these days, for example, dinner was served before Renaud went to work at 4 p.m. *Id.* at pp. 8 (dinner served at 2:45 p.m. on March 12); 13 (dinner served at 2:50 p.m. on March 13); 35 (dinner served at 2:38 p.m. on March 18); 40 (dinner served at 2:40 p.m. on March 19). Similarly, the records show that on March 13 and March 18 showers were provided to inmates in the morning, again before Renaud's shift began at 4 p.m. *Id.* at pp. 9 & 31. [4] Finally, on each of the days in question inmates were seen by mental health providers in the morning. *Id.* at pp. 3, 4, 9, 31, & 36.

While the OBS logbook reflects a number of times when Robinson allegedly refused meals or showers, there is no such reference when Renaud was working. Lombardo Decl., Ex. K. There is no entry that Robinson refused any direction of staff during the four shifts Renaud worked. *See id.* As a result, even accepting as true for purposes of the Motion Plaintiff's claim that the logbook was falsified, there is no evidence in the record that Renaud refused Plaintiff a meal, shower, or mental health services. Plaintiff has thus failed to establish Renaud's involvement in any alleged constitutional deprivation and summary judgment is appropriate. *See, e.g., McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977) ("In this Circuit personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.").

### C. Due Process Claim

**\*9** In the context of an inmate disciplinary proceeding, due process requires that the inmate be: (1) afforded advance written notice of the charges against him; (2) provided a written statement supporting the disposition and reasons for the disciplinary action taken; (3) permitted to call witnesses and present documentary evidence; (4) entitled to a fair and impartial hearing officer; and (5) found guilty only if the disposition is supported by at least "some evidence." *Wolff v. McDonnell*, 418 U.S. 539, 563–64 (1974); *Kalwasinski v. Morse*, 201 F.3d 103, 108 (2d Cir. 1999) (citing cases). Additionally, because Plaintiff was confined to a special housing unit prior to his disciplinary hearing, he was also entitled to an employee assistant. *Clark v. Gardner*, 256 F. Supp. 3d 154, 170 (N.D.N.Y. 2017). The record here establishes that all of these due process requirements were complied with in Plaintiff's case. [5]

As to some of these requirements, there is no dispute. Plaintiff concedes that he received advance written notice of the charges. Defs.' 7.1 Statement at ¶ 18; Pl.'s 7.1 Statement at ¶ 18. There is also no dispute that Quinn provided Plaintiff with a copy of his written disposition of the charges. Defs.' 7.1 Statement at ¶ 22; Pl.'s 7.1 Statement at ¶ 22. Plaintiff also admits that he received assistance prior to the hearing. Defs.' 7.1 Statement at ¶ 19; Pl.'s 7.1 Statement at ¶ 19.

### *1. Denial of Witnesses and Documentary Evidence*

Plaintiff alleges that he was denied the testimony of three inmate witnesses. During the hearing Defendant Quinn discussed with Plaintiff the three inmates Plaintiff wished to have testify. Quinn advised Plaintiff that each refused to testify. The fact that

"Plaintiff's witnesses refused to testify on his behalf does not alter the fact that the was given the opportunity to call witnesses." *Weaver v. Gutwein*, 2014 WL 906150, at *4 (N.D.N.Y. Mar. 7, 2014) (citing cases). While it may be that under New York State regulations a hearing officer may be under an obligation to conduct a further inquiry regarding the refusal to testify in certain circumstances, *see, e.g., Moore v. Goord*, 281 A.D.2d 736, 737 (3d Dep't 2001); Lombardo Decl., Ex. R, it is established that as a matter of federal due process "a hearing officer is under no obligation to 'make an independent evaluation of the basis for the refusal to testify.' " *Smith v. Prack*, 2015 WL 5512951, at *7 (N.D.N.Y. Sept. 14, 2015) (quoting *Greene v. Coughlin*, 1995 WL 60020, at *14 (S.D.N.Y. Feb. 10, 1995) ) (citing cases); *see also Geraci v. Sticht*, 2017 WL 5501084, at *7 (W.D.N.Y. Nov. 16, 2017) ("courts in this Circuit have concluded that a hearing officer does not have to conduct an independent investigation before accepting an inmate-witness's refusal to testify.") (citing cases); *Jamison v. Fischer*, 2013 WL 5231457, at *3 (S.D.N.Y. July 11, 2013) ("an inmate has no constitutional claim simply because the hearing officer chooses not to inquire into a witness's reasons for refusing to testify"). Any error as a matter of state law in this regard, however, is not the basis for a federal constitutional claim against Quinn. *Caimite v. Venettozzi*, 2018 WL 6069458, at *5 (N.D.N.Y. Oct. 29, 2018), *report and recommendation adopted*, 2018 WL 6068414 (N.D.N.Y. Nov. 20, 2018) ("a violation of DOCCS procedures or state procedural rules regarding disciplinary hearings do not, alone, demonstrate a federal due process claim under § 1983").

**\*10** Plaintiff also claims that he was denied certain documentary evidence at the hearing, but the record does not support this allegation. Plaintiff requested an unusual incident report and video footage from his housing unit, both of which Quinn advised Plaintiff did not exist. Lombardo Decl., Ex. P at pp. 16-17 & 33; Pl.'s Dep. at p. 141. Plaintiff has not disputed that these documents do not exist and under well-established law "where the requested documents are found to be nonexistent, the inmate suffers no constitutional deprivation." *Mohamed v. Phelix*, 2017 WL 4326660, at *12 (N.D.N.Y. June 13, 2017), *report and recommendation adopted*, 2017 WL 4326520 (N.D.N.Y. Sept. 28, 2017) (citing *Mays v. Mahoney*, 1994 WL 48831, at *7 (S.D.N.Y. Feb. 14, 1994) ). Plaintiff did request photographs which were provided at the hearing. Pl.'s Dep. at p. 140. This record establishes that Plaintiff was not denied any documentary evidence at his disciplinary hearing.

### 2. Alleged Bias on the Part of the Hearing Officer

Plaintiff also claims that Quinn was not impartial in conducting the hearing. Plaintiff's claim of bias is largely conclusory. He contends that Quinn allowed Sergeant Taylor, the author of the misbehavior report against Plaintiff, to testify falsely. Pl.'s Dep. at pp. 130-31. He also contends that Quinn made certain off the record comments that he had to find Plaintiff guilty or certain unnamed individuals were "going to get on me." *Id.* at p. 133.

"An impartial hearing officer is one who 'does not prejudge the evidence' or an inmate's guilt." *Sowell v. Bullis*, 2016 WL 1696454, at *13 (N.D.N.Y. Mar. 25, 2016), *report and recommendation adopted*, 2016 WL 1700410 (N.D.N.Y. Apr. 27, 2016); *see also Allah-Kasiem v. Sidorowicz*, 2012 WL 2912930, at *11 (S.D.N.Y. July 17, 2012). Plaintiff's only claim that Quinn prejudged the matter relates to his alleged off the record statement that he had to find Plaintiff guilty. "Plaintiff's unsupported assertion is the only evidence of this statement. Where claims of bias are based on purely conclusory allegations, 'they are routinely dismissed.' " *Williams v. Chuttey*, 2017 WL 9673722, at *11 (N.D.N.Y. Sept. 5, 2017), *report and recommendation adopted*, 2018 WL 1413049 (N.D.N.Y. Mar. 21, 2018) (quoting *McAllister v. Call*, 2014 WL 5475293, at *12 (N.D.N.Y. Oct. 29, 2014) ); *see also Brown v. Dubois*, 2017 WL 9511165, at *3 (N.D.N.Y. Feb. 28, 2017), *report and recommendation adopted*, 2017 WL 1102746 (N.D.N.Y. Mar. 24, 2017) ("Claims of hearing officer bias are common in § 1983 cases by inmate plaintiffs, and where they are based on purely conclusory allegations, they are routinely dismissed."); *Lopez v. Whitmore*, 2015 WL 4394604, at *11 (N.D.N.Y. July 16, 2015) ("An inmate's own subjective belief that the hearing officer was biased is insufficient to create a genuine issue of material fact.").

The conduct of the hearing also suggests that Quinn was not biased against Plaintiff. Plaintiff requested to see photographs taken after the use of force which Quinn allowed Plaintiff to have access to despite finding that they were not relevant to the charges lodged against Plaintiff. Lombardo Decl., Ex. P at p. 33. More significantly, the record establishes that Plaintiff was charged with seven facility rule violations and found guilty of five and not guilty of two. Lombardo Decl., Ex. Q at p. 2. That Quinn

**Robinson v. Taylor, Not Reported in Fed. Supp. (2019)**

Case 9:24-cv-00384-AJB-MJK    Document 36    Filed 01/21/26    Page 67 of 75

found Plaintiff not guilty of two of the charges lodged against him is perhaps the "most important[ ]" evidence suggesting a lack of bias. *Allah-Kasiem v. Sidorowicz*, 2012 WL 2912930, at \*11.

### 3. Sufficiency of the Evidence

Plaintiff does not specifically challenge the sufficiency of the evidence relied upon by Quinn to support his determination, apart from his claim that Taylor testified falsely at the hearing.

 **\*11**    "The Supreme Court has clarified that judicial review of the written findings required by due process is limited to determining whether the disposition is supported by some evidence." *McDonald v. Zerniak*, 2016 WL 6581289, at \*5 (N.D.N.Y. Nov. 4, 2016) (internal quotation omitted). This requires the Court to determine "whether there was reliable evidence of the inmate's guilt." *Luna v. Pico*, 356 F.3d 481, 488 (2d Cir. 2004). The record establishes that Quinn relied principally on the misbehavior report and Taylor's testimony, which Quinn found to be credible. Lombardo Decl., Ex Q at p. 4. "As the hearing officer, Defendant [Quinn] was authorized to make credibility determinations." *Lopez v. Whitmore*, 2015 WL 4394604, at \*11; *see also Neree v. O'Hara*, 2011 WL 3841551, at \*19 (N.D.N.Y. July 20, 2011), *report and recommendation adopted*, 2011 WL 3841553 (N.D.N.Y. Aug. 29, 2011) (noting discretion afforded to hearing officers). The "some evidence" standard is satisfied when hearing testimony was consistent with the written misbehavior report. *See Hinton v. Prack*, 2014 WL 4627120, at \*15 (N.D.N.Y. Sept. 11, 2014) (citation omitted) ("some evidence" standard satisfied where the misbehavior report was made by the officer personally involved in the incident and was based upon his first hand observation and detailed account of the incident); *Kotler v. Daby*, 2013 WL 1294282, at \*10 (N.D.N.Y. Mar. 28, 2013) (same); *Creech v. Schoellkoph*, 688 F. Supp. 2d 205, 214 (W.D.N.Y. 2010) (same).

For these reasons, Defendant Quinn's Motion for Summary Judgment is granted.

### IV. CONCLUSION

For the reasons stated herein, it is hereby

**ORDERED**, that Defendants' Motion for Summary Judgment (Dkt. No. 82) be **GRANTED**; and it is further

**ORDERED**, that the following Defendants are Dismissed from this action: Nesmith, Lipka, Maddocks, Karandy, Battu, Renaud, and Quinn; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Memorandum Decision and Order upon the parties to this action.

### All Citations

Not Reported in Fed. Supp., 2019 WL 1429529

---

### Footnotes

1    The parties have consented, pursuant to 28 U.S.C. § 636(c), to have the undersigned handle all proceedings in this case. Dkt. No. 55.

**Robinson v. Taylor, Not Reported in Fed. Supp. (2019)**

Case 9:24-cv-00384-AJB-MJK    Document 36    Filed 01/21/26    Page 68 of 75

2        Defendants have not sought summary judgment as to the circumstances underlying that incident.

3        Plaintiff and Dr. Battu spoke via video conference, apparently because Dr. Battu worked at Central New York Psychiatric
         Center not Great Meadow. *See* Battu Decl. at ¶¶ 2 & 13.

4        These were the only days at issue when showers were provided.

5        Defendant also contends summary judgment is appropriate based on Plaintiff's failure to establish that he had a protected
         liberty interest. *See Sandin v. Connor*, 515 U.S. 472 (1995). Plaintiff alleges that while confined in SHU he was forced
         to use stained linens and a dirty mattress with holes in it. Pl.'s Decl. at ¶ 56. Plaintiff also alleges that he was denied
         recreation, showers, and the ability to clean his cell on occasions. *Id.* at ¶ 64. For purposes of this Motion, these
         allegations are sufficient to establish questions of fact precluding summary judgment on this ground. *Welch v. Bartlett*,
         196 F.3d 389, 393 (2d Cir. 1999) (finding questions of fact when SHU inmate's allegations of atypicality include
         receiving inadequate amounts of soap and cleaning materials and having a filthy mattress).

---

**End of Document**                                           © 2026 Thomson Reuters. No claim to original U.S. Government Works.



KeyCite Yellow Flag

Distinguished by  THOMAS BRYANT, Plaintiff, v. CHRISTOPHER MILLER, Super., Great Meadow C.F.; J. SCROGGY, Sr. Counselor, Great Meadow C.F.; SAVAGE, Corr. Officer, Great Meadow, C.F.; KAISER, Corr. Officer, Great Meadow C.F.; BOGARDUS, Corr. Officer, Great Meadow C.F.; D. COONRADT, Sgt., Great Meadow C.F.; McCLOSKEY, Therapist, MHU, Great Meadow C.F.; C. MEYERS, Nurse Prac., Great Meadow C.F.; MEAGHAN BERNSTEIN, Risk Mgmt. Specialist, CNYPC; DEBORAH J. McCULLOCH, Exec. Dir., CNYPC; JAMES STEED, Clinical Risk Reviewer, OMH; M. HAWK, Sgt., Great Meadow C.F.; and ANNE MARIE SULLIVAN, Comm'r, OMH, Defendants.,  N.D.N.Y.,  September 21, 2021

2012 WL 566875

Only the Westlaw citation is currently available.

United States District Court,

W.D. New York.

Nathaniel SIMS, Plaintiff,

v.

Dr. GORMAN, R. Powell, M. Stirk, K. Washington, and M. Kearney, Defendants.

No. 09–CV–6643 (MAT).

|

Feb. 21, 2012.

## Attorneys and Law Firms

Nathaniel Sims, Romulus, NY, pro se.

J. Richard Benitez, NYS Attorney General's Office, Department of Law, Rochester, NY, for Defendants.

## DECISION AND ORDER

MICHAEL A. TELESCA, District Judge.

### I. Introduction

**\*1**  Plaintiff Nathaniel Sims ("Sims" or "Plaintiff"), a New York State prison inmate who is proceeding *pro se* and *in forma pauperis,* commenced this action pursuant to 42 U.S.C. § 1983, complaining of a violation of his civil rights at the hands of prison officials and seeking recovery of compensatory and punitive damages. Sims contends that by their actions, defendants subjected him to cruel and unusual punishment, in violation of the Eighth Amendment to the United States Constitution, and violated his substantive right to due process. For the reasons set forth below, the Court finds that both Plaintiff's claims are subject to dismissal on the merits as a matter of law.

### II. Background

At all times relevant to this lawsuit, Sims was an inmate of the New York State Department of Correction and Community Services ("NYSDOCCS"), [1] housed at Wende Correctional Facility ("Wende") from August 28, 2009, until September 2, 2010. Because of his diagnoses of bipolar disorder and anti-social personality disorder, Sims received psychiatric care from the Mental Health Unit ("MHU") at Wende. Defendants Kevin Gorman, M.D. ("Dr.Gorman"); MHU Chief Rasheen Powell, ("Powell"); social worker Margaret Stirk, L.M.S.W. ("Stirk"); and therapist Kendra Washington ("Washington"), were, at all relevant times, employed by NYSDOCCS at Wende's MHU. They are collectively referred to hereinafter as "the MHU Defendants". Defendant Captain Martin Kearney ("Capt.Kearney") was, at all relevant times, a supervising corrections officer at Wende.

On August 28, 2009, at 8:41 a.m., Dr. Gorman observed in his treatment notes that Plaintiff has been placed in the Residential Crisis Treatment Program ("RCTP") because he was "threatening self harm by cutting up or hanging up if he had to remain in SHU [ ("special housing unit") ]." (000004). [2] Dr. Gorman remarks that Plaintiff ate dinner the previous day and had not harmed himself in RCTP, but was still refusing his medications. *Id.* Apparently, Plaintiff had been released from RCTP on August 27, 2009, but had been "readmitted rapidly as he threatened self harm...." *Id.*

With regard to Plaintiff's "SUICIDE RISK ASSESSMENT," Dr. Gorman noted that Plaintiff was "no longer agitated, [was] eating but refusing medication. He is not actively suicidal today [August 28th] ... He is released from RCTP." (000004) (capitals in original). At about 11:30 a.m. on August 28, 2009, the nursing progress report notes as follows: "Quiet, behavior has been uneventful, seen by treatment team, presents angry and states he has suicidal ideations, released from RCTP to SHU, no distress noted. 12 p.m. [Plaintiff discharged] from RCTP per Margaret Stark [sic]." (000007).

After his discharge from RCTP and prior to his admission to the SHU, Plaintiff was placed in a holding cell where he was examined by a psychologist, James A. Nesser, Ph. D. ("Dr.Nesser"). Dr. Nesser, who is not a defendant in this action, opined that it was "likely that [Sims's] statements regarding self-harm are instrumental [sic] to avoid being transferred to the SHU." (000008). Plaintiff declined to describe his suicide plans to Dr. Nesser, but "indicated that he did have a plan." (000008). Noting that Plaintiff was classified as "MHL 1S [sic], has a life sentence"; had been diagnosed with Bipolar Disorder as well as Anti–Social Personality Disorder; and had a history of three or more suicide attempts, Dr. Nesser concluded that Plaintiff "posed a significant threat of self-harm based on his level of distress, diagnoses, self-harm history, and his sentence." *Id.* When Dr. Nesser communicated this information to the administrative staff, he was informed that Powell, the MHU Chief had ordered Plaintiff not to be returned to RCTP based upon threats of self-harm alone. Dr. Nesser adhered to his recommendation that Plaintiff should be transferred to RCTP "due to the risk of self-harm." *Id.*

**\*2** Plaintiff was admitted to SHU and later that day fashioned a noose and hung himself from the cell bars at about 1:45 p.m. The following misbehavior report was filed in connection with the incident:

> [Plaintiff] removed his underware [sic] and began to rip them up. Sgt. Kintzel told him to give up the underware [sic] but the inmate refused. The Sgt. then ordered me to remain in front of the cell while he left the company. Simms [sic] then proceeded to tie the strips of cloth into a noose and attach it to the cell door bars. I immediately signaled CO Mack that Simms [sic] was attempting to hang-up. An extraction team (assembled earlier) came down the company, cell 5 was opened, the noose was cut with scissors, the inmate was removed from the cell. The inmate was placed on a stretcher, handcuffed and taken to the RMU [ ("Regional Medical Unit") ].

(000005). After that incident, Sims was placed in MHU for observation.

The treatment notes from later that day (August 29th) indicate that Sims "[was][q]uiet, lying in bed, refused to talk, using hand gestures, offers no complaint, no distress noted." (000006). At 6 p .m., the treatment notes indicate that Sims "continues in deso. [sic] calm & quiet. Lying on bunk much of the shift. Pleasant on approach. Cooperative with p.m. meds. No lethality voiced[;] will continue to assess." *Id.*

On September 2, 2009, Plaintiff was discharged from MHU and transferred to SHU. [3] Capt. Kearney issued a "deprivation order" which stated that pursuant to 7 N.Y.C.R.R. § 305.2, Sims was

being deprived of ... all in cell property except 1 MHU gown, 1 MHU matt [sic], 1 pair shower shoes because it is determined that a threat to the safety or security of staff, inmates or State property exists and for the fallowing specific reason (s): You continue to manipulate staff by threatening, feigning, and actually committing acts of self harm.

(000031). Plaintiff asserts that he was constantly cold and became ill with flu-like symptoms "due to [the] icy cold condition" in the stripped cell. Plaintiff's Rebuttal ("Pl.Reb.") at 7.

The following day, September 3, 2009, the deprivation order was modified: Plaintiff was given a toothbrush, undergarments, pen, paper, and two envelopes. (000031). On September 4, 2009, he was given a set of "greens" (pants and shirt), a mattress, two sheets, a pillow and pillowcase, and a blanket. *Id.* On September 8, 2009, all of his property was returned to him. (000032).

Plaintiff pursued his administrative remedies, seeking compensatory and punitive damages from NYSDOCCS based upon the failure to return him to RCTP after he voiced suicide threats to Dr. Nesser and the deprivation order. These applications were denied, and Plaintiff subsequently instituted this proceeding. Currently pending before the court is a motion for summary judgment filed on behalf of the defendants named in Sims's complaint. In their motion, argue that both claims are lacking in merit.

**\*3** Although defendants in their answer raised the affirmative defense that Sims had failed to exhaust his administrative remedies, they have not reasserted such an argument in their motion for summary judgment. Sims has submitted documentation substantiating his completion of the administrative grievance process, and it appears that his claims are exhausted.

For the reasons that follow, defendants' motion for summary judgment (Dkt.30) is granted and the complaint (Dkt.1) is dismissed in its entirety.

## III. Discussion

### A. General Legal Standards

#### 1. Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). In reaching this determination, the court must assess whether there are any material factual issues to be tried while resolving ambiguities and drawing reasonable inferences against the moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.

Unrepresented litigants are entitled to "a certain liberality with respect to procedural requirements." *Mount v. Book–of–the–Month Club, Inc.,* 555 F.2d 1108, 1112 (2d Cir.1977); *see also Moates v. Barkley,* 147 F.3d 207, 209 (2d Cir.1998) (*"[P]ro se litigants are afforded some latitude in meeting the rules governing litigation[.]"*) (citations omitted). Nevertheless, a *pro se* plaintiff must establish more than mere "metaphysical doubt as to the material facts [,]" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), in order to defeat a motion for summary judgment.

#### 2. 42 U.S.C. § 1983

Plaintiff brings this action pursuant to 42 U.S.C. § 1983, which provides in relevant part as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage of any state ..., subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights,

privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law ... for redress.

42 U.S.C. § 1983. To state a claim under § 1983, a plaintiff must allege (1) that the challenged conduct was attributable at least in part to a person acting under color of state law, and (2) that such conduct deprived plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States. *E.g., Dwares v. City of N.Y.,* 985 F.2d 94, 98 (2d Cir.1993).

### 3. Due Process
The Due Process Clause of the Fourteenth Amendment contains both a substantive component and a procedural component. *Zinernon v. Burch,* 494 U.S. 113, 125, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990). The substantive component "bars certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them[,]" *id.* (internal quotations marks and citation omitted), while the procedural component bars "the deprivation by state action of a constitutionally protected interest in life, liberty, or property ... *without due process of law* [,]" *id.* at 125–126 (internal quotations marks and citations omitted; emphasis in original). A substantive due process violation "is complete when the wrongful action is taken," while a procedural due process violation "is not complete unless and until the State fails to provide due process," which may occur after the wrongful action in question. *Id.*

### 3. Eighth Amendment
 **\*4** The Eighth Amendment of the United States Constitution prohibits the infliction of "cruel and unusual punishments[,]" U.S. CONST., amend VIII, which "includes punishments that 'involve the unnecessary and wanton infliction of pain.' " *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (quoting *Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)). In order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove "deliberate indifference to [his] serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). This standard includes both subjective and objective components. *Chance,* 143 F.3d at 702 (citing *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (explaining that the alleged deprivation of medical care must be, in objective terms, "sufficiently serious", and must be committed by a defendant acting "with a sufficiently culpable state of mind")). "An official acts with the requisite deliberate indifference when that official 'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' " *Chance,* 143 F.3d at 702 (quoting *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)).

Proof of deliberate indifference may be found where a prison official or employee "intentionally den[ies] or delay[s] access to medical care or intentionally interfer[es] with the treatment once prescribed." *Estelle v. Gamble,* 429 U.S. at 104–05. Deliberate indifference requires intentional or criminally reckless conduct; negligence or even gross negligence will not suffice. *See Farmer,* 511 U.S. at 835–40. The totality of an inmate's medical care must be considered in order to determine whether a prison official has acted with deliberate indifference to serious medical needs. *Gutierrez v. Peters,* 111 F.3d 1364, 1375 (7th Cir.1997).

### B. Analysis of Plaintiff's Claims

### 1. Deliberate Indifference to Plaintiff's Mental Health Needs by the MHU Defendants in Violation of the Eighth Amendment
Plaintiff alleges that on August 28, 2009, the MHU Defendants were deliberately indifferent to his medical needs when they refused to return him to RCTP and allowed him to be placed in SHU despite his history of suicide attempts and the fact that he threatened to harm himself if placed in SHU. Defendants argue that mere differences of opinion between the doctor and the inmate over the inmate's treatment are insufficient to state an Eighth Amendment claim. *See Estelle v. Gamble,* 429 U.S. at 106 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."); *Dean v. Coughlin,*

804 F.2d 207, 215 (2d Cir.1986) ( "The Constitution does not command that inmates be given medical attention that judges would wish to have for themselves.").

The Court finds that Sims's diagnosed mental illnesses (bipolar and antisocial personality disorders), and concomitant suicidal ideation and actual suicide attempts, constituted a serious medical need. However, the Court does not find that on this record, the MHU Defendants acted with "deliberate indifference" for purposes of an Eighth Amendment claim. Although one medical professional, Dr. Nesser, believed that Sims should be placed in psychiatric observation in MHU because he was voicing suicidal threats immediately before being placed in SHU, the MHU Defendants, who had been treating and interacting with Sims for a much longer period of time while he was in RCTP, disagreed.

**\*5** The MHU Defendants, after treating Plaintiff and observing that he was psychiatrically stable, declined to place Plaintiff in RCTP based solely on his suicide threats. The MHU Defendants likely surmised that Plaintiff's statements to Dr. Nesser, made just before being placed into an SHU cell, reflected attempts at manipulation rather than a true crisis. [4] Even Dr. Nesser found that Sims's suicide threats were manipulative and made in an attempt to prevent his placement in SHU.

Federal courts faced with similar claims have noted that "[w]hether to place a prisoner on suicide watch and what level of precaution to take with an inmate are issues within a professional medical judgment." *Gay v. Hammersley,* No. 08–59, 2009 WL 596114, at \*6 (S.D.Ill. Mar.6, 2009) (citing *Estate of Cole by Pardue v. Fromm,* 94 F.3d 254, 261 (7th Cir.1996) (noting the distinction between a "medical judgment" and deliberate mistreatment: "a medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment" and "[a]t most it is medical malpractice ...")); *see also Hott v. Hennepin Cnty., Minn.,* 260 F.3d 901, 905 (8th Cir.2001) ("We have generally treated allegations that officials failed to prevent jail suicides as claims for failure to provide adequate medical treatment."); *Simmons v. Navajo Cnty., Ariz.,* 609 F.3d 1011, 1019 (9th Cir.2010) ("We make no determination as to whether Nurse Jones's decision to transfer Jasper from Level I suicide watch to Level II was medically prudent under the circumstances.... Although in hindsight, Nurse Jones may not have made the best or even the proper medical decisions[.]"); *Starks v. Couch,* No. 08CV407, 2009 WL 331357, \*2 (S.D.Ill. Feb.11, 2009) ("Defendant Rhodes's precautionary measure of placing Starks on suicide watch to prevent him from harming himself was a discretionary function done in good faith as a mental health professional." "It is well established that mere differences in opinion regarding medical treatment do not give rise to an Eighth Amendment violation." *Dean,* 804 F.2d at 215; *see also Gamble,* 429 U.S. at 107; *Corby v. Conboy,* 457 F.2d 251, 254 (2d Cir.1972). "Negligence, even if it constitutes medical malpractice, does not, without more, engender a constitutional claim." *Chance,* 143 F.3d at 703.

Here, although Sims disagreed with the MHU Defendants' decision not to return him to RCTP for psychiatric observation, this disagreement is not an actionable Eighth Amendment claim for purposes of 42 U.S.C. § 1983. *Accord Gay,* 2009 WL 596114, at \*6 ("While Plaintiff disagreed with Defendant's decision not to place him on suicide watch ..., that does not give rise to civil rights claim for violation of his Eighth Amendment right.") (citing *Garvin v. Armstrong,* 236 F.3d 896, 897 (7th Cir.2001) ("[A] difference of opinion as to how a condition should be treated does not give rise to a constitutional violation.") An inmate does not get to decide on a particular course of treatment. *Meriweather v. Faulkner,* 821 F.2d 408, 413 (7th Cir.1987)); *see also* 2009 WL 596114, at \*14 ("Simply put, an inmate does not have a constitutionally protected right to be placed on crisis watch at any time he chooses."). The fact that the MHU Defendants' opinion conflicted with that of another medical professional does not chage the result. *See Estate of Cole,* 94 F.3d at 262 ("Mere differences of opinion among medical personnel regarding a patient's appropriate treatment do not give rise to deliberate indifference.") (citing *Estelle v. Gamble,* 429 U.S. at 107; *White v. Napoleon,* 897 F.2d 103, 109–10 (3d Cir.1990)).

**\*6** In a similar case involving a prison doctor's failure to take sufficient precautions to prevent an inmate from committing suicide, the Seventh Circuit held that "[L]iability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment." *Id.* (footnotes omitted).

Considering the totality of Sims's treatment by the MHU Defendants and the timing of his suicide threats, the Court finds as a matter of law that even if the MHU Defendants' treatment decision was erroneous, deliberate indifference cannot be inferred because the decision was not "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment," *Estate of Cole,* 94 F.3d at 262 (citing *Youngberg v. Romeo,* 457 U.S. 307, 322–23, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982)). Accordingly, Plaintiff's first cause of action alleging an Eighth Amendment violation against the MHU Defendants is dismissed. *See Estate of Cole,* 94 F.3d at 263 (prison doctor's diagnosis of pre-trial detainee (who asphyxiated himself with a plastic bag) as a "potential suicide risk" rather than as a "high suicide risk" requiring greater precautions was such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the doctor did not base her diagnosis on such judgment; thus, plaintiffs cannot establish that the doctor was deliberately indifferent to the decedent's serious medical needs).

### 2. Substantive Due Process Violation by Captain Kearney

As his second cause of action, Plaintiff contends that Captain Kearney violated his constitutional rights by ordering that he be placed in a " 'stripped cell' with nothing but a half-inch 'mat'[.]" Pl. Reb. at 6. In his complaint, Plaintiff characterizes this cause of action as a due process claim arising under the Eleventh Amendment. *See* Dkt. # 1. Defendants have interpreted his allegations as sounding in substantive due process, and the Court agrees with this approach.

"Substantive due process protects individuals against government action that is arbitrary, ... conscience-shocking, ... or oppressive in a constitutional sense, ... but not against constitutional action that is incorrect or ill-advised." *Lowrance v. Achtyl,* 20 F.3d 529, 537 (2d Cir.1994) (internal quotation marks and citations omitted). "Very few conditions of prison life are 'shocking' enough to violate a prisoner's right to substantive due process." *Samms v. Fischer,* No. 9:10–CV–0349 (GTS/GHL), 2011 WL 3876528, at *12 (N.D.N.Y. Mar.25, 2011) (citing *Sandin v. Conner,* 515 U.S. 472, 479 n. 4, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418, (1995) (providing only two examples of the type of condition "shocking" enough to offend substantive due process principles-the transfer to a mental hospital and the involuntary administration of psychotropic drugs)).

 **\*7** The first step in a substantive due process analysis is to identify the precise constitutional right at stake. *Lowrance,* 20 F.3d at 537 (citing *Collins v. City of Harker Heights,* 503 U.S. 115, 125, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992)). Here, the Court assumes for the sake of argument that Plaintiff had a substantive due process right to possess the property in question (e.g., clothing, normal bedding, and other items of personal property) unless grounds existed for Captain Kearney to deny Plaintiff access to them. *E.g., Smith v. Burge,* No. 9:03–CV–0955 (LEK/GHL), 2006 WL 2805242, at *8 (N.D.N.Y. Sept.28, 2006) (citing 7 N.Y.C.R.R. § 305.2(a) ("An order depriving an inmate of a specific item ... may be issued when it is determined that a threat to the safety or security of staff, inmates, or State property exists ...."); *see also* 7 N.Y.C.R.R. § 305.2(e) ("Any deprivation order depriving an inmate of minimum standard items (e.g., bedding, clothing, etc.) for 'mental health' or 'psychiatric' reasons must be approved by an appropriate clinical professional or, in their absence, by the ranking facility health service professional.").

Sims contends that Captain Kearney's deprivation order citing safety and security concerns was unfounded given MHU's assessment that he was no longer a threat to himself and could be placed in a regular cell in SHU. Therefore, Sims argues, the deprivation was not authorized under 7 N.Y.C.R.R. § 305.2(a). *See* Pl. Reb. at 6–7. Sims also asserts that Captain Kearney's deprivation order could not be justified under 7 N.Y.C.R.R. § 305.2(e) because individuals in the MHU "assured [him] that it wasn't a decision by [a] mental health or medical professional," Pl. Reb. at 7, to issue the deprivation order.

However, "it is not material to a substantive due process claim whether an inmate's conduct 'in fact gave [a corrections officer] reasonable grounds to believe that [the inmate] posed a threat to the order of the [correctional] facility or whether [the alleged deprivation sustained by the inmate] therefore in fact violated [a particular DOCS rule or regulation] [,]' " *Smith v. Burge,* 2006 WL 2805242, at *9 (quoting *Lowrance,* 20 F.3d at 537, n. 6) ( "We express no view as to whether [ the inmate]'s conduct in fact gave [the officer] reasonable grounds to believe that [the inmate] posed a threat to the order of the facility or whether [the inmate]'s administrative confinement therefore in fact violated section 251–1.6(a). These issues, which rely on facts that may be disputed, are not material to [the inmate]'s due process claims.").)

The Court agrees with Plaintiff that the manner in which the deprivation order was written (noting that Plaintiff "continue[s] to manipulate staff by threatening, feigning and actually committing acts of self harm") could be interpreted as retributive. In addition, it is arguable that 7 N.Y.C.R.R.R. § 305.2(e) may not apply when a safety concern does not affect inmates other than the one who is suffering the deprivation order, and that *id.,* § 305.2(e), which permits deprivations for psychiatric or mental reasons, instead should have applied here. However, whether or not Captain Kearney in fact violated 7 N.Y.C.R.R. § 305.2 is not dispositive because the standard for substantive due process claims is whether the complained-of conduct was arbitrary or conscienceshocking. *See Smith v. Burge,* 2006 WL 2805242, at *9 (citing *Lowrance,* 20 F.3d at 537). Captain Kearney arguably could have concluded that in light of Sims's recent suicide attempt upon being moved from MHU to SHU, it would be prudent to deprive Sims of the means to make another such attempt and observe how he adjusted to his new situation for a period of time. Furthermore, the total deprivation only lasted for one day; Plaintiff was given a toothbrush, undergarments, pen, paper, and two envelopes on September 3, 2009. On September 4, 2009, he was given a set of "greens" (pants and shirt), a mattress, two sheets, a pillow and pillowcase, and a blanket. On September 8, 2009, all of his property was returned to him.

 **\*8** Given Plaintiff's history and the brief length of the deprivation, the Court concludes that, as matter of law, Captain Kearney's conduct was not arbitrary or conscience-shocking in the constitutional sense. In other words, Plaintiff has failed to create a triable question of fact as to whether the state action-the deprivation order-was arbitrary in the constitutional sense and therefore violative of substantive due process. Accordingly, the Court grants summary judgment dismissing the second cause of action involving Captain Kearney.

## IV. Conclusion

For the foregoing reasons, defendants' motion for summary judgment (Dkt.# 30) is granted and Plaintiff's complaint (Dkt.# 1) is dismissed in its entirety with prejudice. The Clerk of the Court is directed to close this case.

**SO ORDERED.**

## All Citations

Not Reported in F.Supp.2d, 2012 WL 566875

---

### Footnotes

1    On April 1, 2011, New York State Department of Correctional Services and Parole merged together into one agency now known as New York State Department of Corrections and Community Supervision.

2    Numbers in parentheses refer to the Bates-numbered documents attached as Exhibits A and B to Defendants' Appendix to Local Rule 56.1 Statement of Material Facts.

3    Defendants inexplicably have omitted from their Statement of Material Facts any description of the subsequent events-such as Sims's discharge from MHU and transfer to SHU. Nor have defendants described the facts giving rise to Plaintiff's complaints against Capt. Kearney. The Court has pieced together the narrative from Plaintiff's Rebuttal to Defendants' Summary Judgment Motion ("Pl.Reb.") and the Exhibits to Defendants' Appendix.

4    In similar cases, medical professionals have observed that placing inmates on suicide watch or in crisis-care simply at their behest is counter-therapeutic. *See Gay v. Hammersley,* 2009 WL 596114, at *7.

---

    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2026 Thomson Reuters. No claim to original U.S. Government Works.